United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PATRICK DANG, on behalf of himself and all others similarly situated, <br><br>           Plaintiff, <br><br>    v. <br><br> SAN FRANCISCO FORTY NINERS, et al., <br><br>           Defendants. | Case No.: 5:12-CV-5481 EJD <br><br> **ORDER DENYING DEFENDANTS' MOTION TO DISMISS** <br><br><br> **[Re: Docket No. 29]** |

      Plaintiff Patrick Dang ("Plaintiff"), an individual, has brought this putative class action against the National Football League ("NFL"), its member clubs, National Football League Properties, Inc. ("NFLP"), and Reebok International, Ltd. ("Reebok")—collectively "Defendants." Plaintiff Dang has alleged that Defendants have engaged in anticompetitive behavior and entered into agreements in violation of state and federal antitrust laws. The allegedly unlawful conduct relates to agreements about the licensing of NFL's and NFL teams' intellectual property for use in apparel for consumer retail.

      Presently before the Court is Defendants' Motion to Dismiss Plaintiff's Complaint. The Court found this matter suitable for decision without oral argument pursuant to Civil Local Rule 7–1(b) and previously vacated the hearing date. For the reasons explained below, Defendants' Motion to Dismiss is DENIED.

**I.      Background**

      The allegations contained in this section are taken largely from the Complaint, which was filed by Plaintiff on October 24, 2012. <u>See</u> Compl., Docket Item No. 1.

      Defendant NFL is an unincorporated association founded in 1963 comprising, through their respective owners, the various football teams in the NFL. <u>Id.</u> ¶ 37. Defendant NFLP is a corporation established by the NFL and NFL teams for the purpose of licensing the trademarks, logos, and other branding of NFL teams and the NFL. <u>Id.</u> ¶ 36. Defendant Reebok is a corporation that markets sports apparel. <u>Id.</u> ¶ 38.

      Plaintiff bases his suit on an agreement that took place in December 2000. During that time, the individual NFL teams, the NFL, and the NFLP jointly agreed to grant Reebok an exclusive license to manufacture NFL-branded apparel.[1] <u>Id.</u> ¶ 63. The agreement, Plaintiff argues, marked a shift in the NFL's licensing landscape. <u>Id.</u> Before December 2000, he argues, NFL-related licensees had to compete against one another in order to obtain an NFLP license for the NFL or a particular NFL team. <u>Id.</u> ¶ 59. He also contends that the individual NFL teams competed against each other for the licensing of their own intellectual property.[2] <u>Id.</u> ¶¶ 63–64. This arena of competition among both the individual NFL teams and the prospective licensees, Plaintiff argues, "ensured that the market for such apparel was subject to free market forces that served to provide the ultimate consumer of such apparel with superior product selection and competitive prices." <u>Id.</u> ¶ 62.

      Plaintiff alleges that in November 2011, he purchased an item of apparel bearing an NFL team's logo and other intellectual property from a sports merchandise retailer. <u>Id.</u> ¶¶ 5, 76. Plaintiff asserts that he was an "indirect purchaser" of this apparel product bearing the NFL team's intellectual property. <u>Id.</u> He argues that due to the allegedly anticompetitive and unlawful

---

[1] Defendants contend that Reebok's licensing rights were exclusive in some, but not all, apparel categories. <u>See</u> Defs.' Mot. to Dismiss. 1.

[2] Defendants appear to disagree with this notion and argue that the NFL and the NFL teams have collectively licensed their logos and other trademarks for use in consumer apparel products for at least fifty years. <u>See</u> Defs.' Mot. to Dismiss. 1.

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

agreement among the Defendants, he paid an "anticompetitive overcharge for his purchase." Id.

¶ 5.

Plaintiff's Complaint brings forth four causes of action. Count I alleges that the December 2000 agreement is a horizontal agreement in restraint of trade that violates California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 et seq. Count II alleges that the agreement also constitutes a vertical agreement in restraint of trade unlawful under the Cartwright Act. Count III alleges that Defendants' conduct is unfair and unlawful in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq. These three Counts are brought on behalf of a class of California indirect purchasers of apparel products branded with NFL team intellectual property. Count IV alleges a violation of the federal Sherman and Clayton Antitrust Acts, 15 U.S.C. §§ 1 et seq. This Count is brought on behalf of a nationwide class of indirect purchasers and seeks injunctive relief pursuant to 15 U.S.C. § 26.

Defendants filed the Motion to Dismiss presently before the Court on February 5, 2013. See Docket Item No. 29. Defendants seek dismissal of the Complaint on the grounds that Plaintiff fails to allege a proper relevant market, that Plaintiff lacks antitrust standing, and that Plaintiff fails to state claims upon which relief can be granted.

## II.     Legal Standard 12(b)(6) Motion to Dismiss

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted). A complaint which falls short of the Rule 8(a) standard may therefore be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008).

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

When deciding whether to grant a motion to dismiss, the court must accept as true all "well-pleaded factual allegations." Ashcroft v. Iqbal, 556 U.S. 662 (2009). The court must also construe the alleged facts in the light most favorable to the plaintiff. Love v. United States, 915 F.2d 1242, 1245 (9th Cir. 1988). However, "courts are not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555. Moreover, anything beyond the pleadings generally may not be examined. Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). But "material which is properly submitted as part of the complaint may be considered." Twombly, 550 U.S. at 555.

