1   Roy A. Katriel (SBN 265463)
    THE KATRIEL LAW FIRM
2   4225 Executive Square Suite 600
    La Jolla, California 92037
3   Telephone: (858) 242-5642
    Facsimile:  (858) 430-3719
4   e-mail: rak@katriellaw.com

5   Ralph B. Kalfayan (SBN 133464)
    KRAUSE KALFAYAN BENINK & SLAVENS, LLP
6   550 West C Street, Suite 530
    San Diego, California 92101
7   Telephone: (619) 232-0331
    Facsimile:  (619) 232-4019
8   e-mail: ralph@kkbs-law.com

9   *Attorneys for Plaintiffs*

10

11

12              **UNITED STATES DISTRICT COURT**
13             **NORTHERN DISTRICT OF CALIFORNIA**

14  PATRICK DANG AND MICHAEL VILLA, ON     ) **Civil Action No. 5:12-cv-5481-EJD**
15  BEHALF OF THEMSELVES AND ALL OTHERS    )
    SIMILARLY SITUATED,                    ) **FIRST AMENDED CLASS ACTION**
16                                         ) **COMPLAINT**
                          *Plaintiffs,*    )
17                 v.                      )
                                           )  **Jury Trial Demanded**
18  SAN FRANCISCO FORTY NINERS, LTD.; THE  )
19  OAKLAND RAIDERS, L.P.; CHARGERS FOOTBALL )
    COMPANY, LLC; NEW ORLEANS LOUISANA     )
20  SAINTS, LLC; FOOTBALL NORTHWEST LLC; THE )
    DETROIT LIONS, INC.; HOUSTON NFL HOLDINGS, )
21  L.P.; MINNESOTA VIKINGS FOOTBALL CLUB, LLC )
22  LTD; JACKSONVILLE JAGUARS, LTD; TENNESSEE )
    FOOTBALL, L.P.; PITTSBURGH STEELERS SPORTS, )
23  INC.; BUFFALO BILLS, INC.; INDIANAPOLIS )
24  COLTS, INC.; PDB SPORTS, LTD. D/B/A DENVER )
    BRONCOS; NEW ENGLAND PATRIOTS, L.P.;    )
25  CINCINNATI  BENGALS, INC.; THE RAMS     )
26  FOOTBALL COMPANY, INC.; GREEN BAY       )
    PACKERS, INC.; MIAMI DOLPHINS LTD.; NEW )
27  YORK JETS LLC; KANSAS CITY CHIEFS FOOTBALL )
28  CLUB, INC.; DALLAS COWBOYS FOOTBALL CLUB )

LTD.; TAMPA BAY AREA NFL FOOTBALL, INC.; )
CLEVELAND BROWNS FOOTBALLL COMPANY )
LLC; NEW YORK FOOTBALL GIANTS, INC.; )
PHILADELPHIA EAGLES   FOOTBALL CLUB, INC.; )
RICHARDSON SPORTS LIMITED PARTNERSHIP; )
PRO-FOOTBALL, INC.; FIVE SMITHS, INC.; )
B & B HOLDINGS, INC.; NATIONAL FOOTBALL )
PROPERTIES, INC.;  NATIONAL FOOTBALL )
LEAGUE; REEBOK INTERNATIONAL, LTD., )
)
*Defendants.* )
)
_____ )

## NATURE OF THE ACTION

1.     Plaintiffs Patrick Dang and Michael Villa (collectively "Plaintiffs") bring this action on behalf of themselves and all other similarly situated indirect purchasers within the State of California of apparel bearing the logo, trademarks, emblems or other intellectual property (collectively "the Intellectual Property") of National Football League ("NFL") teams, to seek monetary, injunctive, and declaratory relief against the named defendants for their violations of the California Cartwright Act and Unfair Competition Law.   Plaintiffs also bring Count IV of this action on behalf of a nationwide class of such indirect purchasers to seek equitable, declaratory, and injunctive relief pursuant to Section 16 of the federal Clayton Act.   As detailed below, the named defendants have entered into a series of agreements in restraint of trade regarding licensing and distribution of apparel bearing the Intellectual Property of the individual NFL teams.  Although each of the NFL team's Intellectual Property is owned by their respective teams, which each would be free to license according to each individual team's sole judgment, the owners of each of the individual teams have agreed to license their Intellectual Property only to Defendant NFL Properties, Inc., a separate Delaware corporation formed by the Individual NFL teams and the NFL.  NFL Properties, Inc., in turn, with the vote and agreement of each of the competing individual NFL teams and the NFL, granted an exclusive license of more than ten years' duration to Defendant Reebok International, Ltd., ("Reebok") to use the Intellectual Property of any and all individual NFL teams in apparel, thereby ensuring that for the more than ten years' or so duration of

the licensing agreement provided by NFL Properties, Inc., any apparel bearing the Intellectual Property of any NFL team could only be manufactured by Reebok, to the exclusion of all other apparel manufacturers.  As a result, competition in the market for apparel bearing the Intellectual Property of any NFL team has been thwarted, and consumers of these products, like Plaintiffs and the putative class members, have been overcharged for their purchases.  But for the agreement entered into between the separate individual NFL teams to stop competing between themselves for the licensing of their respective Intellectual Property, and the separate exclusive agreement entered into between NFL Properties, Inc. and Reebok, there would be competition among the several individual NFL teams for the licensing of the team's Intellectual Property for use in apparel, and there also would be competition among rival apparel manufacturers to manufacture and sell NFL-team branded apparel.  Thus, but for these agreements, the sale of such apparel would be subject to normal market competitive forces. Indeed, this is the situation that prevailed prior to the institution of the agreements at issue.

2.      Plaintiffs do not bring this action on a clean slate.  Rather, in a separate antitrust lawsuit filed and currently pending before the United States District Court for the Northern District of Illinois, styled as *American Needle, Inc. v. New Orleans Louisiana Saints*, No. 04-7806 (N.D. Ill.), American Needle, Inc., a manufacturer of headwear, who prior to the agreement between the NFL teams that is at issue in this case had been granted a license to manufacture headwear bearing the Intellectual Property of various NFL teams, brought a federal antitrust lawsuit against the individual NFL teams, NFL Properties, Inc., the NFL, and Reebok, claiming that, as a result of the agreements in restraint of trade amongst the individual NFL teams and amongst NFL Properties Inc. and Reebok, American Needle was excluded from the market for the manufacturing of NFL-team branded headwear. Although the district court initially entered summary judgment against American Needle, finding that the separate NFL teams formed a single entity for antitrust purposes that could not conspire in violation of the Sherman Act, and that decision was affirmed by the Seventh Circuit, the United States Supreme Court subsequently reversed that judgment, and held that the individual NFL teams were, indeed, separate economic actors for purposes of the antitrust laws that could conspire unlawfully in violation of the federal antitrust laws.  *See American Needle, Inc. v. National Football League*, 130 S. Ct. 2201 (2010). After reversal, the United States Supreme Court remanded the case back to the trial court where

it is currently pending.  While American Needle's case seeks redress for the lost profits it claims to have sustained as a direct result of the defendants' unlawful agreements to restrain trade, Plaintiffs' lawsuit seeks to, *inter alia*, recover damages to compensate California consumers for the overcharges they have been forced to pay as a result of these unlawful agreements to restrain trade.

3.      Unless otherwise specified, the term "apparel" as used in this Class Action Complaint includes all wearable items of clothing, such as jerseys, hoodies, t-shirts, sweaters, fitness wear, and headwear.