### III.   Discussion

#### A.   Relevant Market Antitrust Requirement

Three of Plaintiff's four causes of action directly allege violations of California and federal antitrust laws: Counts I and II allege violations of the Cartwright Act, and Count IV alleges a violation of the Sherman and Clayton Acts. The remaining cause of action—Count III, violation of the UCL—is based on the same allegedly unlawful anticompetitive activity that also forms the basis of the direct antitrust claims. As such, the Court will apply the standard antitrust violation analysis to all of Plaintiff's causes of action. The Court also notes that the Cartwright Act is "California's antitrust law" and "was modeled after the Sherman Act." County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1160 (9th Cir. 2001). Accordingly, analysis under the Cartwright Act "mirrors the analysis under federal law." Id. (citing Nova Designs, Inc. v. Scuba Retailers Ass'n, 202 F.3d 1088, 1091 (9th Cir. 2000), and Mailand v. Burckle, 20 Cal. 3d 367, 375 (1978)); see also Colonial Med. Grp., Inc. v. Catholic Health Care W., 444 F. App'x 937, 939 (9th Cir. 2011) ("[T]he requirements for a claim under California's Cartwright Act are identical to those for a claim under the Sherman Act"). As such, the Court will apply the same analysis to both the federal and state antitrust claims.

In order to state a valid antitrust claim, a plaintiff must allege that the defendant has market power within a legally cognizable relevant market. Newcal Indus., Inc. v. Ikon Office Solution, 513

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

F.3d 1038, 1044 (9th Cir. 2008). "[T]he plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." Id.; see also Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1063 (9th Cir. 2001) ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim."). A plaintiff must delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly. Bhan v. NME Hospitals, Inc., 929 F.2d 1404, 1413 (9th Cir. 1991). This requirement applies both to the California and federal antitrust law claims. See Cnty. of Tuolumne, 236 F.3d at 1160. Also, for purposes of this Order, there is no need to distinguish or differentiate among Plaintiff's several antitrust claims; its market allegations are either sufficient or insufficient. See Newcal, 513 F.3d at 1044 n.3.

    While the definition of a "relevant market" for antitrust purposes is typically a factual inquiry, certain legal principles govern the definition, and antitrust claims may be dismissed under Rule 12(b)(6) if the plaintiff's "relevant market" definition is facially unsustainable. Id. at 1045 (citing Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436–37 (3d Cir. 1997)); see also Apple, Inc. v. Psystar Corp., 586 F. Supp. 2d 1190 (N.D. Cal. 2008). Generally, the relevant market must be a "product market." Newcal, 513. F.3d at 1045 (emphasis in original). Such a market is "composed of products that have reasonable interchangeability for the purposes for which they are produced." United States v. E.I. du Pont De Nemours & Co., 351 U.S. 377, 404 (1956); see also Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."). In other words, a market is "the group of sellers or producers who have the actual or potential ability to deprive each other of significant levels of business." Rebel Oil Co., Inc. v. Atl. Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995) (internal citation and quotation marks omitted); see also du Pont, 351 U.S. 377 at 395 ("[N]o more definite rule can be declared than that the commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade or commerce.").

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

In this case, Plaintiff contends that there are two antitrust markets relevant to the alleged anticompetitive activity:

> The first is the United States market for the licensing of the trademarks, logos, and other emblems (collectively "the Intellectual Property") of individual NFL teams for use in apparel. The second is the United States retail market for apparel bearing the Intellectual Property of any NFL team.

Compl. ¶ 45. Essentially, Plaintiff proffers that there is a market solely for NFL apparel in which the individual NFL teams compete against one another for, among other things, consumers of team apparel and paraphernalia featuring the logos and other intellectual property of the teams. Plaintiff alleges that "[t]he individual NFL teams compete against one another to attract the following of these consumers as new fans and as new purchasers of team apparel." Id. ¶ 52. The market, Plaintiff argues, is separate and distinct from general apparel and sports apparel markets because "[p]rofessional football has a fan base that is distinct from fans for other sports or from amateur football." Id. ¶ 47. Plaintiff also contends that the notion that NFL products are separate and distinct extends to the market for NFL licenses for use in apparel. Id.

In support of their Motion to Dismiss, Defendants argue that these alleged markets, which are limited solely to NFL apparel licenses and NFL apparel, are single-brand and trademark-based; as such, they cannot constitute a plausible market. Defendants illustrate this point with, as an example, the contention that a cap featuring a trademark of an NFL team is interchangeable with a cap bearing the logo of another sports team or even one bearing no logo at all. See Defs.' Reply in Supp. of Mot. to Dismiss 1. Simply put, Defendant argues, there is no market for NFL apparel that is separate from the market for sports apparel or apparel in general. At the least, Defendants assert, Plaintiff has failed to meet the Rule 8 pleading standard by alleging facts that plausibly support an independent market limited to apparel featuring NFL-related intellectual property.

Defendants are correct that single-brand markets typically do not constitute legally cognizable markets for the purposes of an antitrust suit. "In general, a manufacturer's own products do not themselves comprise a relevant product market. . . . [A] company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product." Green Country

6

United States District Court
For the Northern District of California

Food Market, Inc. v. Bottling Group, 371 F.3d 1275, 1282 (10th Cir. 2004); see also Apple, 586 F. Supp. 2d at 1198 ("Single-brand markets are, at a minimum, extremely rare."). "Even where brand loyalty is intense, courts reject the argument that a single branded product constitutes a relevant market." Green Country Food Market, 371 F.3d at 1282; see also Lloyd Design Corp. v. Mercedes Benz of North America, Inc.. 866 Cal. App. 4th 716, 723–24 (1998); Hack v. President & Fellows of Yale College, 237 F.3d 81, 86 (2d Cir. 2000), abrogated on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002); Formula One Licensing v. Purple Interactive, C 00-2222 MMC, 2001 WL 34792530, at *3 (N.D. Cal. Feb. 6, 2001). In that regard, courts have repeatedly rejected proposed relevant markets that are defined by a company's trademark. See Shaw v. Rolex Watch, U.S.A., Inc., 673 F. Supp. 674, 678–79 (S.D.N.Y. 1987) (listing and explicating cases). The antitrust laws, of course, "are primarily concerned with interbrand competition" and the prevention of anticompetitive activities among separate companies and brand- and trademark-holders. Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc., 637 F.2d 1376, 1387 (9th Cir. 1981).