4.      The Class Period applicable to Counts I-III of this Class Action Complaint is October 25, 2008 to April 1, 2012, and for Count IV of this Class Action Complaint, the Class Period runs from October 25, 2008 to the present, and continuing until the date that the Court enters an Order certifying this action as a class action.

## PARTIES

5.      Plaintiff Patrick Dang is a resident of San Jose, California. On November 2011, during the Class Period, Plaintiff, while residing in California, purchased apparel bearing the NFL team logo and Intellectual Property from a sports merchandise retailer, i.e. Plaintiff Patrick Dang was an indirect purchaser of apparel bearing the Intellectual Property of an NFL team.  Due to the anticompetitive and unlawful actions described herein, Plaintiff Patrick Dang was subject to and did pay an anticompetitive overcharge for his purchase.  Plaintiff Michael Villa ("Villa") is a resident of Costa Mesa, California. On or about October 6, 2009, Plaintiff Michael Villa, while residing in California, purchased from a store in Laguna Hills, California, a jersey bearing the logo or other Intellectual Property of the San Diego Chargers that had been manufactured by Defendant Reebok International Ltd. pursuant to the licensing agreement alleged herein, i.e., Plaintiff Michael Villa was an indirect purchaser of apparel bearing the Intellectual Property of an NFL team.  Due to the anticompetitive and unlawful actions described herein, Plaintiff Michael Villa was subject to and did pay an anticompetitive overcharge for his purchase.

6.      Defendant San Francisco Forty Niners, Ltd. is a corporation organized under the laws of the State of California, and having its principal place of business at 4949 Centennial Boulevard in Santa Clara, California 95054.  San Francisco Forty Niners, Ltd. is the owner of the San Francisco Forty

Niners, the NFL team for the city of San Francisco.  San Francisco Forty Niners Ltd. is also the owner of the trademarks, logos, and other intellectual property associated with the San Francisco Forty Niners.

7.      Defendant The Oakland Raiders, L.P. is a limited partnership organized under the laws of the State of California, and having its principal place of business at 1220 Harbor Bay Parkway in Alameda, California 94502.  The Oakland Raiders, L.P. is the owner of the Oakland Raiders, the NFL team for the city of Oakland.  The Oakland Raiders, L.P. is also the owner of the trademarks, logos, and other intellectual property associated with the Oakland Raiders.

8.      Defendant Chargers Football Company, LLC is a limited liability company organized under the laws of the State of California, and having its principal place of business at 4020 Murphy Canyon Road in San Diego, California 92123.  Chargers Football Company, LLC is the owner of the San Diego Chargers, the NFL team for the city of San Diego.  Chargers Football Company, LLC is also the owner of the trademarks, logos, and other intellectual property associated with the San Diego Chargers.

9.      Defendant New Orleans Louisiana Saints, LLC is a limited liability company organized under the laws of the State of Louisiana, and having its principal place of business at 5800 Airline Drive in Metairie, Louisiana 70003.  New Orleans Louisiana Saints, LLC is the owner of the New Orleans Saints, the NFL team for the city of New Orleans.  New Orleans Louisiana Saints, LLC is also the owner of the trademarks, logos, and other intellectual property associated with the New Orleans Saints.

10.     Defendant Football Northwest LLC is a limited liability company organized under the laws of the State of Washington, and having its principal place of business at 12 Seahawks Way in Renton, Washington 98056.  Football Northwest LLC is the owner of the Seattle Seahawks, the NFL team for the city of Seattle.  Football Northwest LLC is also the owner of the trademarks, logos, and other intellectual property associated with the Seattle Seahawks.

11.     Defendant The Detroit Lions, Inc. is a corporation organized under the laws of the State of Michigan, and having its principal place of business at 222 Republic Drive in Allen Park, Michigan 48101.  The Detroit Lions, Inc. is the owner of the Detroit Lions, the NFL team for the city of Detroit.  The Detroit Lions, Inc. is also the owner of the trademarks, logos, and other intellectual property

associated with the Detroit Lions.

12.     Defendant Houston NFL Holdings, L.P. is a limited partnership organized under the laws of the State of Texas, and having its principal place of business at 2 Reliant Park in Houston, Texas 77054.  Houston NFL Holdings, L.P. is the owner of the Houston Texans, the NFL team for the city of Houston.  Houston NFL Holdings, L.P.  is also the owner of the trademarks, logos, and other intellectual property associated with the Houston Texans.

13.     Defendant  Minnesota Vikings Football Club LLC Ltd. is a limited liability company organized under the laws of the State of Minnesota, and having its principal place of business at 9520 Viking Drive in Eden Prairie, Minnesota 55344.  Minnesota Vikings Football Club LLC Ltd. is the owner of the Minnesota Vikings, the NFL team for the city of Minneapolis.  Minnesota Vikings Football Club LLC Ltd. is also the owner of the trademarks, logos, and other intellectual property associated with the Minnesota Vikings.

14.     Defendant Jacksonville Jaguars, Ltd. is a corporation organized under the laws of the State of Florida, and having its principal place of business at 1 EverBank Field Drive in Jacksonville, Florida 32202.  Jacksonville Jaguars, Ltd. is the owner of the Jacksonville Jaguars, the NFL team for the city of Jacksonville.  Jacksonville Jaguars, Ltd.  is also the owner of the trademarks, logos, and other intellectual property associated with the Jacksonville Jaguars, Ltd.

15.     Defendant Tennessee Football, L.P. is a limited partnership organized under the laws of the State of Tennessee, and having its principal place of business at 530 Gay Street in Knoxville, Tennessee 37902.  Tennessee Football, L.P. is the owner of the Tennessee Titans, the NFL team for the city of Nashville.  Tennessee Football, L.P.  is also the owner of the trademarks, logos, and other intellectual property associated with the Tennessee Titans.

16.      Defendant Pittsburgh Steelers Sports, Inc. is a corporation organized under the laws of the State of Pennsylvania, and having its principal place of business at 3400 South Water Street in Pittsburgh, Pennsylvania 15203.  Pittsburgh Steelers Sports, Inc. is the owner of the Pittsburgh Steelers, the NFL team for the city of Pittsburgh.  Pittsburgh Steelers Sports, Inc. is also the owner of the trademarks, logos, and other intellectual property associated with the Pittsburgh Steelers.

17.     Defendant Buffalo Bills, Inc. is a corporation organized under the laws of the State of

New York, and having its principal place of business at 1 Bills Drive in Orchard Park, New York 14127. Buffalo Bills, Inc. is the owner of the Buffalo Bills, the NFL team for the city of Buffalo. Buffalo Bills is also the owner of the trademarks, logos, and other intellectual property associated with the Buffalo Bills.

18.    Defendant Indianapolis Colts, Inc. is a corporation organized under the laws of the State of Indiana, and having its principal place of business at 7001 W. 56th Street in Indianapolis, Indiana 46254. Indianapolis Colts, Inc. is the owner of the Indianapolis Colts, the NFL team for the city of Indianapolis. Indianapolis Colts, Inc. is also the owner of the trademarks, logos, and other intellectual property associated with the Indianapolis Colts.