In this case, the Court rejects Defendants' argument that the markets Plaintiff has alleged to be the relevant markets are single-brand markets such that they are improper for this antitrust suit. This issue has been addressed in a case involving the same factual scenario and circumstances: American Needle, Inc. v. New Orleans Louisiana Saints, 385 F. Supp. 2d 687 (N.D. Ill. 2005). In rejecting the defendant's argument that the alleged relevant market insufficiently consisted of a single brand or single trademark, the American Needle court noted the following: "[W]e are not considering whether headwear and apparel carrying one NFL team's logo constitutes its own market, we are considering whether, as a matter of law, all headwear and apparel carrying NFL team logos cannot constitute a market unto itself." Id. at 695. Essentially, the American Needle court acknowledged a distinction between allegations of a relevant market consisting of the intellectual property of a single team, and that of all NFL teams. The Court adopts that reasoning in the present case. In the Complaint, Plaintiff alleges a market consisting of the intellectual property of at least thirty different and competing professional football teams as well as the intellectual

7

property owned by the NFL itself. See, e.g., Compl. ¶ 50. Plaintiff also notes that the teams compete with one another for sales of clothing apparel bearing their own intellectual property. Id. ("Apparel bearing the Intellectual Property of a particular NFL team competes for sales with apparel bearing the Intellectual Property of other NFL teams."); id. ("[A]pparel of teams having a large national following, such as the Dallas Cowboys (which is often referred to as 'America's Team'), competes for shelf space and purchases against other such nationally-followed teams like the Chicago Bears, Green Bay Packers, Oakland Raiders, the Pittsburgh Steelers, and others."). As such, due to the fact that Plaintiff has alleged a market of several independent and competitive brands, the Court finds that the market alleged by Plaintiff is not a single-brand or trademark-based market.

Moreover, the Court recognizes a distinction between the way in which the trademarks function in Plaintiff's alleged relevant market and that of the trademark-based single-brand markets in the cases cited above. Generally, trademarks serve to "identify the origin of a product." Generac Corp. v. Caterpillar Inc., 172 F.3d 971, 977 (7th Cir. 1999); see also 15 U.S.C. § 1127 (defining the term "trademark" as that which is used to "identify and distinguish" one's goods, "including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown"). The Ninth Circuit, similarly, has stated that the purpose of a trademark is to protect "only the name or symbol of the product." Mozart Co. v. Mercedes-Benz of N. Am., Inc., 833 F.2d 1342, 1346 (9th Cir. 1987). The Mozart court, in rejecting the argument that the prestige of the Mercedes-Benz trademark and uniqueness of a Mercedes automobile gave a franchisor economic power in the automobile parts market, noted that "[m]arket power, if any, is derived from the product, not from the name or symbol as such." Id. In the case presently before the Court, however, the trademarks, logos, and other intellectual property rights do not solely serve to "identify the origin" of the apparel that bears them; nor do they serve to protect the name or symbol of the product. Cf. Am. Needle, 385 F. Supp. 2d at 693. Rather, the logos and trademarks of the NFL and NFL teams may very well be the products themselves that consumers seek to

8

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

purchase. See id. As such, the analyses from the trademark-related cases like Generac and Mozart Co. do not seamlessly translate to the case presently before the Court.[3]

Having rejected Defendants' single-brand argument, the question remains as to whether Plaintiff's alleged markets consisting solely of NFL-related brands to the exclusion of other sports and clothing brands could consist of a unique market unto itself. As noted, a relevant market for the purposes of antitrust suits is defined as a market "composed of products that have reasonable interchangeability for the purposes for which they are produced." du Pont, 351 U.S. at 404. A distinct portion of a market—or submarket—may be considered a relevant market sufficient to sustain an antitrust action. Brown Shoe Co., 370 U.S. at 325. "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Id.

With these standards in mind, the Court finds that Plaintiff's alleged markets have been sufficiently pleaded as relevant markets. As noted, a reason why the apparel products at issue may be deemed valuable and relevant to consumers is in their bearing of NFL-related logos and trademarks. See Am. Needle, 385 F. Supp. 2d at 694 ("[A] significant segment of the market for NFL-branded headwear and apparel is purchasing the team logo."). The question as to whether these products constitute a separate, relevant market, therefore, falls on the interchangeability of these products and their logos. In the Complaint, Plaintiff refers to the intramarket competition in the market for apparel bearing logos of different NFL teams. See Compl. ¶¶ 50, 51. As Plaintiff states in the Complaint, NFL teams—each of which owns its own trademark, logo, and other intellectual property—compete for fans in regions of the country which do not have geographic representation in the NFL. See id. ¶ 50. In these regions, teams that have a large national following

---

[3] It is for this reason that the American Needle court rejected the applicability of Weber v. Nat'l Football League, 112 F. Supp. 2d 667 (N.D. Ohio 2000), a case that is also cited by Defendants here. The Weber court rejected the plaintiff's alleged relevant market consisting of the domain names for NFL teams, "jets.com" and "dolphins.com." Id. at 673. However, that court's reasoning is distinguishable because the "exact purpose" of a domain name is to identify the origin of a product (in that case, web content). See Am. Needle, 385 F. Supp. 2d at 693 n.2.