19.    Defendant PDB Sports Ltd. D/B/A Denver Broncos is a corporation organized under the laws of the State of Colorado, and having its principal place of business at 1701 Mile High Stadium Circle in Denver, Colorado 80204.  PDB Sports Ltd. is the owner of the Denver Broncos, the NFL team for the city of Denver.  PDB Sports Ltd. is also the owner of the trademarks, logos, and other intellectual property associated with the Denver Broncos.

20.    Defendant New England Patriots, L.P. is limited partnership organized under the laws of the State of Massachusetts, and having its principal place of business at One Patriot Place in Foxboro, Massachusetts 02035-1388. New England Patriots, L.P. is the owner of the New England Patriots, the NFL team for the city of Boston and surrounding locales. New England Patriots, L.P. is also the owner of the trademarks, logos, and other intellectual property associated with the New England Patriots.

21.    Defendant Cincinnati Bengals, Inc. is a corporation organized under the laws of the State of Ohio, and having its principal place of business at 1 Paul Brown Stadium in Cincinnati, Ohio 45202. Cincinnati Bengals, Inc. is the owner of the Cincinnati Bengals, the NFL team for the city of Cincinnati. Cincinnati Bengals, Inc. is also the owner of the trademarks, logos, and other intellectual property associated with the Cincinnati Bengals.

22.    Defendant The Rams Football Company, Inc. is a corporation organized under the laws of the State of Missouri, and having its principal place of business at 1 Rams Way in St. Louis, Missouri 63045. The Rams Football Company, Inc. is the owner of the St. Louis Rams, the NFL team

for the city of St. Louis.  The Rams Football Company, Inc. is also the owner of the trademarks, logos, and other intellectual property associated with the St. Louis Rams.

23.    Defendant Green Bay Packers, Inc. is a corporation organized under the laws of the State of Wisconsin, and having its principal place of business at 1265 Lombardi Avenue in Green Bay, Wisconsin 54304.  Green Bay Packers, Inc. is the owner of the Green Bay Packers, the NFL team for the city of Green Bay and surrounding locales.  Green Bay Packers, Inc.  is also the owner of the trademarks, logos, and other intellectual property associated with the Green Bay Packers.

24.    Defendant Miami Dolphins Ltd.  is a corporation organized under the laws of the State of Florida, and having its principal place of business at 7500 S.W. 30th Street in Davie, Florida 33314. Miami Dolphins Ltd. is the owner of the Miami Dolphins, the NFL team for the city of Miami.  Miami Dolphins Ltd. is also the owner of the trademarks, logos, and other intellectual property associated with the Miami Dolphins.

25.    Defendant New York Jets LLC is a limited liability company organized under the laws of the State of New Jersey, and having its principal place of business at 1 Jets Drive in Florham Park, New Jersey 07932.  New York Jets LLC is the owner of the New York Jets, an NFL team for the city of New York.  New York Jets LLC  is also the owner of the trademarks, logos, and other intellectual property associated with the New York Jets.

26.    Defendant Kansas City Chiefs Football Club, Inc. is a corporation organized under the laws of the State of Missouri, and having its principal place of business at 1 Arrowhead Drive in Kansas City, Missouri 64129.  Kansas City Chiefs Football Club, Inc.  is the owner of the Kansas City Chiefs, the NFL team for the city of Kansas City.  Kansas City Chiefs Football Club, Inc. is also the owner of the trademarks, logos, and other intellectual property associated with the Kansas City Chiefs.

27.    Defendant Dallas Cowboys Football Club Ltd. is a corporation organized under the laws of the State of Texas, and having its principal place of business at One Cowboys Parkway in Irvine, Texas 75063.  Dallas Cowboys Football Club Ltd. is the owner of the Dallas Cowboys, the NFL team for the city of Dallas.  Dallas Cowboys Football Club Ltd. is also the owner of the trademarks, logos, and other intellectual property associated with the Dallas Cowboys.

28.    Defendant Tampa Bay Area NFL Football, Inc. is a corporation organized under the

laws of the State of Florida, and having its principal place of business at 1 Buccaneer Place in Tampa, Florida 33607.  Tampa Bay Area NFL Football, Inc. is the owner of the Tampa Bay Buccaneers, the NFL team for the city of Tampa and surrounding locales. Tampa Bay Area NFL Football, Inc. is also the owner of the trademarks, logos, and other intellectual property associated with the Tampa Bay Buccaneers.

29.     Defendant Cleveland Browns Football Company LLC is a limited liability company organized under the laws of the State of Ohio, and having its principal place of business at 76 Lou Groza Boulevard in Berea, Ohio 44017.  Cleveland Browns Football Company LLC is the owner of the Cleveland Browns, the NFL team for the city of Cleveland.  Cleveland Browns Football Club LLC is also the owner of the trademarks, logos, and other intellectual property associated with the Cleveland Browns.

30.     Defendant New York Football Giants, Inc. is a corporation organized under the laws of the State of New Jersey, and having its principal place of business at 1925 Giants Drive in East Rutherford, New Jersey 07073.  New York Football Giants, Inc. is the owner of the New York Giants, an NFL team for the city of New York and surrounding metropolitan area.  New York Football Giants, Inc. is also the owner of the trademarks, logos, and other intellectual property associated with the New York Giants.

31.     Defendant Philadelphia Eagles Football Club, Inc. is a corporation organized under the laws of the State of Pennsylvania, and having its principal place of business at One NovaCare Way in Philadelphia, Pennsylvania 19145.  Philadelphia Eagles Football Club, Inc. is the owner of the Philadelphia Eagles, the NFL team for the city of Philadelphia.  Philadelphia Eagles Football Club, Inc. is also the owner of the trademarks, logos, and other intellectual property associated with the Philadelphia Eagles.

32.     Defendant Richardson Sports Limited Partnership is a limited partnership organized under the laws of the State of North Carolina, and having its principal place of business at 800 South Mint Street in Charlotte, North Carolina 28202.  Richardson Sports Limited Partnership is the owner of the Carolina Panthers, the NFL team for the city of Charlotte and surrounding locales.  Richardson

Sports Limited Partnership is also the owner of the trademarks, logos, and other intellectual property associated with the Carolina Panthers.

33.    Defendant Pro-Football, Inc. is a corporation organized under the laws of the State of Virginia, and having its principal place of business at 21300 Redskin Park Drive in Ashburn, Virginia 20147.  Pro-Football, Inc. is the owner of the Washington Redskins, the NFL team for the city of Washington and surrounding locales.  Pro-Football, Inc. is also the owner of the trademarks, logos, and other intellectual property associated with the Washington Redskins.

34.    Defendant Five Smiths, Inc. is a corporation organized under the laws of the State of Georgia, and having its principal place of business at 4200 Northside Parkway NW in Atlanta, Georgia 30327.  Five Smiths, Inc. is the owner of the Atlanta Falcons the NFL team for the city of Atlanta.  Five Smiths, Inc. is also the owner of the trademarks, logos, and other intellectual property associated with the Atlanta Falcons.

35.    Defendant B & B Holdings, Inc. is a corporation organized under the laws of the State of Arizona, and having its principal place of business at 8701 South Hardy Drive in Tempe, Arizona 85284.  B & B Holdings, Inc. is the owner of the Arizona Cardinals, the NFL team for the city of Phoenix and surrounding locales.  B & B Holdings, Inc.  is also the owner of the trademarks, logos, and other intellectual property associated with the Arizona Cardinals.