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

1    compete for consumer purchases of their apparel in attempts to cultivate a fan base. Id.

2    Competition for team apparel and other paraphernalia also exists in regions that have more than

3    one NFL team.[4] Id. ¶ 51. In addition, NFL teams utilize their apparel to compete for fans among

4    persons who were previously not fans of professional football, id. ¶ 52, as well as fans who move

5    from one region of the country to another, id. ¶ 53. The Court finds that these and other allegations

6    in the Complaint are sufficient to establish this interchangeability necessary for a relevant market

7    under Rule 8, Iqbal, and Twombly.

8        As for whether Plaintiff's alleged relevant market is the proper submarket sufficient to

9    withstand Defendants' Motion to Dismiss, see Brown Shoe Co., 370 U.S. at 325, the Court also

10   answers in the affirmative. Defendants argue that Plaintiff has narrowed the true relevant market—

11   the market for all logo-bearing apparel—so as to improperly exclude apparel bearing the logos,

12   trademarks, and other intellectual property of other sports leagues (e.g., Major League Baseball),

13   colleges and universities (e.g., Stanford), other entertainment providers (e.g., Disney, Warner

14   Bros.), and fashion brands (e.g., Ralph Lauren). See Defs.' Mot. to Dismiss 2. Plaintiff argues that

15   the market consisting solely of apparel bearing NFL-related logos is unique enough so that

16   products bearing non-NFL-related logos would not suffice as a reasonable substitute.

17       The United States Supreme Court has held that college football broadcasts could constitute

18   their own properly alleged submarket. See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of

19   Univ. of Oklahoma, 468 U.S. 85, 111 (1984). The rationale behind this decision was because the

20   audience for these events were "uniquely attractive" to advertisers and therefore competitors were

21   unable to offer programming to attract a similar audience. Id. In other words, the market for college

22   football broadcasts was unique enough so that advertisers did not have reasonable alternatives. Id.;

23   see also Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 613 (1953) (drawing a

24   distinction between "generic qualities" differentiating some types of consumers from one another).

25   The Supreme Court has also held that championship boxing events—arguably a narrower

26

27

28

---

[4] The area in which this Court sits—San Jose, CA—may be viewed as one such region, as fan allegiance to either the San Francisco 49ers or Oakland Raiders may not be as clear-cut in Santa Clara County as it is in other regions of the Bay Area.

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

1   submarket than that of college football broadcasts—could constitute a market separate from non-

2   championship boxing events. Int'l Boxing Club of N.Y., Inc. v. United States, 358 U.S. 242, 252

3   (1959) ("[C]hampionship boxing is the 'cream' of the boxing business, and, as has been shown

4   above, is a sufficiently separate part of the trade or commerce to constitute the relevant market

5   . . . .").

6          In that regard, Plaintiff has established that NFL-logo-bearing apparel is "uniquely

7   attractive" enough so as to constitute its own relevant submarket sufficient to withstand

8   Defendants' Motion to Dismiss. The rationale for this lies in the notion that the reason why many

9   consumers purchase a piece of NFL-logo-bearing apparel is precisely because that item bears the

10  logo of the NFL team. Other, similar products without an NFL-related logo would not have

11  relevance to them. As the American Needle court explained,

12
13          [A] significant segment of the market for NFL-branded headwear and apparel is
            purchasing the team logo. If a store sold out of hats carrying the Chicago Bears
14          logo, these individuals would not necessarily find caps carrying logos for
            Sponge[B]ob, the University of Michigan, or even the Chicago Bulls to be
15          reasonable substitutes. . . . The product for these consumers is the trademarked
            logo.
16

17  Am. Needle, 385 F. Supp. 2d at 694. As such, apparel featuring logos of teams from other sports,

18  other forms of entertainment, or fashion brands would not be a reasonable substitute.

19          Contrary to Defendants' contention, courts have not categorically rejected proposed

20  relevant markets and submarkets narrowed to professional football. The Ninth Circuit has held that

21  a jury had sufficient evidence to find a verdict of harm to competition in a market limited solely to

22  professional football. L.A. Mem'l Coliseum Comm'n v. Nat'l Football League, 726 F.2d 1381,

23  1394 (9th Cir. 1984). That case involved an antitrust challenge to Rule 4.3 of Article IV of the NFL

24  Constitution, which required that three-fourths of NFL member teams approve a move by one team

25  into another team's home territory. Id. at 1385. While they disagreed as to the market's geographic

26  scope, both plaintiffs in that action—the L.A. Coliseum and the Oakland Raiders—sought to define

27  the relevant product market as limited to NFL football entertainment. Id. at 1393 ("The Raiders

28

11

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

attempted to prove the relevant market consists of NFL football (the product market) in the Southern California area (the geographic market). . . .  The L.A. Coliseum claims the relevant market is stadia offering their facilities to NFL teams (the product market) in the United States (the geographic market).”). Similar to the present suit, the NFL contended that the actual product market was all forms of entertainment, arguing that a professional football team in a specific region competes not just with other football teams but rather with other forms of entertainment. Id. In affirming the district court’s denial of the NFL’s motion for judgment notwithstanding the jury’s verdict, the Ninth Circuit found that there was sufficient evidence as to the product market to support the jury’s finding. Id. at 1393–94.