36.    Defendant National Football League Properties, Inc. ("NFLP") is a corporation organized under the laws of the State of Delaware, and having its principal place of business at 280 Park Avenue in New York, New York 10017.  NFLP was established pursuant to an agreement between the NFL and the constituent NFL teams for the purpose of licensing the trademarks, logos and other indicia of the individual NFL teams and the NFL for commercial use.  Pursuant to an agreement between the competing individual NFL teams and the NFL, NFLP has the "exclusive right to license for commercial purposes" the trademarks, logos, and other indicia of NFL teams and the NFL.

37.    Defendant National Football League ("NFL") is an unincorporated association founded in 1963 comprising, through their respective owners, the various football teams in the NFL, and having its principal place of business at 280 Park Avenue in New York, NY 10017.

38.    Defendant Reebok International, Ltd. is a corporation organized under the laws of the

State of Massachusetts with its principal place of business at 189 JW Foster Boulevard in Canton, Massachusetts 02021.  Among other things, Defendant Reebok International, Ltd. is a marketer of sports apparel.

## JURISDICTION AND VENUE

39.     Counts I and II of this Class Action Complaint assert claims on behalf of Plaintiffs and a class of California indirect purchasers, for Defendants' violations of California's Cartwright Act, Section 16720 et. seq. of the California Business and Professions Code.   .

40.     Count III of this Class Action Complaint asserts claims on behalf of Plaintiffs and the same class for violations of California's Unfair Competition Law, Section 17200 of California's Business and Professions Code.

41.     This Court has subject-matter jurisdiction over the claims pled in Counts I-III, pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because these claims involve a putative class action where the citizenship of the class members is diverse from that of at least one of the defendants, and the recovery sought exceeds $5 million exclusive of costs and interest.

42.     Count IV of this Class Action Complaint asserts a claim for injunctive and prospective relief on behalf of Plaintiffs and a nationwide class of indirect purchasers, pursuant to Section 16 of the federal Clayton Act, 15 U.S.C. §26.  This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1331.

43.     To the extent that subject-matter jurisdiction over any of the claims is found lacking under any of the foregoing statutory sections, this Court also has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367 because the claims arise from the same nucleus of operative facts as claims over which this Court does have subject matter jurisdiction.

44.      Venue is proper in this judicial district because one of the Plaintiffs resides in this judicial district, sustained the alleged injury and damages within this judicial district, and at least two of the named defendants, San Francisco Forty Niners Ltd. and The Oakland Raiders, L.P., are headquartered and reside within this judicial district.

## THE RELEVANT ANTITRUST MARKETS

45.     For purposes of this Class Action Complaint, there are two relevant antitrust markets of interest.  The first is the United States market for the licensing of the trademarks, logos, and other emblems (collectively "the Intellectual Property") of individual NFL teams for use in apparel.  The second is the United States retail market for apparel bearing the Intellectual Property of any NFL team.

46.     The former is a necessary input for the latter, as it is not possible to legally manufacture and offer for sale apparel bearing the Intellectual Property of any NFL team without first obtaining a license to use the Intellectual Property from the team at issue.

47.     Professional football has a fan base that is distinct from fans for other sports or from amateur football.

48.     The courts have repeatedly recognized that the nature and activities of the NFL makes it uniquely susceptible to a separate antitrust market or submarket analysis, and that NFL teams compete with each other for sales within this market.  *See American Needle, Inc . v. Louisiana New Orleans Saints*, No. 04-07806 (N.D. Ill.  Dkt. No. 23 entered May 5, 2005), at 13 (denying motion to dismiss complaint upon finding that complaint's alleged market definition for the licensing of NFL team trademarks for use in apparel stated plausible antitrust market definition over objection of NFL that market should include other sporting or entertainment trademarks, and holding that "we do not see how, as a matter of law, a unique market cannot exist for the manufacture and distribution of merchandise carrying the NFL trademarks"); *Los Angeles Memorial Coliseum Commission v. NFL*, 726 F.2d 1381, 1393 (9th Cir. 1984) (holding that NFL games constitute a market separate from other forms of entertainment, and noting that NFL considers its product unique, and that its fans are different from college football fans); *Sullivan v. National Football League*, 34 F.3d 1091, 1097 (1st Cir. 1994) ("it is well established that NFL clubs also compete with each other, both on and off the field, for things like fan support, players, coaches, ticket sales, local broadcast revenues, and the sale of team paraphernalia.").

49.     Similarly, the industry recognizes that competition exists between individual NFL teams for the licensing of their intellectual property for use in the sale of team paraphernalia, and that this comprises a separate antitrust market in which the individual teams compete against one another.  For

example, in 1996, the Dallas Cowboys filed suit against the NFL and the individual NFL teams, arguing that the method by which the teams combined to license their respective intellectual property exclusively through NFLP eliminated "competition in the professional football sponsorship and merchandise markets" in violation of the antitrust laws. *Dallas Cowboys Football Club, Ltd. v. National Football League Trust*, 1996 WL 601705, at *2 (S.D.N.Y. Oct. 18, 1996) (citing Dallas Cowboys' Amended Complaint, at ¶¶ 1, 42).

50. Apparel bearing the Intellectual Property of a particular NFL team competes for sales with apparel bearing the Intellectual Property of other NFL teams. In many parts of the country, there is no NFL team representing that region, although there is an appreciable professional football fan base that purchases NFL team-branded apparel. In these regions (which form the majority of the country), apparel of teams having a large national following, such as the Dallas Cowboys (which is often referred to as "America's Team"), competes for shelf space and purchases against other such nationally-followed teams like the Chicago Bears, Green Bay Packers, Oakland Raiders, the Pittsburgh Steelers, and others. Indeed, so intense is the competition amongst the individual NFL teams, that advertising executives have publicly noted, for example, that even though the Dallas Cowboys have long been known as "America's Team," the Green Bay Packers are more recently in close contention for that designation.

51. Competition for team paraphernalia amongst the rival teams is not limited to those regions of the country that lack an NFL football team. A number of metropolitan regions are approximately equidistant to the home base of more than one NFL team. Thus, in these regions, there is wide competition among these locally overlapping NFL teams for the local fan's consumer dollars. Thus, for example, consumers in Orlando, Florida are approximately equidistant to the home base of two rival NFL teams—the Jacksonville Jaguars and the Tampa Bay Buccaneers. As a result, many Orlando retailers carry NFL team apparel for both teams, as many consumers in the area view both as competitive alternative choices. A similar situation arises in the San Francisco Bay Area where the San Francisco Forty Niners' and the Oakland Raiders' respective home bases are in close geographic proximity.

52. A large source of consumer demand for individual NFL team-branded apparel is from

persons who previously were not fans of professional football.  The individual NFL teams compete against one another to attract the following of these consumers as new fans and as new purchasers of team apparel.   Thus, in a market devoid of Defendants' alleged anticompetitive conduct, a person who heretofore was not a fan of professional football, would base his purchases of NFL team-branded apparel on, *inter alia*, the pricing of a particular NFL team-branded apparel.

53.     Another aspect furthering competitive demand among the several NFL teams for their apparel is that the nature of today's mobile society means that a large segment of the adult population does not remain in the same locale for their entire lifetime.  It is now commonplace for persons to have been born in one metropolitan area, spent their childhood there, but gone to college in a different part of the country, obtained a first job out of college in yet a third area, and obtained a subsequent job or jobs in a different city or cities still again.  Such persons who have ties to multiple areas of the country will often have an interest in the NFL team apparel of various teams representing the different cities to which such people have ties.  In a market devoid of Defendants' unlawful and anticompetitive conduct, these various teams would compete against one another, including on price, to win the demand of such consumers for NFL-team branded apparel.