It is noted that the L.A. Coliseum court did not affirmatively conclude that there existed a relevant market limited to NFL entertainment or products:

> In the context of this case in particular, we believe that market evidence, while important, should not become an end in itself. . . . Instead, the critical question is whether the jury could have determined that Rule 4.3 reasonably served the NFL’s interest in producing and promoting its product, i.e., competing in the entertainment market, or whether Rule 4.3 harmed competition among the 28 teams to such an extent that any benefits to the League as a whole were outweighed. As we find below, there was ample evidence for the jury to reach the latter conclusion.

Id. at 1394. However, the fact that that case went well beyond the motion to dismiss stage of litigation based on the plaintiffs’ allegation of the NFL-specific relevant product market confirms the Court’s conclusion in the present case. In essence, the L.A. Coliseum court found that sufficient evidence had been presented from which the jury could have identified a relevant submarket limited to professional football. Id. at 1393 (“To some extent, the NFL itself narrowly defined the relevant market by emphasizing that NFL football is a unique product which can be produced only through the joint efforts of the 28 teams.”); see also U.S. Football League v. Nat’l Football League, 644 F. Supp. 1040, 1057 (S.D.N.Y. 1986), aff’d, 842 F.2d 1335 (2d Cir. 1988) (“I decline to accept the NFL’s argument that no evidence has been presented demonstrating the existence of a distinct product market for professional football.”).

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS’ MOTION TO DISMISS

United States District Court
For the Northern District of California

The Court notes that this analysis has been limited to the arguments presented in Defendants' Motion to Dismiss. The Court is not making a conclusive determination about whether the markets Plaintiff has alleged do in fact exist; rather the Court finds that antitrust law "does not preclude an antitrust claim based on such markets" at this state in the litigation. See Am. Needle, 385 F. Supp. 2d at 696.[5] Accordingly, the Court finds that Plaintiff has alleged relevant markets sufficient to withstand Defendants' Motion to Dismiss: (1) "the United States market for the licensing of the trademarks, logos, and other emblems of individual NFL teams for use in apparel"; and (2) "the United States retail market for apparel bearing the Intellectual Property of any NFL team." Compl. ¶ 45.

### B. Antitrust Standing

#### 1. Applicability of the AGC Standard

Antitrust standing is distinct from Article III standing: "A plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper party to bring a private antitrust action." Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal., 190 F.3d 1051, 1054 n.3 (9th Cir. 1999); see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC"), 459 U.S. 519, 535 n.31 (1983). "[A]ntitrust standing generally refers to the requirement that an antitrust plaintiff demonstrate 'injury in his business or property' by 'reason of anything forbidden in the antitrust laws,' and the prudential pre-requisites associated with this requirement."

---

[5] With regard to a sufficiently pleaded relevant market, the American Needle court noted the following:

> Our analysis is limited to the issues raised in defendants' motion to dismiss. As pointed out above, we have not determined whether the markets plaintiff alleges do in fact exist, thereby supporting its claims. We have found only that the law does not preclude an antitrust claim based on such markets. Even though plaintiff's market definitions do not fall due to reliance on NFL trademarks, they may still be improper. As indicated in our analysis, if the true product in this case is NFL teams' logos, not the items that carry them, then there may be no justification for limiting the relevant market to headwear and apparel that carry these logos. Perhaps, the market would more properly include all merchandise carrying NFL logos. Of course, this broader market definition would then alter the impact of the exclusive contract with Reebok, which is allegedly limited to the manufacture and distribution of headwear and apparel.

Am. Needle, 385 F. Supp. 2d at 696. The Court adopts a similar sentiment in this case. This Order finds only that, taking as true the facts alleged in the Complaint, Plaintiff has sufficiently alleged a relevant market so as to withstand Defendants' Motion to Dismiss.

13

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

In re Dynamic Random Access Memory Antitrust Litig. ("DRAM II"), 536 F. Supp. 2d 1129, 1135

(N.D. Cal. 2008) (quoting, inter alia, 15 U.S.C. § 15(a)). A plaintiff must demonstrate antitrust

standing under both the Clayton Act and the Cartwright Act. See id.; see also Cargill, Inc. v.

Monfort of Colo., Inc., 479 U.S. 104, 110–11 (1986) (Clayton Act); Knevelbaard Dairies v. Kraft

Foods, Inc., 232 F.3d 979, 987 (9th Cir. 2000) (Cartwright Act).

        In AGC, the Supreme Court identified certain factors for making the determination as to

whether a plaintiff has antitrust standing. 459 U.S. 519. These factors include: "(1) the nature of the

plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to

forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of

duplicative recovery; and (5) the complexity in apportioning damages." Am. Ad Mgmt., 190 F.3d

at 1054–55 (discussing AGC, 459 U.S. 519). "To conclude that there is antitrust standing, a court

need not find in favor of the plaintiff on each factor." Id.; Amarel v. Connell, 102 F.3d 1494, 1507

(9th Cir. 1996). Instead, courts are to balance the factors, "giv[ing] great weight to the nature of the

plaintiff's alleged injury." Am. Ad Mgmt., 190 F.3d at 1055; R.C. Dick Geothermal Corp. v.

Thermogenics, Inc., 890 F.2d 139, 146 (9th Cir. 1989).