54.     These and other factors show that there is consumer demand from consumers across the country for apparel bearing the Intellectual Property of individual NFL teams, and that price competition among individual NFL teams for apparel bearing their respective team's Intellectual Property would exist in the absence of the unlawful conduct detailed herein.

55.     The consumer demand for apparel bearing the Intellectual Property of the individual NFL teams also supports and provides demand for the licensing of such Intellectual Property by apparel manufacturers.  Indeed, for decades, individual manufacturers licensed the Intellectual Property of the several NFL teams in order to incorporate that Intellectual Property in apparel to be manufactured by such licensees.

56.     When consumers like Plaintiffs and the class members purchase from a retailer or other merchant NFL apparel bearing the Intellectual Property of an individual NFL team they acquire, as part of that apparel purchase, the license to use (i.e. wear) that Intellectual Property as part of their apparel purchase.  As such, Plaintiffs and the class members are indirect purchasers of the apparel and of the

license because they did not purchase the apparel and did not negotiate the license directly from the individual NFL team defendants.

## APPAREL BEARING THE INDIVIDUAL NFL TEAMS' INTELLECTUAL PROPERTY AND THE LICENSING OF THE SAME

57.     The popularity of professional football in the United States has long supported a market for apparel that bears the Intellectual Property of individual NFL teams.   Manufacture of such apparel, however, requires the manufacturer to obtain a license from the particular NFL team whose Intellectual Property is to form part of the manufactured apparel.   The Intellectual Property comprising these trademarks, logos, and emblems belongs to each of the separate NFL teams, respectively.

58.     Prior to December 2000, Defendant NFLP accepted applications for and granted licenses to various businesses ("NFL Licensees") that incorporate the various individual NFL teams' Intellectual Property as decoration on apparel, and for other items for sale to the general public.  Some of these licensees included Reebok, Puma, Nike, and others.  As of January 1995, for example, Reebok International was just one of 27 licensees of NFL team apparel.

59.     Prior to December 2000, the various NFL Licensees competed against each other in attempts to obtain such an NFLP license for a particular NFL team or set of teams.

60.     The NFL Licensees, in turn, also competed against each other in the design, manufacture, and sale of apparel that bore the individual NFL team Intellectual Property.

61.     One such NFL Licensee prior to December 2000 was American Needle, Inc., which manufactured headwear bearing the Intellectual Property of various individual NFL teams.  American Needle had been such a licensee since the 1970's.

62.     The net result of this competitive landscape was that there was competition among the individual NFL teams to license their respective Intellectual Property to various NFL Licensees for use in apparel.  Each individual NFL team had a competitive incentive to license its Intellectual Property to licensees on terms that would make the would-be NFL Licensees choose to license that individual team's Intellectual Property over other competing teams' Intellectual Property.  Likewise, because there were several NFL Licensees, competition among them for the sale of apparel bearing NFL teams'

Intellectual Property ensured that the market for such apparel was subject to free market forces that served to provide the ultimate consumer of such apparel with superior product selection and competitive prices.

63.     That competitive landscape all changed in December 2000.  On that date, the individual NFL teams—all of whom previously competed against one another for the licensing of their respective team's Intellectual Property—as well as the NFL and NFLP jointly agreed that they would no longer grant multiple licenses to use the Intellectual Property of the individual NFL teams for use in apparel. Instead, these heretofore competing actors jointly agreed to cease competing as to this licensing and, instead, to grant only an exclusive license to a single marketer, Reebok, to use the Intellectual Property of the individual NFL teams and the NFL for use in apparel.  Specifically, the NFLP, with the vote and agreement of the Individual NFL teams and the NFL, licensed to Reebok International the exclusive right to use NFL team trademarks in the category for uniforms, sideline apparel, headwear, and fitness equipment.  The NFLP-Reebok agreement, which took approximately six months to negotiate, marked the first time that the Individual NFL team's apparel business had been united under one company.

64.     The result of this agreement amongst these separate economic actors who heretofore had competed against one another for the licensing of their Intellectual Property for use in apparel, was that competition in such licensing was eliminated by joint agreement. No longer would the individual NFL teams compete against each other for the licensing of their Intellectual Property to apparel manufacturers.  As a further result of this agreement, the manufacture and sale of NFL-team branded apparel, which heretofore had been subject to competition amongst the several NFL Licensees, also was eliminated and replaced by a single exclusive licensee, Reebok.

65.     In fact that is just what occurred.  After the foregoing agreement between the NFLP, NFL, and individual NFL teams, the NFLP, with the participation and consent of the NFL and individual NFL teams, entered into an exclusive licensing agreement with Reebok.  Pursuant to that exclusive agreement, Reebok was granted an exclusive license of more than ten years' duration, pursuant to which Reebok and only Reebok was licensed to manufacture apparel bearing the Intellectual Property of any NFL team.   In doing so, the individual NFL teams, the NFL, and NFLP

intended to and did create a monopoly in the licensing and manufacturing of apparel bearing NFL team Intellectual Property.

66.     After the exclusive agreement between NFLP and Reebok was executed, those entities, like American Needle, that were NFL Licensees (and in American Needle's case, had been licensees for decades), were notified by the NFLP that their licenses would not be renewed upon their expiration. American Needle's license, for example, was not renewed upon its expiration in March 2001. Thereafter, for a period of approximately ten years or more, the sole entity permitted to manufacture apparel bearing the Intellectual Property of any NFL team was Reebok.

67.     More recently, following the expiration of Reebok's ten year exclusive contract, the NFL announced, that beginning in April 2012, Nike, Reebok's main competitor, will replace Reebok and be the new exclusive licensee of the Intellectual Property of any and all Individual NFL teams for use in apparel other than headwear, and that the company New Era Cap Co. Inc. will be the new exclusive licensee for use of the Intellectual Property of any and all individual NFL teams for use in headwear.  Both the Nike and New Era exclusive contracts are for a period of five years.

68.     That the exclusive license to Reebok resulted in the thwarting of competition and increased pricing is not surprising because this was precisely the goal of the Individual NFL teams and of the NFLP in granting such an exclusive license.  By the 1990's the NFL began to see its royalty revenues stagnate.  Facing this circumstance, the NFL hired apparel expert Chuck Zona to restructure the NFLP's approach to licensing, including in the context of apparel.

69.     Zona concluded that the NFLP had executed licensing agreements with too many apparel companies, which in turn sold too many products to too many stores, thereby creating an 'inventory glut' insofar as NFL-related apparel was concerned.

70.     Zona contended that, to rectify itself, the NFLP needed to "create the dynamic of supply and demand," meaning, in effect, price and produce like a monopolist rather than like a competing firm. It was in furtherance of achieving that end that the NFLP, with the vote and agreement of the individual NFL teams and the NFL, awarded its apparel license to one company, Reebok, which paid $250 million in 2002 for the exclusive licensing contract of more than ten years' duration.

71.     The NFLP believed that this exclusive license with Reebok would allow for monopoly

*Dang v. San Francisco Forty Niners, Ltd. et. al,*
First Amended Class Action Complaint

pricing of NFL team-branded apparel, and would also remove opportunities for what the NFLP viewed as idiosyncratic arrangements between individual NFL teams and nonexclusive companies.