        Whether the AGC factors are to be applied to Plaintiff's state-based antitrust claims is

determined by state law.  See In re Flash Memory Antitrust Litig., 643 F. Supp. 2d 1133, 1151

(N.D. Cal. 2009); In re Dynamic Random Access Memory Antitrust Litig. ("DRAM I"), 516

F. Supp. 2d 1072, 1087 (N.D. Cal. 2007); see also United Broth. of Carpenters & Joiners of Am.

Local 586 v. N.L.R.B., 540 F.3d 957, 963 (9th Cir. 2008). "Where the state's highest court has not

decided an issue, the task of the federal courts is to predict how the state high court would resolve

it." Dimidowich v. Bell & Howell, 803 F.2d 1473, 1482 (9th Cir. 1986). If "there is relevant

precedent from the state's intermediate appellate court, the federal court must follow the state

intermediate appellate court decision unless the federal court finds convincing evidence that the

state's supreme court likely would not follow it." Ryman v. Sears, Roebuck & Co., 505 F.3d 993,

994 (9th Cir. 2007) (emphasis omitted). While the California Supreme Court has not reached this

issue, at least one of its intermediate appellate courts has applied the AGC factors to California's

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

antitrust law, the Cartwright Act. See Vinci v. Waste Mgmt., Inc., 36 Cal. App. 4th 1811, 1814 (1995); see also Knevelbaard Dairies, 232 F.3d 979, 987 (9th Cir. 2000). As such, the Court finds that the AGC factors will be applied to Plaintiff's state-based antitrust claims along with his claims predicated upon federal antitrust law. See Flash Memory Antitrust Litig., 643 F. Supp. 2d at 1151–52; DRAM I, 516 F. Supp. 2d at 1087.

### 2.  Application of AGC to Plaintiff's Claims

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977); see also Am. Ad. Mgmt., 190 F.3d at 1055. "Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained." Id. at 1057. "[I]t is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff." Id. at 1058; see also Amarel, 102 F.3d at 1508. "Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." Am. Ad. Mgmt., 190 F.3d at 1057.

However, there is a "narrow exception" to this "market participant" requirement "for parties whose injuries are 'inextricably intertwined' with the injuries of market participants" or with "the injury the conspirators sought to inflict." Id. at 1057 n.5. (citing Blue Shield v. McCready, 457 U.S. 465 (1982) and Ostrofe v. H.S. Crocker Co., 740 F.2d 739, 745–46 (9th Cir. 1984)). "This exception applies when the claimant can be considered the 'direct victim' of a conspiracy or the 'necessary means' by which the conspiracy was carried out." Lorenzo v. Qualcomm Inc., 603 F. Supp. 2d 1291, 1300–01 (S.D. Cal. 2009) (quoting Ostrofe, 740 F.2d at 744–47 (citing McCready, 457 U.S. at 479)).

As stated in the preceding section, Plaintiff alleges that Defendants' conduct restrained competition in the following two markets:

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

> The first is the United States market for the licensing of the trademarks, logos, and other emblems (collectively "the Intellectual Property") of individual NFL teams for use in apparel. The second is the United States retail market for apparel bearing the Intellectual Property of any NFL team.

Compl. ¶ 45. As such, under the principles of antitrust standing, Plaintiff must sufficiently allege that he has suffered injury in these markets. Am. Ad. Mgmt., 190 F.3d at 1057.

In support of his contention for standing, Plaintiff has stated that he purchased an item of apparel bearing an NFL team logo from a sports merchandise manufacturer. Compl. ¶ 5. Plaintiff states that he was an "indirect purchaser" of this product, meaning that he purchased it as a consumer on the retail market. Id. The Court first notes that this allegation alone is sufficient for Plaintiff to have shown antitrust injury vis-à-vis the second of Plaintiff's alleged relevant markets—the American retail market for NFL logo- or intellectual property-bearing apparel. Plaintiff clearly states that he participated in this market and suffered an injury in the form of an "anticompetitive overcharge" for this purchase. Id. Defendants argue that Plaintiff has not met the antitrust injury factor because he "does not claim to be a rival manufacturer who was denied a license." See Defs.' Mot. to Dismiss 11. However, this argument is misplaced in that it ignores the fact that Plaintiff has alleged a relevant market in the form of the retail market for NFL-related apparel in addition to the market for licenses. As such, the Court finds that Plaintiff is a participant in the retail market for such apparel and has sufficiently demonstrated an injury in that market.

The Court next considers whether Plaintiff has met the antitrust injury requirement for the first of Plaintiff's alleged relevant markets: the market for the licensing of NFL intellectual property for use in apparel. While Plaintiff acknowledges that he was not a direct purchaser of NFL-related licenses, he asserts that he still has met the antitrust injury factor because "supra-competitive royalty rates were passed on to the ultimate consumers of the apparel, like Plaintiff and the class members, in the form of higher prices for the apparel." Compl. ¶ 93; see also Pl.'s Opp'n to Defs.' Mot. to Dismiss 19. Plaintiff essentially argues that his situation falls within the "narrow exception" for indirect purchasers who suffer injuries in a market that is "inextricably intertwined" with the alleged relevant market. See Am. Ad. Mgmt., 190 F.3d at 1057 n.5.