**ANTITRUST INJURY AND ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT**

72.    The Individual NFL teams' agreement and decision to stop competing in licensing their respective teams' Intellectual Property for use in apparel, and the NFLP's and Individual NFL teams' decision to provide an exclusive blanket license to Reebok to use the Intellectual Property of any individual NFL team for apparel, have thwarted competition in the downstream market for apparel bearing the Intellectual Property of any NFL team.

73.    Absent the agreement among the individual NFL teams to cease competing among themselves for such licensing, and instead to assign to NFLP the exclusive right to license their respective individual team's Intellectual Property, the individual NFL teams would be free to and would compete against one another for such licensing, with such competition resulting in licensing royalty rates that were competitively priced.  Indeed, prior to 2000, American Needle had first obtained licenses to use only some, but not all, individual NFL teams' Intellectual Property for use in headwear, and only eventually secured licenses from all competing NFL teams' Intellectual Property for such use.

74.    Likewise, the NFLP's decision, with the vote of the individual NFL teams and the NFL, to grant an exclusive more than 10-year blanket license to Reebok to use the Intellectual Property of any and all individual NFL teams for use in apparel incorporating the Intellectual Property of any individual NFL team, foreclosed competition between rival NFL Licensees that would otherwise exist and compete in manufacturing and distributing such apparel.  Absent this exclusive agreement, rival licensees manufacturing and distributing apparel bearing the Intellectual Property of any NFL team would have competed against one another, thereby providing consumers like Plaintiffs and the class members with the benefits of such market competition, including lower prices and increased quality and selection.

75.    The net result of these two agreements was that competition in the market for apparel bearing the Intellectual Property of any NFL team has been foreclosed both because the Individual NFL teams agreed to and did cease competing for the licensing of their respective team's Intellectual

Property and because the NFLP, with the vote of the individual NFL teams and the NFL, entered into an exclusive 10-year or longer agreement with Reebok, making Reebok the only NFL Licensee for use of Intellectual Property of individual NFL teams in apparel, to the exclusion of all other would-be competing licensees.

76.     When Plaintiffs, both of whom are California residents, purchased their apparel bearing the logo and Intellectual Property of an NFL team during the Class Period from retailers, they made their purchases in a market that was devoid of competition for the apparel they purchased and, as such, they were subject to an anticompetitive overcharge resulting from these antitrust violations.

77.     The anticompetitive effects of the Defendants' conduct is readily apparent by even a cursory sampling of prices of the pertinent apparel during the time period following Reebok's exclusive agreement with the NFLP.  For example, in the early 2000's prices for fitted caps increased from $19.99 to $30.00, an increase far and above what would be expected in a market devoid of unlawful, exclusionary conduct.  Similarly, between 2002 and 2003, the price of replica football jerseys increased from $40 to $65, also indicative of exclusionary conduct undertaken by actors with market power.

## CLASS ACTION ALLEGATIONS

78.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiffs bring this action on behalf of themselves and all others similarly situated.   Counts I-III of this Class Action Complaint assert claims under the California Cartwright Act and California's Unfair Competition Law, and are brought on behalf of a class of California residents who, during the Class Period, were indirect purchasers of apparel branded with the Intellectual Property of any of the Individual NFL teams.  Count IV of this Complaint is brought on behalf of a nationwide class of persons who, during the Class Period, were indirect purchasers of apparel branded with the Intellectual Property of any of the Individual NFL teams, and seeks injunctive and prospective relief under the federal Sherman and Clayton Acts, pursuant to 15 U.S.C. § 26.  Excluded from all class definitions are indirect purchasers who purchased the foregoing apparel solely for purposes of resale.  Also excluded from all class definitions are all employees, officers, and/or agents of any of the named defendants in this Class Action Complaint.  Moreover, all federal and state government employees, including the judicial

officers assigned to this case and their staff, are also explicitly excluded from all class definitions. Plaintiffs reserve the right to amend these class definitions as discovery or other case circumstances warrant.

79.     Although the exact number of class members is presently unknown, Plaintiffs are informed and believe, based on the popularity of the NFL and apparel branded with NFL team Intellectual Property, that that there are at least hundreds of thousands of class members, thereby readily satisfying the numerosity requirement for class certification.

80.     Class certification is also appropriate because there is an identifiable class on whose behalf this class action would be prosecuted.  Specifically, Plaintiffs seek to represent a class of all California persons who, during the Class Period, indirectly purchased apparel branded with the Intellectual Property of any individual NFL team.  For Count IV, Plaintiffs seek to represent all indirect purchasers within the United States who made such purchases during the Class Period.

81.     Class certification is also appropriate because there are questions of fact and/or law that are common to the class members, and that predominate over any issues that may affect only individual members of the class.  Among these predominating common questions of fact and/or law are:

a.  Whether the Individual NFL teams agreed to cease competing against one another in the licensing of their individual teams' Intellectual Property for use in apparel;

b.  Whether there exists an antitrust market as defined in Plaintiffs' Class Action Complaint;

c.  Whether NFLP's decision, with the vote of the Individual NFL teams and the NFL, to award an exclusive license to Reebok to all of the Individual NFL teams' Intellectual Property for use in apparel is anticompetitive and violates the Cartwright Act;

d.  Whether any anticompetitive effects of Defendants' practices are justified or outweighed by any procompetitive effects;

e.  Whether Plaintiffs and the class members were injured as a result of Defendants' conduct, as alleged herein, and, if so, the proper measure of damages;

f.  Whether NFLP's ongoing decision to grant a new exclusive blanket license to Nike,

Inc. for the use of any of the individual NFL teams' Intellectual Property in apparel is likely to cause imminent future harm to the members of the injunctive relief class.

82.    Plaintiffs' claims are typical of the claims of the absent class members in that Plaintiffs, like all the absent class members, were (and still are) California residents and indirect purchasers during the Class Period of apparel featuring the Intellectual Property of an individual NFL team.  Plaintiffs further claim, as is claimed on behalf of the class members, that the actions of the Defendants, as described herein, restricted competition in the market for apparel bearing the Intellectual Property of any NFL team, and caused Plaintiffs and the class members to be overcharged for their purchases of the same during the Class Period.  The claims Plaintiffs advance on their own behalf are identical to the claims asserted on behalf of the class.

83.    Plaintiffs are adequate class representatives in that, as a member of the class and an indirect purchaser during the Class Period of apparel branded with the Intellectual Property of an NFL team, their interests are entirely aligned with those of the class.  There are no individual conflicts that prevent Plaintiffs from adequately representing the class.  Plaintiffs have also retained competent counsel experienced in class action litigation.

84.    Class certification is proper because the individual NFL team defendants and NFLP have acted or refused to act on grounds generally applicable to the entire class.  These defendants have provided only an exclusive blanket license to a single entity (previously Reebok, and now Nike) to manufacture apparel branded with the Intellectual Property of any NFL team, and have agreed that the individual NFL teams will not compete against one another for such licensing, thereby continuing to thwart competition in the relevant market and imposing or threatening to impose economic injury on the members of the class.    Absent a class action, there would be a risk of inconsistent rulings with respect to these defendants' duties to each of the thousands of putative class members.

85.    A class action presents a superior form of adjudication over individual litigation.  The costs of litigating this action against large and sophisticated defendants like the individual NFL teams, the NFL, NFLP, and Reebok, in comparison to the recovery or relief sought, would make individual litigation impracticable.  In addition, forcing individual litigation would risk the result of inconsistent rulings with respect to the Defendants' duties owed to the various class members.