16

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

1      Several courts in this district have recently considered this question. In In re TFT-LCD

2   (Flat Panel) Antitrust Litig., some of the plaintiffs purchased finished products—such as computer

3   monitors, laptop computers, televisions, and mobile phones—containing Thin Film Transistor

4   Liquid Crystal Display ("TFT-LCD") panels. 586 F. Supp. 2d 1109, 1113–14 (N.D. Cal. 2008).

5   Because the defendants in this anticompetitive antitrust suit were the manufacturers and distributers

6   of the TFT-LCD panels, these plaintiffs were considered "indirect purchasers" of these products

7   who did not directly participate in the alleged relevant market of the panels. Id. Nevertheless, when

8   considering plaintiffs' argument that "the market for LCD panels and the market for the products

9   into which they are placed are inextricably linked and intertwined because the LCD panel market

10  exists to serve the LCD products market," id. at 1123 (internal quotations and citations omitted),

11  the court concluded the following:

12           The Court finds that there are factual questions about the relevant market, and it
             may be, as plaintiffs allege, that the indirect purchaser plaintiffs "have participated
13           in the market for LCD panels through their purchases of products containing such
             panels." Or, it may be that indirect purchasers have participated in an analytically
14           distinct market for finished products. In any event, the Court finds that plaintiffs'
             allegations are sufficient at this stage to weigh in favor of standing under the first
15           factor of AGC.

16

17  Id. (internal citations omitted); see also In re Graphics Processing Units Antitrust Litig., 540

18  F. Supp. 2d 1085, 1098 (N.D. Cal. 2007) (finding that indirect purchasers' allegations that

19  increased costs for the products they did purchase were "traceable" through the chain of

20  distribution "slightly favors standing"); Flash Memory Antitrust Litig., 643 F. Supp. 2d at 1154

21  ("[W]hile the markets for NAND flash memory and products that contain NAND flash memory

22  technically may be different, in practice, both markets are inextricably intertwined and there is

23  inherent cross-elasticity of demand between the two."). Similarly, In re Cathode Ray Tube (CRT)

24  Antitrust Litig., involved purchasers of products containing cathode ray tubes (CRTs) bringing suit

25  against defendants who allegedly agreed to fix prices of the CRTs themselves. 738 F. Supp. 2d

26  1011 (N.D. Cal. 2010). As in TFT-LCD (Flat Panel) Antitrust Litig., the court found that notion

27  that the "market for CRTs and the market for CRT Products are . . . inextricably linked and cannot

28

17

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

be considered separately" was sufficient to find antitrust injury in the indirect purchases of the CRTs. Id. at 1023–24; see also id. at 1024 (taking into consideration the fact that the increased prices of products containing CRTs could "easily be traced" to the alleged price fixing agreement in the market for CRTs themselves).

      The Court finds similarly in the present case. As noted, the logos, trademarks, and other intellectual property featured on the apparel are not merely indicators of the origin of the apparel purchased by Plaintiff and putative class members; they may very well be the products purchased themselves. As such, an anticompetitive effect on the market for the licensing of these logos and trademarks would necessarily have an effect on the consumer retail market for that apparel bearing those logos and trademarks. While the American Needle court did not rule directly on the issue of standing, it expressed a similar conclusion: "It is readily apparent how restricting the issuance of licenses for the use of the NFL's and NFL teams' trademarked logos in the input market could directly affect the ability of consumers to purchase goods carrying the trademarked logos in the output market." Am. Needle Inc. v. New Orleans Louisiana Saints, 385 F. Supp. 2d 727, 730 (N.D. Ill. 2005); see also id. at 731 (finding that when considering the harm to a direct purchaser of the licensing market, the court could consider "how the NFLP's alleged exclusive contract with Reebok affects the consumers of the products carrying those trademarks—'the consumers that antitrust laws are supposed to protect.'" (quoting Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n, 961 F.2d 667, 669 (7th Cir. 1992)). In that regard, as explained above, the relevance and value of the apparel to the consumers lie in their containing and displaying the logos and trademarks of NFL teams; an item of clothing not displaying an NFL team's logo would not be an appropriate substitute. As such, contrary to Defendants' argument, the retail market for apparel bearing NFL-related intellectual property may be inextricably intertwined with the market for the licensing of that intellectual property.

      Moreover, Plaintiff has alleged that an increase in price in the retail market for NFL-related apparel is directly traceable to the licensing market. See Graphics Processing Units Antitrust Litig., 540 F. Supp. 2d at 1098; Cathode Ray Tube (CRT) Antitrust Litig., 738 F. Supp. 2d at 1024. In

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

1    other words, as Plaintiff so alleges, anticompetitive conduct in the licensing market would

2    necessarily have an effect on the retail market. See Compl. ¶ 93 ("The direct, proximate, and

3    foreseeable result and effect of the horizontal agreement was that competition for the licensing of

4    Intellectual Property of NFL teams for use in apparel was thwarted, royalty rates were increased

5    over what they would have been in a market devoid of this anticompetitive horizontal agreement,

6    and these supra-competitive royalty rates were passed on to the ultimate consumers of the apparel,

7    like Plaintiff and the class members, in the form of higher prices for the apparel."); id. ¶ 45–46

8    ("The former [market, i.e., an NFL team's intellectual property license] is a necessary input for the

9    latter [market, i.e., apparel bearing that team's intellectual property], as it is not possible to legally

10   manufacture and offer for sale apparel bearing the Intellectual Property of any NFL team without

11   first obtaining a license to use the Intellectual Property from the team at issue."). As such, for the

12   purposes of Defendants' Motion to Dismiss, Plaintiff has sufficiently alleged antitrust injury.[6]

13        Having found that Plaintiff has sufficiently shown antitrust injury, the Court notes that this

14   factor is considered the most critical of the AGC factors in determining antitrust standing. See Am.