86.     A class action is manageable.  The proposed class represents an identifiable community that can be readily identified, and the relief sought is one that can be overseen by the Court.

## COUNT I

**HORIZONTAL AGREEMENT IN RESTRAINT OF TRADE IN VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT—AGAINST ALL INDIVIDUAL NFL TEAM DEFENDANTS, NFLP, AND THE NFL**
**(ON BEHALF OF A CLASS OF CALIFORNIA INDIRECT PURCHASERS)**

87.     Plaintiffs hereby incorporate by reference all of the allegations of this Class Action Complaint with the same force and effect as if they had been fully restated herein.

88.     In the relevant antitrust market for the licensing of the Intellectual Property of NFL teams for use in apparel, the individual NFL team defendants are all competitors of one another.  As such, absent the agreements detailed herein, each of these individual NFL teams would be free to and would license its Intellectual Property to licensees upon terms (including royalty rates) freely negotiated between the particular individual NFL team and licensee.  Such licensing, however, would be subject to, and constrained by, market forces because, no individual NFL team could plausibly seek to exact a supra-competitive royalty rate for its Intellectual Property, or it would risk losing royalty revenue and/or the licensing agreements to rival competing individual NFL teams.

89.     The agreement among the individual NFL teams and the NFLP that the individual teams would stop competing against one another in the market for the licensing of the Intellectual Property of individual NFL teams for use in apparel has thwarted and prevented that competition from taking place, and has resulted in the charging of supra-competitive royalty rates for a blanket license, which, in turn, has been passed on to consumers, like Plaintiffs and the members of the class they seek to represent, in the form of supra-competitive prices for the apparel items containing the Intellectual Property of any of the individual NFL teams.

90.     The agreement between the individual NFL teams and the NFLP, pursuant to which the individual teams would cease competing against one another in the licensing of their respective team's Intellectual Property for use in apparel is a classic horizontal agreement in restraint of trade among competitors that is *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as California's Cartwright Act, Section 16720 et. seq. of the California Business and Professions Code.  It

1    is hereinafter referred to as the "horizontal agreement."

2        91.    To the extent that the horizontal agreement were to be found not subject to *per se*

3    illegality, the horizontal agreement is still unlawful under the antitrust Rule of Reason because its

4    anticompetitive effects are not overridden or justified by any procompetitive benefits stemming from

5    the horizontal agreement.  Further, to the extent that any procompetitive benefits result from the

6    horizontal agreement, they could be achieved by less restrictive means.

7        92.    The individual NFL teams, as well as the NFLP, continue to adhere to the horizontal

8    agreement to this day, and did so during the Class Period when Plaintiffs and the class members made

9    their apparel purchases.  Thus, although the individual NFL teams own their respective team's

10   Intellectual Property, they have refused to individually license their team's Intellectual Property for use

11   in apparel because they have adhered to the terms of the horizontal agreement, pursuant to which they

12   agreed not to provide individual licenses, and to instead cease any competition for such licensing

13   among individual teams, letting only the NFLP grant blanket licenses for all teams' Intellectual

14   Property collectively for use in apparel.

15       93.    The direct, proximate, and foreseeable result and effect of the horizontal agreement was

16   that competition for the licensing of Intellectual Property of NFL teams for use in apparel was thwarted,

17   royalty rates were increased over what they would have been in a market devoid of this anticompetitive

18   horizontal agreement, and these supra-competitive royalty rates were passed on to the ultimate

19   consumers of the apparel, like Plaintiffs and the class members, in the form of higher prices for the

20   apparel.

21       94.    As a direct, proximate, and foreseeable result of the horizontal agreement, Plaintiffs and

22   the class members have been injured in their business or property by, *inter alia*, being charged supra-

23   competitive prices for their purchases during the Class Period of apparel containing the Intellectual

24   Property of any NFL team.

25       95.    As consumers and indirect purchasers in California who, during the Class Period,

26   allegedly paid supra-competitive prices for the apparel bearing the Intellectual Property of any NFL

27   team, Plaintiffs and the members of the class they seek to represent, have standing to and do seek an

28   award of money damages, trebled under the applicable statutes, to compensate them for the overcharges

they sustained as a result of the Defendants' conduct, as well as an award of attorneys' fees and costs of suit. Plaintiffs and the class members also have standing to and do seek declaratory and injunctive relief that would, *inter alia*, declare the agreement to be unlawful and unenforceable.

## COUNT II

**VERTICAL AGREEMENT IN RESTRAINT OF TRADE IN VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT—AGAINST ALL INDIVIDUAL NFL TEAM DEFENDANTS, NFLP, THE NFL, AND REEBOK**
**(ON BEHALF OF A CLASS OF CALIFORNIA INDIRECT PURCHASERS )**

96. Plaintiffs hereby incorporate by reference all of the allegations of this Class Action Complaint with the same force and effect as if they had been fully restated herein.

97. In the relevant market for apparel bearing the Intellectual Property of NFL teams, several rival manufacturers, including Reebok, Puma, American Needle, and others competed prior to the grant of an exclusive license to Reebok from NFLP. Competition between rival manufacturers provided the ultimate consumer, like Plaintiffs and the members of the class they seek to represent, the benefits of free market forces, including competitive pricing and enhanced quality. Without a license to use the Intellectual Property of an NFL team, it is impossible for any manufacturer legally to manufacture and offer for sale any apparel bearing the Intellectual Property of that NFL team.

98. In approximately December 2000, NFLP, with the vote and consent of each of the individual NFL teams, agreed that competition in the manufacture and sale of apparel bearing the Intellectual Property of any NFL team would stop, because NFLP would grant an exclusive license for the Intellectual Property of any and all individual NFL teams for use in apparel only to Reebok for a 10-year or longer period of time, to the exclusion of all other manufacturers. Pursuant to this agreement, which is hereinafter referred to as the "vertical agreement," the licenses of apparel manufacturers other than Reebok to use the Intellectual Property of any of the individual NFL teams in apparel were not renewed upon their expiration. The duration of Reebok's exclusive license expired in early 2012, as there was a lag time between the announcement of the agreement in December 2000 and its implementation some 18 months later.

99. As a result of the horizontal agreement detailed in Count I herein and the fact that each

individual NFL team was the sole owner of its team's Intellectual Property, the NFLP possessed a monopoly in the licensing of NFL team Intellectual Property, and as a result, the 10-year or so exclusive vertical agreement between the NFLP and Reebok locked up 100 percent of the relevant market because there were no other sources, during the duration of the vertical agreement, from which rival manufacturers (i.e., manufacturers other than Reebok) could obtain a license to the Intellectual Property necessary to manufacture apparel bearing the Intellectual Property of any NFL team.

100.    The direct, proximate, and foreseeable result and effect of the vertical agreement was that competition for apparel bearing Intellectual Property of NFL teams was thwarted, forcing the ultimate consumer of such apparel, like Plaintiffs and the class members, to pay supra-competitive prices for their apparel purchases during the Class Period.

101.    As a direct, proximate, and foreseeable result of the vertical agreement, Plaintiffs and the class members have been injured in their business or property by, *inter alia*, being charged supra-competitive prices for their purchases during the Class Period of apparel containing the Intellectual Property of any NFL team.