15   Ad Mgmt., 190 F.3d at 1054; see also Cargill, 479 U.S. at 110 n.5. In any event, the Court will

16   consider other AGC factors Defendants contend have not been met. First, Defendant argues that

17   because the costs of producing an item of NFL-branded apparel include numerous elements beyond

18   the licensing costs, the speculative nature of the harm and complexity in apportioning damages—

19   the third and fifth AGC factors—weigh against standing. Defs.' Mot. to Dismiss 15. The Court

20   finds that while this may be so, such a determination would be better suited upon a fuller record.

21   See Flash Memory Antitrust Litig., 643 F. Supp. 2d at 1154. The allegations in Plaintiff's

22   Complaint to the contrary have satisfied the plausibility standard required to withstand a motion to

23   dismiss. Second, Defendants contend that other plaintiffs—namely those plaintiffs in American

24   Needle—are better situated to challenge the allegedly anticompetitive and unlawful conduct. Defs.'

---

[6] The Court notes that the "actual determination" of whether indirect purchasers are "participants" in the same "relevant market" for purposes of antitrust standing may be better suited to resolution upon a fuller record. See Flash Memory Antitrust Litig., 643 F. Supp. 2d at 1154.

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

1  Mot. to Dismiss 15. Regardless as to whether this is actually one of the AGC factors,[7] the plaintiffs

2  in American Needle and Plaintiff in this case seek redress of different harms. The American Needle

3  plaintiffs sought redress for lost profits as a result of being shut off from the market of

4  manufacturing trademark- and logo-bearing apparel by the exclusive agreement with Reebok. In

5  this case, Plaintiff seeks redress for the premiums consumers pay on the retail market of this

6  apparel, a remedy not directly at issue in American Needle.[8]

7  For the foregoing reasons, the Court finds that Plaintiff has alleged antitrust standing

8  pursuant to the AGC factors sufficient to withstand Defendants' Motion to Dismiss in that regard.

9

10

11  **C.  Motion to Dismiss for Failure to State a Claim**

12  Defendants also argue that Counts II and III of the Complaint should be dismissed for

13  failure to state a claim upon which relief could be granted.

14

15  **1.  Count II**

16  Defendants seek dismissal of Count II of Plaintiff's Complaint on the grounds that Plaintiff

17  has failed to plead this cause of action with supporting facts or specificity. See Defs.' Mot to

18  Dismiss 16. Defendants argue that Plaintiff's failure to identify the kind of apparel he purchased,

19  by whom it was manufactured, and from what kind of sports merchandise retailer he purchased it is

20  a fatal pleading deficiency. Id. The Court disagrees. Plaintiff alleges that he purchased an item of

21  apparel bearing the logo of an NFL team; and he states that this item was subject to a premium

22  price that was the result of the alleged anticompetitive activity undertaken by Defendants. See, e.g.,

23  Compl. ¶ 5. In detailing how an agreement between NFLP and Reebok granted Reebok the

24  exclusive license to use the intellectual property of the NFL and all NFL teams, Count II of the

25
26  [7] It appears that Defendants contends that a favorable outcome for plaintiffs in this case and the American Needle case would amount to "duplicative recovery," which is the fourth of the AGC factors as enumerated by the Ninth Circuit in American Ad Management. 190 F.3d at 1054.

27  [8] Defendants appear to concede this point: "Plaintiff is correct that any recoveries by a former licensee for lost profits would not necessarily be duplicative of recoveries for damages by licensees, retailers, consumers, or others in the distribution chain." Defs.' Reply in Supp. of Mot. to Dismiss 12, Docket Item No. 36 (internal citation omitted).

28

20

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

Complaint illustrates the affect such an agreement would have on the purchase of any officially-licensed NFL apparel. See id. ¶¶ 98–102. As such, Plaintiff has met the plausibility requirement of showing that the item he purchased would have been one affected by the allegedly anticompetitive agreement.[9] See TFT-LCD (Flat Panel) Antitrust Litig., 599 F. Supp. 2d at 1184 (noting that even complex consolidated antitrust litigation does not require "elaborate fact pleading").

### 2.   Count III

Defendants also seek dismissal of Count III of the Complaint, which alleges that Defendants' anticompetitive conduct is unfair and unlawful in violation of California's UCL, Cal. Bus. & Prof. Code §§ 17200 et seq. Defendants' attack on this cause of action relies on dismissal of the Complaint's remaining three counts which allege violation of federal and state antitrust laws. Having found that Plaintiff has stated viable causes of action with regard to these direct antitrust claims, the Court rejects Defendants' argument that Plaintiff fails to state a claim for relief under the UCL. See Stanislaus Food Prods. Co. v. USS-POSCO Indus., No. CV 09-0560, 2011 WL 2678879, at *15 (E.D. Cal. July 7, 2011).

### IV.   Conclusion and Order

Having rejected Defendants' arguments in support of their Motion to Dismiss, the Court finds that Plaintiff has stated a claim upon which relief could be granted sufficient to withstand Defendants' Motion. As such Defendants' Motion to Dismiss is DENIED.

 IT IS SO ORDERED.

Dated: August 2, 2013



EDWARD J. DAVILA
United States District Judge

---

[9] In its Motion to Dismiss, Defendant appears to suggest that, despite the exclusive licensing agreement, NFL-licensed T-shirts are manufactured by at least one other company in addition to Reebok, namely a company called VF. As Plaintiff suggests, if Defendant can show that this is true and that Plaintiff purchased a product manufactured by VF, Defendant would still have to show that such a product was not subject to a premium due to the allegedly anticompetitive agreement. Such a determination would be better suited to resolution upon review of a fuller record.

Case No.: 5:12-CV-5481 EJD
ORDER DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California