102.    As consumers and indirect purchasers in California who, during the Class Period, allegedly paid supra-competitive prices for the apparel bearing the Intellectual Property of any NFL team, Plaintiffs and the members of the class they seek to represent, have standing to and do seek an award of money damages, trebled under the applicable statutes, to compensate them for the overcharges they sustained as a result of the Defendants' conduct, as well as an award of attorneys' fees and costs of suit.   Plaintiffs and the class members also have standing to and do seek declaratory and injunctive relief that would, *inter alia*, declare the vertical agreement to be unlawful and unenforceable.

## COUNT III

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW—AGAINST ALL DEFENDANTS**
**(ON BEHALF OF A CLASS OF CALIFORNIA INDIRECT PURCHASERS)**

103.    Plaintiffs hereby incorporate by reference all of the allegations of this Class Action Complaint with the same force and effect as if they had been fully restated herein.

104.    The conduct engaged in by Defendants, as alleged herein, is unlawful in that it violates,

*inter alia*, California's Cartwright Act, Section 16720 et. seq. of the California Business and Professions Code, as well as Section 1 of the federal Sherman Act, 15 U.S.C. § 1.

105. Defendants' conduct described herein was undertaken as part of a business practice of each of the named Defendants.

106. Defendants' conduct, as alleged herein, is also unfair within the meaning of California's Unfair Competition Law because it threatens competition at its incipiency by thwarting competition among rival NFL team members for the licensing of their respective competing teams' Intellectual Property for use in apparel, and because it forbids competition among rival apparel manufacturers.

107. Plaintiffs and members of the class, as indirect purchasers of apparel bearing the Intellectual Property of NFL teams, conveyed money or interest to Defendants because the royalties paid to these NFL team defendants for the use of their Intellectual Property on the apparel purchased by Plaintiffs and the class members during the Class Period was ultimately borne by Plaintiffs and the class members in the form of the supra-competitive prices paid by them for the apparel.

108. Plaintiffs and the class members have standing to and do seek equitable relief against Defendants, including an order of equitable restitution that would restore to Plaintiffs and the Class members the interest or moneys conveyed to Defendants during their unlawful and/or unfair business practices within the Class Period.

## COUNT IV

**VIOLATION OF FEDERAL SHERMAN AND CLAYTON ACTS—AGAINST INDIVIDUAL NFL TEAMS, NFLP, AND THE NFL**

**(ON BEHALF OF NATIONWIDE CLASS OF INDIRECT PURCHASERS SEEKING INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 26)**

109. Plaintiffs hereby incorporate by reference all of the allegations of this Class Action Complaint with the same force and effect as if they had been fully restated herein.

110. Both the vertical and horizontal agreements detailed herein amount to unreasonable agreements in restraint of trade in violation of 15 U.S.C. § 1.

111. Plaintiffs and the members of the class they seek to represent are likely to suffer future imminent harm unless the Court enjoins the Defendants from continuing their horizontal and vertical

*Dang v. San Francisco Forty Niners, Ltd. et. al,*
First Amended Class Action Complaint

agreements in restraint of trade.

112.    Plaintiffs and the class members seek and may recover money damages to compensate them for the overcharges they have already sustained in purchasing during the Class Period apparel bearing the Intellectual Property of any NFL team.  However, Plaintiffs and the class members are reasonably likely to purchase additional apparel bearing such Intellectual Property in the near future. Unless and until Defendants are enjoined from continuing their conduct, including entering and abiding by the horizontal and/or vertical agreements described herein, Plaintiffs and the class members are reasonably likely to continue to suffer imminent harm.

113.    Indeed, because a finding of liability on Plaintiffs' claims for money damages depends upon a finding that either the horizontal or vertical agreement, or both, are unlawful under state and/or federal antitrust laws, it would be indefensible for a Court to simply award Plaintiffs and the class members money damages to Plaintiffs and the class members, but allow the Defendants to continue abiding by these agreements already found to be unlawful and violative of the antitrust laws.

114.    The horizontal agreement alleged herein continues in effect.  The vertical agreement in which Reebok was the exclusive 10-year licensee of NFLP has expired, but has been replaced by a new similar vertical agreement in which Nike has been granted an exclusive 5-year license to the Intellectual Property of any NFL team for use in apparel.  The anticompetitive effect of the new vertical agreement with Nike is the same, for all intents and purposes, as the vertical agreement that was in place during the Class Period involving Reebok as the sole licensee.

115.    Section 16 of the Clayton Act, 15 U.S.C. § 26, permits a court to award injunctive relief to private plaintiffs proving an antitrust violation.  Pursuant to that statutory section,  Plaintiffs and the class members seek such equitable and injunctive relief that would, include a declaratory judgment by this Court that the horizontal agreement, vertical agreement involving the NFLP and Reebok, and the new vertical agreement involving the NFLP and Nike all violate the federal and California antitrust laws, as well as injunctive relief, enjoining the Individual NFL team defendants and the NFLP from continuing to abide by any of these agreements.

1

2

3

**<u>PRAYER FOR RELIEF</u>**

4

WHEREFORE, Plaintiffs and the class members pray for judgment against all Defendants as follows:

5

     A.    That the Court determine that this action may be litigated as a class action, and

6

that Plaintiffs and their counsel be appointed class representatives and class counsel,

7

respectively;

8

     B.    That Defendants be permanently enjoined from continuing in any manner the

9

violations alleged herein, and that Defendants' conduct be declared unlawful and

10

violative of the federal and state antitrust laws;

11

     C.    That judgment be entered against Defendants and in favor of Plaintiffs and the

12

class members on all counts;

13

     D.    That Defendants be ordered to bear the cost of notifying the absent class

14

members of this class action, and of the class members' rights respecting the same;

15

     E.    That Defendants be ordered to pay the actual damages and losses sustained by

16

Plaintiffs and the class members and, where statutorily permissible, treble damages;

17

     F.    That the Court order the creation of a common fund by Defendants from which

18

Plaintiffs and their counsel shall be awarded their reasonable costs of suit, including

19

reasonable attorneys' fees and expenses incurred in prosecuting this class action and in

20

conferring a common benefit upon the class members;

21

     G.    That Defendants be ordered to provide equitable restitution to Plaintiffs and the

22

class members;

23

     H.    That Defendants be ordered to pay Plaintiffs' counsel reasonable attorneys' fees

24

and costs of suit, as awarded by this Court;

25

     I.    That Plaintiffs and the class members be awarded all such other relief as this

26

Court deems just and proper.

27

28

1

## **JURY DEMAND**

2          Plaintiffs respectfully request a trial by jury on all claims and causes of action properly triable

3   before a jury.

4   Dated:  June 3, 2014                               Respectfully submitted,

5                                                        __/s/ Roy A. Katriel_____
                                                          Roy A. Katriel (SBN 265463)
6                                                        THE KATRIEL LAW FIRM
                                                          12707 High Bluff Drive  Suite 200
7                                                        San Diego, CA 92130
                                                          Telephone: (858) 350-4342
8                                                        Facsimile:  (858) 430-3719
                                                          email:rak@katriellaw.com
9

10                                                       Ralph B. Kalfayan (SBN 133464)
                                                          KRAUSE KALFAYAN BENINK & SLAVENS, LLP
11                                                       550 West C Street, Suite 530
                                                          San Diego, California 92101
12                                                       Telephone: (619) 232-0331
                                                          Facsimile:  (619) 232-4019
13                                                       e-mail: ralph@kkbs-law.com

14

15                                                       *Counsel for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28