Sonya D. Winner (SBN 200348)
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-6000
Facsimile:  (415) 591-6091
E-mail: SWinner@cov.com

Gregg H. Levy (*pro hac vice*)
Derek Ludwin (*pro hac vice*)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave. NW
Washington, D.C. 20004
Telephone: (202) 662-6000
Facsimile:  (202) 778-5429
E-mail: GLevy@cov.com
E-mail: DLudwin@cov.com

*Attorneys for the NFL, NFL Properties,
and the Individual NFL Clubs*

*[Additional counsel listed below]*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK DANG AND MICHAEL VILLA, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SAN FRANCISCO FORTY NINERS, LTD., et al. <br><br> Defendants. | Case No.: 5:12-cv-5481 EJD <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** <br><br> **Date:**       **April 9, 2015** <br> **Time:**       **9:00 a.m.** <br> **Courtroom:** **4** <br> **Judge:**      **Hon. Edward J. Davila** |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 2

    A.    The NFL and Its Licensing Program ............................................ 2

    B.    Sales of Licensed Products to End Users....................................... 4

    C.    The Named Plaintiff ....................................................................... 5

    D.    Plaintiff's Motion and Supporting Evidence ................................ 7

ARGUMENT .............................................................................................................. 9

I.    Plaintiff's Proposed Classes Are Not Ascertainable............................ 10

    A.    Plaintiff's Class Definitions Lack Definite Criteria for Identifying Class Members. .................................................. 11

    B.    Plaintiff Has Identified No Practical Means to Identify Class Members. ....................................................................... 12

II.    Plaintiff's Proposed Classes Do Not Satisfy the Requirements of Rule 23(a). .............. 15

    A.    Plaintiff Has Not Demonstrated the Existence of Common Issues. .................... 15

    B.    Plaintiff's Claims Are Not Typical of the Claims of the Proposed Class Members. ....................................................... 20

    C.    Plaintiff Is Not an Adequate Representative of the Proposed Classes................. 21

III.    Plaintiff's Proposed Damages Class Does Not Satisfy the Requirements of Rule 23(b)(3). ........................................... 23

    A.    Plaintiff Cannot Prove Harm to Competition on a Class-Wide Basis. ................ 24

    B.    Plaintiff Fails to Demonstrate a Common Method of Proving that the Proposed Class Members Suffered Injury. ........................................... 27

        1.    Plaintiff Fails to Demonstrate that the Impact of the Horizontal Agreement on Indirect Purchasers Is Subject to Common Proof. ............ 28

        2.    Plaintiff Fails to Demonstrate that the Impact of the Vertical Agreement on Indirect Purchasers Is Subject to Common Proof. ............ 29

    C.    Plaintiff Cannot Prove Damages on a Common Basis. ......................... 35

        1.    Plaintiff Fails to Demonstrate that He Can Calculate on a Class-Wide Basis Overcharges on Distributors or Retailers. ............................ 36

2.      Plaintiff Fails to Demonstrate That He Can Calculate Pass-Through on a Class-Wide Basis...............................................................39

IV.   Plaintiff's Proposed Nationwide Injunctive Relief Class Does Not Satisfy Rule 23. ................................................................................................................42

A.   Plaintiff Has Made No Meaningful Showing Under Rule 23(a) for a Nationwide Class Seeking to Enjoin a New Set of Licensing Arrangements. ...............................................................................................42

B.   Certification Under Rule 23(b)(2) Would Be Improper. .....................................44

CONCLUSION.................................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp.,*
  247 F.R.D. 156 (C.D. Cal. 2007) ............................................................21, 22, 29

*Am. Honda Motor Co. v. Allen,*
  600 F.3d 813 (7th Cir. 2010) ........................................................................42

*Am. Needle, Inc. v. Nat'l Football League,*
  560 U.S. 183 (2010) ....................................................................................24

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997) ................................................................................22, 23

*Astiana v. Ben & Jerry's Homemade, Inc.,*
  2014 WL 60097 (N.D. Cal. 2014) ..............................................................13, 24

*Berger v. Home Depot USA, Inc.,*
  741 F.3d 1061 (9th Cir. 2014) ......................................................................44

*Bieneman v. City of Chicago,*
  864 F.2d 463 (7th Cir. 1988) ........................................................................22

*Cal. v. Infineon,*
  2008 WL 4155665 (N.D. Cal. 2008) ..........................................................24, 36

*Carrera v. Bayer Corp.,*
  727 F.3d 300 (3d Cir. 2013) ........................................................................14

*Cholakyan v. Mercedes-Benz, USA, LLC,*
  281 F.R.D. 534 (C.D. Cal. 2012) ..................................................................45

*City of San Mateo v. CSL Ltd.,*
  2014 WL 4100602 (N.D. Cal. 2014) ..............................................................35

*Comcast Corp v. Behrend,*
  133 S. Ct. 1426 (2013) ................................................................9, 23, 36, 37, 41

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.,*
  691 F.2d 1335 (9th Cir. 1982) ..................................................................34, 35

*County of Tuolumne v. Sonora Cmty. Hosp.,*
  236 F.3d 1148 (9th Cir. 2001) ......................................................................16

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
  2013 WL 5391159 ................................................................................37, 38

*Daubert v. Merrell Dow Pharm.,*
  509 U.S. 579 (1993) ....................................................................................42

*Deitz v. Comcast Corp.*,
   2007 WL 2015440 (N.D. Cal. 2007) ........................................................................10, 12, 13

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) ...........................................................................................................10

*In re Fla. Cement & Concrete Antitrust Litig.*,
   2012 WL 27668 (S.D. Fla. 2012) ..........................................................................32, 33, 40, 42

*In re Fla. Cement & Concrete Antitrust Litig.*,
   278 F.R.D. 674 (S.D. Fla. 2012) ........................................................................................10

*In re Flash Memory Antitrust Litig.*,
   2010 WL 2332081 (N.D. Cal. 2010) ........................................................................... *passim*

*In re Google AdWords Litig.*,
   2012 WL 28068 (N.D. Cal. 2012) .......................................................................................41

*In re Google Inc. Gmail Litig.*,
   2014 WL 1102660 (N.D. Cal. 2014) ...................................................................................25

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) ................................................................................. *passim*

*In re High Tech Emp. Antitrust Litig.*,
   289 F.R.D. 555 (N.D. Cal. 2013) ..................................................................................27, 28

*Holman v. Experian Information Solutions, Inc.*,
   2013 WL 4873496 (N.D. Cal. 2013) ...................................................................................13

*Kottaras v. Whole Foods Mkt., Inc.*,
   281 F.R.D. 16 (D.D.C. 2012) ..........................................................................24, 25, 32, 37, 39

*Leyva v. Medline Indus., Inc.*,
   716 F.3d 510 (9th Cir. 2013) ..............................................................................................38

*Lilly v. Jamba Juice Co.*,
   2014 WL 4652283 (N.D. Cal. 2014) ...................................................................................25

*Luiken v. Domino's Pizza, LLC*,
   705 F.3d 370 (8th Cir. 2013) ..............................................................................................19

*Mad Rhino, Inc. v. Best Buy Co.*,
   2008 WL 8760854 (C.D. Cal. 2008) ...................................................................................12

*Major v. Ocean Spray Cranberries, Inc.*,
   2013 WL 2558125 (N.D. Cal. 2013) ...................................................................................21

*Marcus v. BMW of N. Am., LLC*,
   687 F.3d 583 (3d Cir. 2012) ......................................................................................10, 12, 14

*Mazur v. eBay Inc.*,
   257 F.R.D. 563 (N.D. Cal. 2009) ....................................................................................9, 10

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ........................................................................................9

*In re Methionine Antitrust Litig.*,
   204 F.R.D. 161 (N.D. Cal. 2001) .............................................................................24, 28

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
   2014 WL 3899815 (N.D. Cal. 2014) .........................................................................26, 27

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) .....................................................................................27

*In Re Optical Disk Drive Litig.*,
   2014 WL 4965655 (N.D. Cal. 2014) .................................................................... *passim*

*Package Shop, Inc. v. Anheuser-Busch, Inc.*,
   1984 WL 6618 (D.N.J. Sept. 25, 1984) .....................................................................24, 25

*In re Phenylpropanolamine (PPA) Prods. Liability Litig.*,
   214 F.R.D. 614 (W.D. Wash. 2003) .............................................................................15

*Photochromic Lens Antitrust Litig.*,
   2014 WL 1338605 (M.D. Fla. 2014) .............................................................................22

*Pickett v. Iowa Beef Processors*,
   209 F.3d 1276 (11th Cir. 2000) ...................................................................................22

*In re Plastics Additives*,
   2010 WL 3431837 (E.D. Pa. 2010) ..............................................................................42

*In re POM Wonderful LLC*,
   2014 WL 1225184 (C.D. Cal. 2014).........................................................................14, 15

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013) .....................................................................................38

*Ramirez v. United Rentals, Inc.*,
   2013 WL 46648 (N.D. Cal. 2013) ................................................................................19

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) .......................................................................................16

*Sethavanish v. ZonePerfect Nutrition Co.*,
   2014 WL 580696 (N.D. Cal. 2014) ..............................................................................13

*Smith v. Univ. of Wash., Law Sch.*,
   233 F.3d 1188 (9th Cir. 2000) .....................................................................................43

*Somers v. Apple*,
   258 F.R.D. 354 (N.D. Cal. 2009).........................................................................36, 38, 40

*In re Taco Bell Wage & Hour Actions*,
   2011 WL 4479730 (E.D. Cal. 2011)..............................................................................10

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ...........................................................................16, 24

*In re TFT-LCD Antitrust Litigation*,
    267 F.R.D. 583, 607-08 (N.D. Cal. Mar. 28, 2010) ...............................................38

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2012 WL 6708866 (N.D. Cal. 2012) ......................................................................34

*United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers*
    *Int'l Union v. ConocoPhillips Co.*,
    593 F.3d 802 (9th Cir. 2010) ...................................................................................18

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2010) ..................................................................................... *passim*

*In re Wal-Mart Stores, Inc. Wage & Hour Litig.*,
    2008 WL 413749 (N.D. Cal. 2008) .........................................................................13

*Wiener v. Dannon Co.*,
    255 F.R.D. 658 (C.D. Cal. 2009) ............................................................................21

*Wiesfeld v. Sun Chem. Corp.*,
    84 F. App'x 257 (3d Cir. 2004) ...............................................................................40

*Xavier v. Philip Morris USA Inc.*,
    787 F. Supp. 2d 1075 (N.D. Cal. 2011) ......................................................10, 12, 13

*Yordy v. Plimus, Inc.*,
    2014 WL 1466608 (N.D. Cal. 2014) .......................................................................19

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012).....................................................................................27

*Zinser v. Accufix Research Inst.*,
    253 F.3d 1180 (9th Cir. 2001) ...................................................................................9

**Statutes**

California Cartwright Act ......................................................................................................7

**Rules**

Fed. R. Civ. P. 23(a) ...................................................................................... *passim*

Fed. R. Civ. P. 23(a)(3).........................................................................................21

Rule 23(a)(4) ..........................................................................................................22

Rule 23(b)(2)...............................................................................................43, 44, 45

Rule 23(b)(3) .................................................................................................. *passim*

Rule 23(c)(2)(B)..................................................................................................................10

**Other Authorities**

Daniel L. Rubinfeld, "Reference Guide on Multiple Regression", *Reference Manual on
    Scientific Evidence*, Federal Judicial Center (3d. ed. 2011). ..............................................36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# INTRODUCTION

This case is brought by a single plaintiff who purchased a single item of NFL apparel (a San Diego Chargers jersey) manufactured by one of 69 companies that held licenses to manufacture NFL apparel during the class period.

That single plaintiff seeks to represent many thousands (and perhaps millions) of class members who purchased (i) literally thousands of different apparel products (ranging from jerseys to t-shirts to hats to sweaters to baby sleepwear, to name just a few) (ii) at widely different price points (ranging from a few dollars to several hundred dollars) (iii) from thousands of different retailers (ranging from Nordstrom's to Walmart to stadium shops).  And plaintiff would include in his proposed class *all* purchasers of NFL-licensed apparel during the class period, even though only *35 percent* of those sales were in product categories subject to Reebok's exclusive rights, the principal focus of plaintiff's complaint.  Plaintiff's motion fails to address the fact that *65 percent* of purchases by members of the proposed class were of products available from *multiple* licensees.

Plaintiff maintains that the impact on this vast array of indirect purchasers of the two challenged agreements – the limited exclusive rights granted to Reebok and the NFL's decades-old practice of collectively licensing intellectual property – can be established by common proof.  That is demonstrably untrue.  None of the elements of plaintiff's antitrust claims presents a common issue for this breathtakingly broad class; individual issues overwhelmingly predominate.  Indeed, plaintiff's principal expert admitted that he could not even confirm that all members of the proposed class had suffered injury in fact – *i.e.*, that each had paid a higher price for apparel than he or she would have paid in the absence of the challenged agreements.  If anything, the extensive record evidence submitted with this Opposition demonstrates that many consumers affirmatively *benefited* from the challenged agreements, thus creating a conflict of interest within the proposed class.  Under these circumstances, plaintiff cannot satisfy the commonality, typicality, or adequacy requirements of Rule 23(a), much less the predominance requirement of Rule 23(b)(3).

More fundamentally, plaintiff has offered no basis for identifying the members of his proposed classes, a crucial prerequisite for class certification.  His class definitions are fatally ambiguous, and there are no data sources from which one could identify the vast majority of purchasers

of NFL-licensed merchandise during the class period.  Self-identification of class members would not solve this problem; even if such an approach were legally permitted, it would not be feasible under the circumstances presented here.  The current and former plaintiffs in this case had no independent recollection of the prices of their purchases and did not retain receipts.  Plaintiff has no answers to any of these challenges.

For these and other reasons addressed in the pages that follow, plaintiff's motion for class certification should be denied.

## BACKGROUND

### A.   The NFL and Its Licensing Program

The National Football League is an association of 32 member clubs that collectively produce an entertainment product known as "NFL Football."  Each club operates a football team that competes with another NFL team on the field once a week during the season but cooperates closely with the other clubs throughout the year to market and present their joint product.  Gertzog Dec. ¶ 3.  Each club owns marks and logos used on the team's uniforms and in its operations, as well as by the NFL in its marketing efforts.  *Id.* ¶ 4.  Since 1963, the NFL and its member clubs have licensed their marks collectively through National Football League Properties ("NFL Properties").  *Id.* ¶ 6.

NFL Properties does not manufacture merchandise or sell it to end-users.  Instead, NFL Properties licenses club marks (as well as marks of the NFL itself, such as Super Bowl logos) to third parties that in turn use them in manufacturing pennants, mugs, t-shirts, hats, baby bibs, oven mitts, and thousands of other items.  *Id.* ¶ 7.  This case concerns the licensing of NFL club marks for use on a subset of NFL licensed products described in the complaint as "apparel," which "includes all wearable items of clothing, such as jersey's, hoodies, t-shirts, sweaters, fitness wear, and head wear."  Dkt. No. 66 ¶¶ 1, 3.  While it is undisputed that plaintiff's description of apparel includes thousands of different products, it is equally evident that the plaintiff and his experts are inconsistent and unclear on the parameters of that term.  *See* Gertzog Dec. ¶ 8; Ludwin Dec. Ex. I at 87-89, 90, Ex. F at 15-18, Ex. G at 138-41, *see also id.* Ex. H (Villa's judgments on what is and is not apparel).

During the putative damages period, as many as 69 different licensees held licenses to manufacture NFL-logoed products that appear to fall within plaintiff's definition of "apparel."  Stiroh

1    Rep. ¶ 40; *see also* Gertzog Dec. ¶ 15.[1]  One of those licensees was Reebok.  It held exclusive rights to

2    use NFL marks only on jerseys, hats, and certain types of athletic footwear, and non-exclusive rights to

3    use the marks in many other product categories.  Gertzog Dec. ¶ 14.  In each of the many categories

4    outside Reebok's limited exclusive rights, varying combinations of multiple licensees had rights to use

5    the marks.  Stiroh Rep. ¶ 41; Gertzog Dec. ¶¶ 14-15.  Product categories in which Reebok had exclusive

6    rights accounted for approximately 35 percent of NFL-licensed apparel manufactured during the

7    damages period.  Stiroh Rep. ¶ 106.  Numerous popular apparel categories – including the single largest

8    selling category, t-shirts – were manufactured and distributed by multiple licensees.  Gertzog Dec. ¶ 14.

9            The Reebok license was entered into on May 24, 2001, following a broad evaluation by

10   NFL Properties of its licensing arrangements that revealed significant deficiencies, including under-

11   investment by licensees in innovation, product quality, and variety; a failure by licensees to market

12   products effectively; and a resulting stagnation in sales.  Gertzog Dec. ¶¶ 10-14; Katriel Dec. Ex. 1.

13   NFL Properties revamped its licensing program, adding and expanding the rights of some licensees,

14   electing not to renew others, and designating certain categories for exclusivity, a status intended to

15   create an incentive for investment in new products, improvements in design and quality, and expanded

16   marketing.  Gertzog Dec. ¶¶ 13, 16.

17           The incentives afforded by the limited exclusivity provided to Reebok resulted in a

18   variety of investments.  Reebok launched new and expanded lines of apparel products, including new

19   and expanded offerings for women.  *Id.* ¶ 16; Warren Dec. ¶¶ 5-7, 9.  It also introduced product

20   improvements such as seamless jerseys, wicking features, compression technology, and new types of

21   antimicrobial, heat dispensing, and high-stretch fabrics.  Warren Dec. ¶ 6.  And it implemented more

22   effective marketing and distribution.  *Id.* ¶ 5.  Retailers (the customers of the licensees) and consumers

23   (the customers of the retailers) benefited from the availability of more and improved products.  The NFL

24   benefitted from better promotion of its entertainment product through wider distribution of more

25

26   [1] Of those 69 licensees, 28 manufactured bottoms, fleeces, footwear, hats, jerseys, juvenile items, knits,
     outerwear, sleepwear, and wovens during the damages class period.  Gertzog Dec. ¶ 15; Stiroh Rep. ¶ 40
27   & n.31.  The remaining 41 licensees manufactured products such as belts, gloves, ties, scarves, and
     scrubs that appear to fall within plaintiff's definition of apparel.  *Id.*

28

---

attractive, higher quality products bearings NFL marks, as well as from the royalties earned on increased sales of licensed merchandise.  Gertzog Dec. ¶¶ 16, 18; Stiroh Rep. ¶¶ 74-79.

After implementation of the new licensing arrangements, average wholesale prices of some licensed apparel items increased; average prices of others decreased.  Stiroh Rep. ¶¶ 118-25.  As discussed below, there are no comprehensive data available on retail prices, but what data do exist show similar variations in pricing for different products at the retail level as well.  Stiroh Rep. ¶ 47.  There was, of course, no price increase (or decrease) for the many products that had simply not existed previously.  Royalty rates paid by NFL Properties' licensees varied according to product type and other factors.  For some products, the royalty was zero.  Stiroh Rep. ¶¶ 100-02.

The Reebok license expired by its terms in 2012.  NFL Properties then awarded to Reebok's competitor, Nike, a limited exclusive license to use NFL marks on certain apparel items, but the scope and terms of that license are different from those of Reebok's license – for example, hats are no longer an exclusive category – and Nike's product offerings are different from those of Reebok. Gertzog Dec. ¶¶ 19-21.

**B.    Sales of Licensed Products to End Users**

This is an indirect purchaser action.  Dkt. No. 66 ¶ 1.  Plaintiff and members of the classes he seeks to represent did not purchase licenses to use NFL club marks.  Nor did they purchase apparel from Reebok or other NFL licensees.  Instead, they purchased licensed merchandise from third-party *retailers* that had purchased the goods either from licensed manufacturers or from intermediate distributors that had purchased from the manufacturers.  Dkt. No. 66 ¶¶ 5, 78.  None of these retailers (or intermediate distributors) is alleged to have participated in the challenged agreements.

NFL-licensed merchandise is sold by a wide variety of retailers, including mass-market retailers like Walmart, high-end retailers such as Nordstrom's, mid-level department stores like Kohl's, specialty retailers like Dick's Sporting Goods or Sports Authority, and many small retailers.  Gertzog Dec. ¶ 22; Stiroh Rep. ¶ 39.  Licensed merchandise is also available through online retailers, although the volumes sold through that channel were significantly less during the damages period than they are today.  Gertzog Dec. ¶ 23.  Reebok sold its products to different retailers at different prices based upon sales volumes, timing of order placement, competition, and other market conditions.  Warren Dec. ¶ 11.

1   Each retailer set its own prices for the merchandise it sold.  Warren Dec. ¶ 12; *see also*

2   Gertzog Dec. ¶ 24.  Many products were distributed with "Manufacturer's Suggested Retail Prices"

3   ("MSRPs"), but retailers were free to charge different prices, and many did so.  Warren Dec. ¶ 12.

4   Former plaintiff Dang, for example, bought a jersey from an online retailer for $37.49; that product had

5   an MSRP, reflected on the tag still attached to the jersey, of $260.  Ludwin Dec. Ex. J at 4-5, Ex. B at 3.

6   Many retailers offered discounts from their own standard prices through periodic sales, coupons, or

7   rewards programs.  Such price adjustments also varied substantially by retailer and over time.  Warren

8   Dec. ¶ 12; Stiroh Rep. ¶¶ 165-66.

9   There is no comprehensive source of transaction-specific data on retailers' sales of

10  licensed apparel to end users.  Plaintiff has offered no such evidence, and defendants are aware of none.

11  Nor has plaintiff cited any source that would identify every consumer (or most consumers) who

12  purchased licensed NFL apparel during the damages period.  Although discovery has been open for over

13  a year, plaintiff has taken no discovery to obtain such data or even to confirm their existence.  Ludwin

14  Dec. ¶ 21.  Plaintiff's expert testified that he *assumes* that some data on retail prices are available

15  through third parties, but he did not check to see if that was the case.  *Id.* Ex. F at 165-66, 169-70.

16  Defendants' experts *have* checked and confirmed that comprehensive retail data are *not* available on

17  class members' purchase transactions or the prices that they paid.  Stiroh Rep. ¶¶ 153-59; *see also*

18  Bucklin Rep. ¶ 87.

19  **C.     The Named Plaintiff**

20  There have been two named plaintiffs in this case, Michael Villa and Patrick Dang.  Villa

21  is an avid San Diego Chargers fan who lived in Orange County and now resides in Hawaii.  Ludwin

22  Dec. Ex. G at 8-10, 14, 23, 25-27, 29; Dkt. No. 89 ¶ 2.  Dang, who has since withdrawn from the

23  litigation, lives in the Bay Area.  Ludwin Dec. Ex. A at 4; Dkt. No. 80.

24  Villa and Dang each based his claim on a purchase of an NFL jersey, one of thousands of

25  apparel items bearing NFL marks.  A jersey resembles the uniform top that players wear on the field,

26  typically including a player's name and/or number.  Gertzog Dec. ¶ 9.  A jersey therefore offers an

27  association with NFL football going beyond that offered by a hat or scarf – items that reflect only a

28  team's logo and/or colors.  *Id.*  During the class period, Reebok (which had the exclusive license in the

---

1   jersey category) offered many different types of jerseys with differing levels of quality and at different

2   wholesale price points.  The most inexpensive jerseys were sold by mass retailers.  The more expensive

3   jerseys were available through specialty sports stores and other higher-end retailers.  Warren Dec. ¶ 7.

4          Villa owns a Chargers jersey bearing the name of Darren Sproles, a former Chargers

5   player.  Ludwin Dec. Ex. C at 3; Dkt. No. 89 ¶ 2.  He claims to have bought the jersey from Dick's

6   Sporting Goods in October 2009, Dkt. No. 89 ¶ 2, but he did not retain a receipt for this purchase or the

7   original price tag.  Ludwin Dec. Ex. G at 108.  Instead, he searched his bank statements over a period of

8   three years and found one debit-card purchase at Dick's Sporting Goods, which he inferred must reflect

9   the jersey purchase.  *Id.* at 107, 109-10.  Villa could not recall whether any other items were included in

10  the $87 total charge recorded on his bank statement, nor did he recall the price of the jersey, although he

11  agreed that the $87 must have included tax.  *Id.* at 103-104, 111-12, 120-21.  After his deposition, Villa

12  contacted Customer Service at Dick's Sporting Goods and obtained an email confirming his purchase of

13  an item described as "NFLCHARGER/C" for a "total" paid of $87.  Ludwin Dec. Ex. L.

14         Villa testified that he would not have considered *any* other item of NFL merchandise as a

15  substitute for that jersey, even at a significantly lower price.  Ludwin Dec. Ex. G at 135-37; *see* Dkt.

16  No. 89 ¶ 5.  He wanted to make his jersey purchase only at a sports specialty retailer, and he was

17  unwilling to consider any of the lower-priced Darren Sproles Chargers jerseys that were then available

18  from mass-market retailers.[2]  He would not have considered a jersey (or anything else) with the logo of

19  a different NFL team.  Ludwin Dec. Ex. G at 75.  He suggested in a declaration that if the price were "a

20  lot" less, he might have been interested in buying a jersey with Sproles' name and the logo of a team for

21  which Sproles played after he left the Chargers, but he later testified that the price of such jerseys would

22  have to be at least $50 less than the price of his Chargers jersey for him to consider one.  Dkt. No. 89

23  ¶ 6; Ludwin Dec. Ex. G at 154-55.

---

25  [2]  Ludwin Dec. Ex. G at 76-77, 132-33.  Villa's jersey was in an intermediate quality tier; it was of

26  higher quality (and hence cost the retailer more) than a jersey available from a mass-market retailer but
    did not have all of the quality characteristics (materials, fabrication, and design largely identical to the

27  jerseys worn in games) of the most expensive jerseys, for which the MSRP was three times what Villa
    paid.  Warren Dec. ¶ 14.

28

1    Villa also purchased hats.  Ludwin Dec. Ex. G at 55.  He considered buying a Chargers

2    hat but bought "baseball" hats instead; he chose the latter because of "the way they fit on [his] head."

3    *Id.* at 57.  He is not a baseball fan (or a fan of any baseball team) and does not even recall which teams'

4    logos were on the hats he bought.  *Id.* at 23, 55, 58, 83.

5    The original named plaintiff, Patrick Dang, claims to have purchased a Dallas Cowboys

6    jersey with the number 9 (Tony Romo's number).  Ludwin Dec. Ex. D at 3, Ex. B.  In interrogatory

7    answers, Dang stated that he bought the jersey in November 2011 for $79.67.  Ludwin Dec. Ex. A at 3-

8    4, Ex. D at 3-4.  Despite repeated requests that this jersey be made available for inspection, only a

9    photograph was provided, which showed a price tag indicating an MSRP of $260.  Ludwin Dec. ¶ 9 &

10   Ex. B at 3.

11   At his request, Dang was voluntarily dismissed from this case, subject to the stipulation

12   that he complete his response to outstanding discovery.  Dkt. No. 78 at 2-3.  On October 22, 2014,

13   plaintiff's counsel served "amended" discovery responses stating that Dang no longer possessed the

14   Cowboys jersey.  Ludwin Dec. Ex. E at 3.  After defendants inquired about this surprising development,

15   plaintiff's counsel reported that the jersey had been given away.  Ludwin Dec. ¶ 11; *see also id.* Ex. M

16   at 2.  Plaintiff's counsel then served another set of amended responses stating that Dang had actually

17   paid only $37.49 for the jersey, not $79.67 as he had represented in his initial interrogatory answers, and

18   disclosing that Dang possessed several additional items with NFL club logos.  Ludwin Dec. Ex. J at 3-6,

19   Ex. K at 3.  Plaintiff's counsel has claimed that Dang is unable to appear for deposition, so defendants

20   have had no opportunity to investigate the circumstances under which Dang made his alleged purchases.

21   Ludwin Dec. ¶ 18.

22          **D.    Plaintiff's Motion and Supporting Evidence**

23   Plaintiff's motion seeks certification of two classes:  a class of "California" purchasers to

24   assert claims for damages or restitution under the California Cartwright Act and UCL, and a nationwide

25   class to assert a claim for injunctive relief under the federal Sherman Act.  Dkt. No. 88 at i.  The class

26   period for the proposed damages class runs from October 25, 2008, to April 1, 2012.

27   Plaintiff's motion rests almost entirely on the reports of two retained experts; very little

28   other evidence is offered.  One expert, Bruce Isaacson, oversaw an online survey of California residents,

conducted in mid-2014, to assess (a) the extent to which those who purchased apparel bearing NFL logos during the prior year would have considered different products and (b) whether such purchasers would have bought something different if the prices of the products they bought had been higher.  *See* Isaacson Rep. ¶¶ 55-71.  Plaintiff's other expert, Russell Mangum, opines that Isaacson's survey establishes that all products within the proposed class definition are in a single common antitrust "relevant market."  *See* Mangum Rep. ¶¶ 42-49.

In fact, Isaacson's survey was not designed to measure whether products bought by survey respondents were substitutes *for each other* (and hence would all fall into a single, common relevant market).  To the extent that his results bear on that question, they indicate that consumers do *not* view items of apparel bearing different teams' marks (*e.g.*, a Chargers jersey and a 49ers jersey) as substitutes, which suggests that those products compete in *different* markets.  *See* Bucklin Rep. ¶¶ 63-66; Stiroh Rep. ¶¶ 177-78.  More generally, various flaws in Isaacson's survey render its results invalid and biased; among many other problems, the survey drew on respondents who were ten times more likely to have purchased NFL apparel than the population as a whole.[3]

Mangum also opines that it should be possible to develop and implement computerized models that would (a) measure the impact of the Reebok agreement on the wholesale prices of apparel, (b) measure the extent to which any wholesale price overcharges were "passed through" by retailers to the prices they charged consumers, and (c) measure the damages suffered by each class member.  Mangum has not created or tested any such models.  Nor has he taken steps to confirm that it would be possible to implement such hypothetical models in this case or that such models would be scientifically valid.  *See* Stiroh Rep. ¶¶ 143-46, 153-62.  Indeed, although he identified a variety of necessary data inputs for such models (including data on actual retail prices paid by class members), he has not confirmed that such data inputs exist or would be available to him.  *Id.*

---

[3] Isaacson hired a survey firm to implement the survey.  The responses indicate that the firm targeted a group that was much more likely than average to buy NFL merchandise.  *See* Bucklin Rep. ¶¶ 17-19.  Isaacson was apparently unaware of this limitation, which biased the results.  Ludwin Dec. Ex. I at 71; Bucklin Rep. ¶¶ 20-22.

Mangum admitted that he has not confirmed that all members of the proposed class suffered injury in fact – *i.e.*, that all (or nearly all) class members paid a higher price than they would have paid in the absence of the challenged agreements.  Ludwin Dec. Ex. F at 63, 125-27.  Nor does he claim that his contemplated models, if implemented, would be capable of proving injury-in-fact for all class members.  *Id.* at 126.  Rather, his proposed models would focus exclusively on *averages*; they could not identify which individual class members were adversely affected and which were not.  Stiroh Rep. ¶ 132.

Nor does Mangum offer *any* opinion about competitive effects of the challenged *horizontal* agreement of the NFL clubs to license their marks jointly.  Ludwin Dec. Ex. F at 38.  For example, he did not consider whether the joint licensing arrangement, standing alone, has had the *same* impact (if any) on prices of goods bearing the marks of all 32 NFL clubs, a requirement for demonstrating the availability of common proof of class-wide impact.  Stiroh Rep. ¶¶ 83-96.  Instead, the horizontal agreement is relevant to his analysis only insofar as it is a necessary prerequisite, in his view, to Reebok's limited exclusive license.  Ludwin Dec. Ex. F at 48-49.

## ARGUMENT

To meet his burden under Rule 23, plaintiff must demonstrate compliance with each of the four requirements of Rule 23(a) and at least one of the three grounds for a class action under Rule 23(b).  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2549 (2010); *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  In addition, plaintiff "must demonstrate that an identifiable and ascertainable class exists."  *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009).

Rule 23 is far more than a pleading standard; the Supreme Court has mandated a "rigorous analysis" of plaintiff's proffered evidence supporting class certification, even if that analysis "entail[s] overlap with the merits of the plaintiff's underlying claim."  *Comcast Corp v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *see Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

Because plaintiff's motion offers little or no evidence on key elements of the class certification inquiry, it bears mention that "it is Plaintiffs' initial burden" to meet the standards of Rule 23, and the evidence on which plaintiff relies to satisfy that burden "should [be] proffered with Plaintiff['s] moving papers in order to afford Defendants a full and fair opportunity to respond."  *In re*

*Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *15 (N.D. Cal. 2010). Plaintiff's failure to meet his initial burden cannot be remedied on reply; courts generally follow the rule that "new evidence or analysis presented for the first time in a reply will not be considered." *In re Taco Bell Wage & Hour Actions*, 2011 WL 4479730, at *7 (E.D. Cal. 2011) (declining to consider supplemental expert declaration and report filed as part of plaintiff's reply in support of class certification); *see also In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) (same); *In re Fla. Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 683-84 (S.D. Fla. 2012) (same).

## I.      Plaintiff's Proposed Classes Are Not Ascertainable.

Plaintiff "must demonstrate that an identifiable and ascertainable class exists." *Mazur*, 257 F.R.D. at 567. A clear, definite, and objective class definition is necessary to delineate the scope of the claims at issue and to determine whether each element of the Rule 23 inquiry is satisfied *as to that class*. Moreover, the class definition must be one that can be feasibly applied to identify class members. Certification is inappropriate "where ascertaining class membership would require unmanageable individualized inquiry." *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011).

As the court explained in *Xavier*, "[t]he class definition must be clear in its applicability so that it will be clear later on whose rights are merged into the judgment, that is, who gets the benefit of any relief and who gets the burden of any loss." *Id.*; *see also Deitz v. Comcast Corp.*, 2007 WL 2015440, at *8 (N.D. Cal. 2007) ("The problem of ascertainability is the inability for future courts to ascertain who was and was not bound by the judgment."). Ascertainability is also important to ensure compliance with the notice requirement of Rule 23(c)(2)(B), which protects due process rights of absent class members by giving them an opportunity to opt out and not be bound by any judgment. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593-94 (3d Cir. 2012). For a class certified under Rule 23(b)(3) – which plaintiff seeks here – such notice ordinarily must be given personally to each individual class member. *Id.*; *see Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175 (1974). This in turn requires an administratively feasible method of *identifying* class members.

"[S]ince it is Plaintiffs' initial burden to demonstrate the existence of an ascertainable class, such evidence should have been proffered with the Plaintiffs' moving papers." *In re Flash*

*Memory Antitrust Litig.*, 2010 WL 2332081, at *15 (denying class certification in part due to failure to demonstrate feasibility of ascertaining class members).  Here, plaintiff has offered neither a class definition with a definite scope nor any feasible method for identifying class members.  These issues are not even mentioned in plaintiff's motion.

### A.     Plaintiff's Class Definitions Lack Definite Criteria for Identifying Class Members.

Plaintiff's proposed class definitions lack clear and definite criteria for identifying class members.  Both proposed classes are defined as consisting of persons who "indirectly purchased . . . *any item of apparel* bearing the Intellectual Property of any of the NFL teams."  Mot. at i (emphasis added).  Plaintiff provides no metes and bounds for his term "apparel" and instead states that it "*includes all wearable items of clothing . . . .*"  Dkt. No. 66 ¶ 3 (emphasis added).  While the primary defect of the class definition is its staggering overbreadth, the definition is separately flawed because it is unclear.

The named plaintiff – who is presented as a "typical" consumer and should therefore be able to provide a consumer's common-sense view – was thoroughly confused about what his class definition does and does not include.  When shown pictures and descriptions of just a sample of items with Chargers logos, he identified as apparel some gloves, baby clothes, and scarves; he identified as *not* apparel other gloves, baby clothes, and scarves.  Ludwin Dec. Exs. G at 138-41, H at 15, 17, 55-56, 58.  And while he thought that hats were apparel, he thought that ear muffs and headbands were not.  *Id.* Ex. H at 36, 53.  Similarly, plaintiff's experts disagreed with one another as to whether the "cheesehead" hats cherished by Green Bay Packers fans constitute "apparel" and expressed uncertainty about other items.  Ludwin Dec. Exs. F at 17, I at 88; *see also id.* Ex. G at 138.[4]

As further discussed below, this is one of several fundamental problems resulting from plaintiff's effort to group together indirect purchasers of thousands of *different* apparel products, most of which are manufactured and sold under very different competitive conditions, and only one of which – a

---

[4] The term "apparel" is used in defendants' business, but not with any consistent meaning – and often in a narrower sense than what plaintiff apparently intends.  For example, NFL Properties' "Blitz" data – data reflecting royalties paid on the thousands of products licensed to use NFL marks – track many items plaintiff appears to regard as "apparel" (including hats and gloves) as "accessories" or in other non-apparel categories.  Gertzog Dec. ¶ 8; Dkt. No. 66 ¶ 3.

jersey – plaintiff actually bought.  Due to the ambiguity of the class definition, it is not even clear what products and purchasers it includes.  That defect alone is sufficient to warrant denial of the motion.  *See Mad Rhino, Inc. v. Best Buy Co.*, 2008 WL 8760854, at *3-4 (C.D. Cal. 2008) (denying certification where "Plaintiff's own representatives cannot consistently define" one of the terms in the definition).

### B.   Plaintiff Has Identified No Practical Means to Identify Class Members.

Plaintiff has also failed to demonstrate an administratively feasible means of identifying class members or the existence of records from which their identities can be ascertained.  Where the "information necessary to ascertain the class is not readily available, class certification is inappropriate." *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *14.

In most class actions, a defendant or third party possesses transaction records from which class members can be reliably identified.  Where such records do not exist and there is no other reliable method to identify class members, class certification is properly denied.  *See, e.g.*, *Xavier*, 787 F. Supp. 2d at 1089 (denying class certification on ascertainability grounds where there were "no defendant records on point to identify class members"); *Deitz*, 2007 WL 2015440, at *8 (no ascertainable class where defendant did not maintain records on types of devices owned by customers); *see also Marcus*, 687 F.3d at 594 ("where nothing in company databases shows or could show whether individuals should be included in the proposed class, the class definition fails" (collecting cases)).

Plaintiff has offered no evidence to establish that records exist from which class members could be identified.  Defendants possess no such records; class members made their purchases from third party retailers.  Plaintiff has made no effort to demonstrate that all (or even most) of those retailers possess records of their sales to consumers in California from which it would be possible to identify all, or even most, class members.  Indeed, plaintiff has not shown that he has a reliable way to identify even all of the *retailers* from which class members made their purchases.  *See* p. 41 n.19, below. [5]

---

[5] On reply, plaintiff may argue that an inference could be drawn from the fact that, *after* he filed his motion (and after the issue surfaced during his deposition), he was able to obtain from Dick's Sporting Goods a confirmation of his own purchase.  *See* p. 6, above.  That suggests that *one* retailer has *some* records of its sales from which *some* information may be available.  Even that retailer likely has no equivalent records for purchases made with cash.  (Villa bought his jersey with a debit card.)  And there (continued…)

As another judge of this Court recently observed, "even though there is no requirement that the named plaintiff identify all class members at the time of certification, that does not mean that a named plaintiff need not present some method of identifying absent class members to prevail on a motion for class certification." *Sethavanish v. ZonePerfect Nutrition Co.*, 2014 WL 580696, at *5 (N.D. Cal. 2014). The court found:

> Plaintiff has yet to present any method for determining class membership, let alone an administratively feasible method. It is unclear how Plaintiff intends to determine who purchased ZonePerfect bars during the proposed class period, or how many ZonePerfect bars each of these putative class members purchased. It is also unclear how Plaintiff intends to weed out inaccurate or fraudulent claims. Without more, the Court cannot find that the proposed class is ascertainable.

*Id.* at *6. Exactly the same problems exist here.

Numerous decisions in this Court have denied class certification in the absence of proof of records from which class members could be identified.[6] The few cases that have taken a different approach are unpersuasive, as demonstrated in Judge Conti's careful analysis in *Sethavanish*, 2014 WL 580696, at *5-6 (discussing and analyzing cases). Among other things, none solves the notice problem; it is impossible to provide proper notice to class members when no one knows who they are. Further, the primary alternative method of addressing identification of class members – permitting self-identification with appropriate proof of purchase – would not work in this case. Plaintiff has offered no evidence – and it would not be credible to assume – that proposed class members will possess receipts for purchases made as many as six years ago. The named plaintiff himself retained no such receipt. Ludwin Dec. Ex. G at 108. Because Villa used a debit card for his purchase, he was able to find – with extensive effort – evidence that he claims confirms it. *See* p. 6, above. But there is no indication that

---

is nothing in the record to indicate that all – or even most – retailers have records comparable to what Dick's Sporting Goods retained on Villa's purchase.

[6] *See Xavier*, 787 F. Supp. 2d at 1901; *Astiana v. Ben & Jerry's Homemade, Inc.*, 2014 WL 60097, at *3 (N.D. Cal. 2014); *Deitz*, 2007 WL 2015440, at *8; *In re Flash Memory Antitrust Litigation*, 2010 WL 2332081, at *16; *In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 2008 WL 413749, at *9 (N.D. Cal. 2008); *see also Holman v. Experian Information Solutions, Inc.*, 2013 WL 4873496, at *7 (N.D. Cal. 2013) (finding ascertainability satisfied because class members could be identified from defendant's records and distinguishing cases in which no such records existed).

1   more than a fraction of the proposed class would be able to come up with such documentation even if

2   they invested equivalent effort to obtain it.  People who paid cash would not even have that option.

3              Moreover, Villa had no independent recollection of the price he paid for his jersey.

4   Ludwin Dec. Ex. G at 120-21.  Dang's recollection, to which he attested in sworn interrogatory answers,

5   was of an amount double the price that he actually paid.  There is no reason to believe that other class

6   members could do any better.  So the option of having class members verify their claims through

7   affidavits, which has been accepted in a few cases, is not available.[7]  And since retail prices for identical

8   items vary dramatically, *see* Stiroh Rep. ¶ 47, there is no independent source for this information.

9              Finally, plaintiff has identified no manageable method to confirm that items prospective

10  class members claim to have purchased were in fact authentic NFL-licensed merchandise.

11  Counterfeiting is an endemic problem in this market.  *See* Gertzog Dec. ¶ 25; Warren Dec. ¶ 13; Stiroh

12  Rep. ¶ 190.  While counterfeits can be identified by an expert, most purchasers of such products likely

13  are unaware that their items are not authentic.  Plaintiff has identified no manageable method for

14  ensuring that any "self-identified" class is limited to buyers of genuine NFL-licensed apparel.

15             Given these challenges, the ascertainability challenge is unmanageable and class

16  treatment is unavailable.  *See, e.g.*, *In re POM Wonderful LLC*, 2014 WL 1225184, at *6 (C.D. Cal.

17  2014) ("In situations where purported class members purchase an inexpensive product for a variety of

18  reasons, and are unlikely to retain receipts or other transaction records, class actions may present such

19  daunting administrative challenges that class treatment is not feasible.").[8]

20

21

22  [7] Even if feasible, such an approach would be highly problematic, as "to accept as true absent persons'
    declarations that they are members of the class, without further indicia of reliability, would have serious

23  due process implications."  *Marcus*, 687 F.3d at 594; *see also Carrera v. Bayer Corp.*, 727 F.3d 300,
    307 (3d Cir. 2013) ("[a] defendant in a class action has a due process right to raise individual challenges

24  and defenses to claims, and a class action cannot be certified in a way that eviscerates this right. . . .").

25  [8] *See also In re Phenylpropanolamine (PPA) Prods. Liability Litig.*, 214 F.R.D. 614, 619 (W.D. Wash.
    2003) (plaintiff failed to meet the ascertainability requirement "[b]ecause the vast majority of putative

26  class members are unlikely to possess proof of purchase, and given the purportedly immense size of this
    class, the individualized inquiries surrounding class identification would be prodigious and would defy

27  the court's ability to effectively and efficiently manage the litigation").

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR        14                    Case No.: 5:12-cv-5481 EJD
CLASS CERTIFICATION

## II.   Plaintiff's Proposed Classes Do Not Satisfy the Requirements of Rule 23(a).

To obtain class certification, plaintiff must satisfy all four elements Rule 23(a) as well as the additional requirements of Rule 23(b).  One Rule 23(a) element – numerosity – is not contested here. Plaintiff has failed to satisfy any of the other three.

### A.   Plaintiff Has Not Demonstrated the Existence of Common Issues.

Rule 23(a) requires a showing that "there are questions of law or fact common to the class."  To satisfy this requirement, plaintiff must demonstrate the existence of at least one "common contention . . . of such a nature that it is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart v. Dukes*, 131 S. Ct. at 2551.  Plaintiff's motion, which discusses commonality only in conjunction with the separate predominance requirement of Rule 23(b)(3), proposes four "common" questions:  (a) existence of the challenged agreements, (b) identification of the relevant market, (c) existence of antitrust injury to class members, and (d) damages.  *None* of these is a common question satisfying the requirements of the Rule.

*Existence of the Agreements.*  Plaintiff's reliance on the existence of the challenged agreements as a "common question" is inexplicable.  This subject presents no "question" at all requiring resolution in this case and it therefore cannot be a "common question" for Rule 23(a) purposes.  These are not secret agreements later denied by the alleged conspirators.  They are contracts entered into in full public view and with widespread publicity over decades.  There is no common question about the existence of the challenged agreements or their content.  *See id.*

*Relevant Market.*  In citing as a "common question" the definition of the relevant market(s), plaintiff presents a different kind of straw-man argument.  He argues that there can be only one relevant market; therefore, he contends, it must present a common issue.  Mot. at 10-13.  That argument rests upon a false premise.[9]

---

[9] Plaintiff also argues that he is not required to offer a definition of the relevant market(s).  Mot. at 8-9. The law of this Circuit is otherwise.  *See County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001).

For purposes of analyzing the effect of a restraint *on a particular product* (for example, a San Diego Chargers jersey), it is certainly correct to say that the relevant market ordinarily will present a common question for all purchasers *of that product*. (That is why relevant market definition may be found to be a common question in cases involving homogeneous commodities or other products with little or no variation.) But plaintiff's proposed class consists of purchasers of thousands of different products. It is far from clear that the relevant market for one item of "apparel bearing the logo of an NFL team" (such as a Chargers jersey) will be the same as the relevant market for a completely *different* item of apparel bearing the logo of a *different* NFL team (such as a Green Bay Packers baby hat). *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995) (relevant market test considers, *inter alia*, whether consumers "view the products as substitutes").

Plaintiff's burden at this stage was to prove that the thousands of different items of "apparel" encompassed by his breathtakingly broad class definition are all in *the same* relevant market so that the relevant market question can be decided for all class members "in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. But neither plaintiff nor his experts have addressed that issue. Instead, they sought to prove that *other things* – such as NBA jerseys or Major League Baseball hats – should be *excluded* from what they *assume* to be a common market for all NFL apparel products.

Plaintiff and his experts interpret the results of the Isaacson survey as evidence that other apparel products (such as a Madison Bumgarner San Francisco Giants t-shirt) are not in the same relevant market as "NFL apparel" (such as a Frank Gore 49ers t-shirt). *See* Mangum Rep. ¶¶ 42-49. As described by Professor Randolph Bucklin, the Isaacson survey was deeply flawed and biased in multiple respects; among other things, it appears to have been directed at a subset of the population (NFL fans) particularly likely to give the answers plaintiff was hoping for, and key questions were phrased with an ambiguity that undermines the conclusions plaintiff draws from the responses. *See* Bucklin Rep. ¶¶ 13-62.[10] But if one disregards these fundamental flaws, treats the results of the survey as potentially

---

[10] Randolph E. Bucklin is Professor of Marketing and Faculty Chairman at the UCLA Anderson School of Business, where he holds the Peter W. Mullin Endowed Chair in Management, and is the co-editor of the *Journal of Marketing Research*. Bucklin Rep. ¶¶ 1-3, Exs. A-B. A summary of Professor Bucklin's opinions is provided in paragraphs 9 through 12 of his report.

meaningful, and views them through the lens of plaintiff's own approach to market definition, the survey results refute the suggestion that relevant market definition presents a common question.

Plaintiff's approach to interpreting the Isaacson survey results leads inevitably to the conclusion that items of NFL apparel with different team marks are in different relevant markets. If non-NFL apparel is not in the same relevant market as the item of NFL apparel that each respondent bought, it cannot be disputed that apparel with marks of *different* NFL teams are not in the same relevant market either. *See* Bucklin Rep. ¶¶ 63-66; Stiroh Rep. ¶¶ 95, 177-78. In fact, respondents to Isaacson's survey were substantially *less* likely to consider as an alternative apparel with the logo of a different NFL team than they were to consider apparel bearing *no NFL logos at all*. *See* Bucklin Rep. ¶ 65. Only a tiny number of respondents indicated that they considered items *from a different NFL team* in making their purchase decision – or that they would have done so had the price of their item been higher. *See id.*; Stiroh Rep. ¶ 178. In other words, someone shopping for a Chargers jersey might not have considered a Lakers jersey instead, but he would not be interested in a 49ers jersey either. That indicates, if anything, that definition of the relevant market is *not* a common question. *See* Stiroh Rep. ¶ 177.

Other aspects of Isaacson's survey results (putting aside the survey's many flaws) confirm that the relevant market question would not be common for the class. The conclusions plaintiff's experts draw from the survey results rest on the totals for all respondents. But once one looks at subsets of respondents associated with purchases of particular *types* of apparel, particular price ranges, or other differences, significant disparities emerge. *See* Bucklin Rep. ¶¶ 67-73.[11] Unsurprisingly, for example, non-fans (who represent a significantly larger proportion of the overall population than in Isaacson's sample, *see* Bucklin Rep. ¶ 20), were significantly more willing to view non-NFL apparel as acceptable substitutes. Bucklin Rep. ¶ 68.

---

[11] Isaacson gathered only limited information on these characteristics. For example, his only question about the type of product each respondent purchased divided the thousands of available items into only seven categories. *See* Bucklin Rep. ¶ 42.

1    Villa's experience demonstrates how plaintiff's approach to market definition does not

2    present a common issue.  His purchase of his Darren Sproles jersey mirrors the results of Isaacson's

3    study – both the aspects plaintiff trumpets and the aspects he ignores.  Villa made clear that he would

4    not, under any circumstances, have purchased an item of apparel without an NFL logo in place of his

5    beloved Chargers jersey.  Dkt. No. 89 ¶ 5.  But he was equally clear that he would not have purchased a

6    Broncos or Cowboys or Raiders jersey – even at a significantly more favorable price.  Ludwin Dec.

7    Ex. G at 60, 75, 135-37.  If plaintiffs' experts rely on this kind of response to exclude non-NFL apparel

8    from the relevant market for Villa's jersey, it excludes non-Chargers NFL apparel as well.

9    Further undermining any suggestion of commonality is Villa's approach to the selection

10   of hats.  In buying a hat, unlike a jersey, Villa's overriding consideration was not the opportunity to

11   display his loyalty to the Chargers; it was whether the hat was comfortable.  *Id.* at 57.  He considered a

12   Chargers hat as a potential substitute to a baseball hat, but rejected it on this ground.  *Id.*  Is Villa typical

13   in these respects?  Given the typicality requirement of Rule 23(a), his counsel cannot argue he is not.

14   If and when the Court considers market definition on the merits, defendants will show

15   that plaintiff's approach to defining the relevant market(s) is misguided.  The evidence will show that

16   many other types of merchandise (including items not bearing NFL club logos) are sufficiently close

17   substitutes to merit inclusion in the same relevant market(s).  At this stage, however, the question is

18   whether *plaintiff's* theory and evidence, on their own terms, present a common question.  *See United*

19   *Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union v.*

20   *ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (at class certification stage, court must determine

21   not whether plaintiffs' theory will prevail, but whether it presents a predominantly common question).

22   Here, plaintiff's experts and, indeed, plaintiff's own testimony show that the definition of relevant

23   market(s) does not present a question common to all proposed class members.

24   ***Antitrust Injury ("Impact").***  Plaintiff next argues that the question of whether class

25   members are adversely affected (*i.e.*, injured by a harm to competition) presents an issue common to the

26   proposed class.  Once again, plaintiff's argument misses the point and misunderstands the law.

27   Plaintiff cannot simply identify "Were all class members injured?" as a common

28   question.  In *Wal-Mart v. Dukes*, the Supreme Court made clear that this approach is *not* sufficient to

1    satisfy Rule 23(a).  A plaintiff cannot just identify a question; he must also demonstrate that the question

2    is susceptible to a common *answer*, established through common proof, that resolves the question as to

3    all class members "in one stroke."  131 S. Ct. at 2551; *see also Luiken v. Domino's Pizza, LLC*, 705 F.3d

4    370, 376-77 (8th Cir. 2013); *Yordy v. Plimus, Inc.*, 2014 WL 1466608, at *2-4 (N.D. Cal. 2014);

5    *Ramirez v. United Rentals, Inc.*, 2013 WL 46648, at *4 (N.D. Cal. 2013).

6                 The facts of *Wal-Mart v. Dukes* illustrate this point.  There, certification was sought for a

7    nationwide class of female employees who allegedly suffered discrimination in promotions.  The

8    evidence showed that Wal-Mart's promotion decisions were made at the regional and local level, so the

9    evidence needed to *prove* discrimination varied among employees or groups of employees in different

10   regions and localities.  The Supreme Court recognized that class members might have in "common" the

11   overarching question of whether they were all victims of discrimination, but that did not constitute a

12   "common question" for purposes of Rule 23(a) because it could not be resolved "in one stroke" for the

13   entire class through common evidence.  131 S. Ct. at 2551.

14                Similarly here, there is no common question of injury that can be resolved "in one stroke"

15   for all class members through common evidence.  As demonstrated above, identifying the relevant

16   market applicable to each class member's purchase – the first critical step in assessing whether there has

17   been an adverse effect on competition and a resulting antitrust injury to class members – is itself not

18   common.  Plaintiff's own theory and evidence suggest that the thousands of products included in the

19   class definition compete in at least scores, and probably hundreds, of different relevant markets.

20   Plaintiff makes no effort even to argue, much less prove, that impact can be proven through common

21   evidence for products that are not in the same market.

22                Take, for example, Villa, with his Chargers jersey manufactured by Reebok, and a

23   hypothetical consumer who bought a 49ers t-shirt manufactured by VF Imagewear.  As demonstrated

24   above, plaintiff has not shown that the relevant market for these two products is the same; if anything,

25   his approach to market definition strongly suggests that they are not.  Moreover, the t-shirt manufactured

26   by VF Imagewear was not manufactured and sold under the Reebok agreement that is the focus of

27   plaintiff's claim.  Whether Reebok's license for jerseys affected the prices of t-shirts manufactured by

28

VF Imagewear is debatable at best (*see* pp. 34-36, below); either way, antitrust impact presents a *different* question for t-shirts than for jerseys.

In the absence of proof that all purchases by class members fell within the same relevant market, there is no basis to assume that the net effects of the challenged agreements on competition are uniform, much less that the answer to the question of "impact" is a common one. Answering the question of impact as to Villa's jersey purchase will not resolve "in one stroke" the question of whether the purchaser of a 49ers t-shirt (or an Eagles apron or Dolphins baby slippers) also suffered antitrust injury.

*Damages*. Plaintiff does not, and could not, seriously contend that quantification of damages presents a common issue. This is not a case in which every class member paid the same price for the same product and therefore can be shown to have suffered exactly the same damages. *See generally* Stiroh Rep. ¶¶ 45-46, 142, 164-67. Plaintiff's arguments about damages do not suggest the complete absence of individualized damages issues; plaintiff merely argues that such individual issues do not *predominate*.

In sum, plaintiff has failed to satisfy his burden under Rule 23(a) to establish the existence of one or more common issues. Even after *Wal-Mart*, this burden is not heavy – even one substantial contested common issue can be sufficient – but where, as here, the requirement is not satisfied, class certification is improper.

### B.   Plaintiff's Claims Are Not Typical of the Claims of the Proposed Class Members.

To meet the typicality requirement, the "claims or defenses of the class representative must be typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The claims of the purported class representative need not be identical to the claims of other class members, but the class representative 'must be part of the class and possess the same interest and suffer the same injury as the class members.'" *Major v. Ocean Spray Cranberries, Inc.*, 2013 WL 2558125, at *3 (N.D. Cal. 2013) (Davila, J.) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).

In light of his overbroad class definition, plaintiff cannot satisfy this requirement here. The fact that Villa bought a jersey does not make him typical of the class as a whole. As in *Major*, "Plaintiff's proposed classes are so broad and indefinite that they encompass products that [he himself]

did not purchase." *Id.* at *4.  He cannot be found typical of such a class absent a showing that the claims of class members who bought all of those other products are "'fairly encompassed by [his] claims.'"  *Id.* (quoting *Falcon*, 457 U.S. at 156).  Plaintiff has made no such showing; nor could he do so.

Even if one assumes that Villa would be typical of a class of jersey purchasers, he is *not* typical of a class that includes thousands of items that he never bought or considered buying.  For example, he did not buy *any* of the thousands of items of NFL licensed apparel that were produced by manufacturers other than Reebok or that were not within the limited exclusivity of the Reebok agreement.  *See Major*, 2013 WL at 2558125, at *4-5 (no typicality where label on which the plaintiff's claim was based differed from that on other products she sought to include in the class); *see also Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp.*, 247 F.R.D. 156, 178 (C.D. Cal. 2007) (in antitrust case involving a variety of products, seven named plaintiffs failed to meet typicality requirement where there was "sufficient heterogeneity to indicate that proof that one Plaintiff was overcharged is not probative of whether other class members were overcharged"); *Wiener v. Dannon Co.*., 255 F.R.D. 658, 665-67 (C.D. Cal. 2009) (discussing cases in which a plaintiff who purchased one product failed to satisfy the typicality requirement as to different products).  Because plaintiff is not typical of the proposed class as a whole, that class cannot be certified.  *See Major*, 2013 WL 255825, at *3.

### C.    Plaintiff Is Not an Adequate Representative of the Proposed Classes.

Rule 23(a)(4) requires the party seeking class certification to demonstrate that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requires a showing, *inter alia*, that there is no conflict of interest between the named plaintiff and the claims he seeks to present and the actual interests of a significant number of class members.  *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997) ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.").  Plaintiff's motion offers nothing more than passing mention of this requirement, which he cannot satisfy.

It is well established that adequacy cannot be established where some class members have affirmatively benefitted from the challenged conduct.  *See Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) ("[A] class cannot be certified when its members have opposing

1   interests or when it consists of members who benefit from the same acts alleged to be harmful to other

2   members of the class."); *Bieneman v. City of Chicago*, 864 F.2d 463, 464-65 (7th Cir. 1988) (same);

3   *Allied Orthopedic Appliances*, 247 F.R.D. at 177-78 (same).  No one can adequately represent such a

4   class because the interests of class members are simply not aligned.

5          Even if one assumes *arguendo* that some members of the proposed classes have been

6   harmed by the challenged agreements, it is plain that those agreements have worked to the benefit of

7   others.  Because of the limited exclusivity awarded to Reebok, it was able to invest in the creation and

8   marketing of new products that had not been available at all.  This included, for example, a substantial

9   expansion in the line of apparel items designed for women.  Warren Dec. ¶ 9.  Regardless of whether

10  Villa was harmed by the Reebok agreement, if his sister was a fan and able for the first time to buy a

11  jersey actually designed to fit her – and there were 1,500,000 purchases of such new women's jerseys

12  just during the damages period – she was better off.  *See* Stiroh Rep. ¶ 76; Warren Dec. ¶ 9; *see also*

13  *Photochromic Lens Antitrust Litig.*, 2014 WL 1338605 (M.D. Fla. 2014) (adequacy not satisfied where

14  some members of class could benefit from challenged exclusive license).

15         Plaintiff's challenge to the "horizontal" agreement among the clubs to license their marks

16  jointly presents other conflicts of interest within the class.  That agreement also made possible many

17  products that would not exist otherwise.  Pursuant to the agreement, each licensee is required to make its

18  products available with the logos of all 32 clubs, precluding licensees from restricting their products to

19  only those bearing the marks of the most popular clubs.  The agreement thus ensured the availability of

20  products featuring logos of clubs with more limited followings.  As a result, the array of options

21  available for fans of the Buffalo Bills, Jacksonville Jaguars, and – most likely – the San Diego Chargers

22  would be much more limited if plaintiff's challenge to the joint licensing arrangement were to succeed.

23  *See* Stiroh Rep. ¶¶ 56-58 & Ex. 8.

24         Moreover, in the absence of joint licensing, the most popular clubs likely would have

25  charged royalties *higher* than the standard royalty rate NFL Properties charged for rights for all 32 clubs,

26  leading (under plaintiff's theory) to higher prices paid by consumers who bought apparel bearing the

27  marks of clubs like the Packers, the Steelers, or the Cowboys.  *See* Stiroh Rep. ¶¶ 84-86, 97-99.  Indeed,

28

---

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION                                                    22                            Case No.: 5:12-cv-5481 EJD

this was the implicit premise of the Cowboys' complaint that is plaintiff's *only* "evidence" of the competitive effects of the horizontal arrangement. *See* Stiroh Rep. ¶¶ 90-92.

Because at least some members of plaintiff's proposed classes affirmatively benefitted from the agreements he seeks to challenge, it follows that plaintiff – who seeks to eliminate those benefits – is not, and cannot be, an adequate representative of those classes.

## III.   Plaintiff's Proposed Damages Class Does Not Satisfy the Requirements of Rule 23(b)(3).

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.,* 521 U.S. at 623-24. Predominance is a "far more demanding" inquiry than the commonality inquiry under Rule 23(a) and must be satisfied with evidentiary proof. *Id.*; *see Comcast v. Behrend*, 133 S. Ct. 1426, 1432 (2013).

In an antitrust case, the plaintiff "must satisfy the predominance requirement with respect to three key elements of [his] claims":  (1) whether the challenged restraints violated the antitrust laws; (2) whether all (or nearly all) class members suffered injury as a result of the alleged violations; and (3) the amount of damages sustained as a result of the alleged violations. *In Re Optical Disk Drive Litig.*, 2014 WL 4965655, at *6 (N.D. Cal. 2014) (denying certification). "The fact that plaintiff may have established that common questions predominate with regard to some elements of some of the claims is not sufficient to support certification." *Astiana v. Ben & Jerry's Homemade, Inc.*, 2014 WL 60097, at *13; *accord In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 164-67 (N.D. Cal. 2001). Here, plaintiff has not demonstrated that common issues predominate for *any* element of his claims.[12]

---

[12] The factors that compel a finding that common issues do not predominate also compel a finding that the "difficulties likely to be encountered in the management" of this case render it unsuitable for class treatment under the superiority requirement of Rule 23(b)(3). *See Cal. v. Infineon*, 2008 WL 4155665 (N.D. Cal. 2008). As in *Infineon*, "[g]iven the numerous individual issues of fact at issue, and the numbers of class members, all of whom have divergent interests at stake, prosecution of the action as a class is likely to be an unmanageable, rather than a superior, method of litigation." *Id.* at *13.

1

A.      **Plaintiff Cannot Prove Harm to Competition on a Class-Wide Basis.**

2

Plaintiff cannot prove on a common basis the unreasonableness (*i.e.*, the illegality) of

3

either the horizontal agreement among the NFL teams or the vertical licensing agreement between NFL

4

Properties and Reebok.  In an effort to avoid this obligation, plaintiff asserts that both agreements are

5

*per se* unlawful.  But, as detailed in defendants' opposition to plaintiff's motion for partial summary

6

judgment, this is not a *per se* price-fixing case in which defendants' practices "would always or almost

7

always tend to restrict competition and decrease output," and the Supreme Court has already held that

8

*these specific NFL practices, including the specific Reebok agreement challenged in this case,* "must be

9

judged under the Rule of Reason," not the *per se* rule.  *Am. Needle, Inc. v. Nat'l Football League*, 560

10

U.S. 183, 186 (2010); *see* Dkt. 102 at 1.

11

Assessing the validity of the challenged agreements will require a full rule of reason

12

analysis.  "A restraint violates the rule of reason if the restraint's harm to competition outweighs its

13

procompetitive effects." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (citations

14

omitted).  Thus, plaintiff's burden at the class certification stage is to demonstrate that he can prove –

15

using common proof on a class-wide basis – that each agreement resulted in anticompetitive effects that

16

outweighed any procompetitive effects in each of the relevant markets.  *E.g.*, *Kottaras v. Whole Foods*

17

*Mkt., Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012) ("benefits must be offset against losses"); *Package Shop,*

18

*Inc. v. Anheuser-Busch, Inc.*, 1984 WL 6618 (D.N.J. Sept. 25, 1984) (denying class certification where

19

"the question of whether procompetitive effects outweigh the anticompetitive effects of the restraints

20

cannot be proved by common evidence.").

21

Plaintiff's required showing extends to the entire rule of reason analysis; he must

22

demonstrate that both the anticompetitive effects of the agreements *and* their procompetitive effects can

23

be fully evaluated using common proof.  *E.g.*, *Kottaras*, 281 F.R.D. at 24 (rejecting class certification

24

where plaintiff's expert "fail[ed] to account for the benefits of the merger (contrary to law and logic)");

25

*see also, e.g.*, *Lilly v. Jamba Juice Co.*, 2014 WL 4652283, at *7 (N.D. Cal. 2014) ("[i]n determining

26

whether common questions predominate, the Court identifies the substantive issues related to plaintiff's

27

claims (both the causes of action and affirmative defenses)"); *In re Google Inc. Gmail Litig.*, 2014 WL

28

1102660, at *21 (N.D. Cal. 2014) (individualized questions with respect to affirmative defense precluded finding that common issues predominated).

Plaintiff contends that the reasonableness of the challenged agreements can be evaluated through common proof based on his premise that a single relevant market, limited to NFL apparel, encompasses the thousands of different NFL apparel products (ranging from jerseys to hats to t-shirts to children's clothing). As discussed above (p. 17), plaintiff's own theories and evidence undermine his contention. Indeed, plaintiff's expert admitted that he did not make any inquiry to determine whether different NFL apparel products are in the same relevant market. Ludwin Dec. Ex. F at 55-56.

As described by Dr. Lauren Stiroh, plaintiff's analysis suggests hundreds of separate relevant markets, based on the myriad different NFL apparel products available for each of the 32 different teams. *See* Stiroh Rep. at ¶¶ 177-81.[13] There is no evidence – and no plausible theory – that the net competitive effects of the challenged agreements would be the same in all of these different markets, much less that those effects could be established on a common basis across the proposed classes. To the contrary, plaintiff's evidence suggests that the contours of these different markets vary widely. *See id.*

For example, the net competitive effects of the Reebok agreement might vary substantially between (i) a relevant market limited to Chargers jerseys in which a "typical" consumer, like Villa, would not consider any substitutes, and (ii) a relevant market for Chargers hats for which the same consumer (Villa) was willing to substitute hats bearing the marks of Major League Baseball teams. Stiroh Rep. ¶ 180. And the net effects might be different still in (iii) a relevant market for Chargers t-shirts, where Reebok had non-exclusive rights and faced competition from other licensees. *See id.*; *see also id.* at ¶¶ 115-16.

Similarly, the net competitive effects of the collective licensing arrangements might vary between these Chargers-related relevant markets and relevant markets associated with the apparel of

---

[13] Dr. Lauren J. Stiroh, Senior Vice President of NERA Economic Consulting, has extensive experience analyzing and testifying about class certification and damages issues in a wide range of antitrust and other matters. Stiroh Rep. ¶¶ 1-3, Ex. 1. Dr. Stiroh's opinions are summarized at paragraphs 13 through 33 of her report.

1   other NFL teams.  For example, the collective licensing of NFL marks (and accompanying obligations

2   on licensees to produce apparel for all 32 teams) may have provided more benefits to purchasers of

3   Chargers apparel (who might otherwise have had access to fewer choices) than to purchasers of Green

4   Bay Packers apparel, which is more broadly popular.  Stiroh Rep. ¶¶ 56-58 & Ex. 8.

5          In short, if there are multiple relevant markets, the net competitive effects of the

6   challenged agreements cannot be established through class-wide proof.  Stiroh Rep. ¶ 179.  Applying the

7   rule of reason to these agreements would require a relevant-market-by-relevant-market evaluation of

8   whether the anticompetitive effects (if any) of each agreement outweighed its procompetitive benefits,

9   such as increased product variety (including availability of new products not previously available),

10  improvements in quality, and – in some instances – price decreases.  *Id.*; *see, e.g.*, *O'Bannon v. Nat'l

11  Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 986-99 (N.D. Cal. 2014) (separately analyzing each

12  relevant market implicated by plaintiffs' claims).

13         Plaintiff's experts offer nothing to address this problem.  Mangum did not conduct any

14  analysis, identify any evidence, or propose any method to determine whether royalty rates for any

15  particular team would have been higher or lower in the absence of collective licensing.  Ludwin Dec.

16  Ex. F at 94.  He presented no evidence that each team's royalty rates would have moved in a common

17  fashion; to the contrary, he concedes that individual teams would have undertaken different strategies in

18  the absence of the collective licensing arrangements, *id.* at 43-44, meaning that the competitive effects

19  of the horizontal agreement on any team-specific relevant markets would have varied as well.  Stiroh

20  Rep. ¶¶ 84-86.

21         Nor does Mangum provide evidence that the reasonableness of the Reebok agreement can

22  be evaluated on a class-wide basis.  The fact that Reebok paid more for its rights than prior licensees or

23  that it obtained exclusivity for certain apparel categories (Mangum Rep. ¶ 27) does not establish net

24  anticompetitive effects in any relevant market.  A reduction in the number of licenses is not necessarily

25  anticompetitive; to the contrary, exclusive licenses are frequently deemed procompetitive.  *ZF Meritor,

26  LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) ("Exclusive dealing agreements are often entered

27  into for entirely procompetitive reasons, and generally pose little threat to competition."); *Omega Envtl.,

28  Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) ("There are . . . well-recognized economic

benefits to exclusive dealing arrangements, including the enhancement of interbrand competition."); Stiroh Rep. ¶ 71; *see also id.* at ¶¶ 67-80.

The *net competitive effects* of the reduction in licenses cannot be summarily established; that would require (among other things) a relevant-market-by-relevant-market application of the rule of reason. In fact, Mangum's focus on the reduction of the number of licensees suggests that the reasonableness of the Reebok agreement might be evaluated differently in a relevant market in which Reebok had exclusive rights (*e.g.*, a market that included Chargers jerseys) than in a market in which it *did not* have exclusive rights (*e.g.*, a market that included Chargers t-shirts). Stiroh Rep. ¶ 179.

**B.    Plaintiff Fails to Demonstrate a Common Method of Proving that the Proposed Class Members Suffered Injury.**

"'Antitrust impact' – also referred to as antitrust injury – is the 'fact of damage' that results from a violation of the antitrust laws." *In re High Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 565 (N.D. Cal. 2013). "To proceed with a class action, the plaintiffs must be able to establish, predominantly with generalized evidence, that all (or nearly all) members of the class suffered damage as a result of defendants' alleged anti-competitive conduct." *In re Optical Disk Drive Litig.*, 2014 WL 4965655, at *7. It is well established that "for cases involving antitrust violations, common issues do not predominate unless the issue of impact is also susceptible to class-wide proof." *In re High Tech*, 289 F.R.D. at 566; *accord In re Methionine Antitrust Litig.,* 204 F.R.D. 161, 164-67 (N.D. Cal. 2001) (denying certification of indirect purchaser class where "plaintiff has not demonstrated that injury in fact – an element essential to prove liability – can reasonably be proved on a class-wide basis").

"Where, as here, the plaintiffs are *indirect purchasers* there are two-steps to the predominance analysis." *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *7 (emphasis in original). Plaintiff must first establish that "*direct purchasers* paid an artificially inflated price" (or overcharge), and second that "the direct purchasers, in turn, *passed through* some or all of the inflated cost [*i.e.*, overcharge] to *indirect purchasers*." *Id.* (emphasis in original). Plaintiff has not demonstrated that he can establish either step through common evidence on a class-wide basis.

1.   **Plaintiff Fails to Demonstrate that the Impact of the Horizontal Agreement on Indirect Purchasers Is Subject to Common Proof.**

Plaintiff's expert argues that the collective licensing of NFL club marks adversely affected all proposed class members solely because it facilitated the vertical licensing agreement with Reebok.  Ludwin Dec. Ex. F at 22, 48-51.  But for plaintiff to succeed in his challenge to the collective licensing arrangement, he must offer common evidence of adverse impact from the *totality* of its effects, including those unrelated to the Reebok agreement.  For example, any such analysis would have to take into account impacts relating to all of the *other* 68 NFL Properties apparel licenses facilitated by collective licensing during the class period, none of which afforded exclusivity, the element that plaintiff challenges in the Reebok agreement.  Such an analysis would also have to take into account the many *benefits* that at least some class members enjoyed as a result of new products, greater product variety, or more favorable pricing, among others.  *See* Stiroh Rep. ¶ 52; *see also id.* at ¶¶ 48-80.

Mangum concedes that he has no evidence that the horizontal agreement, *standing alone*, had a common impact on class members or caused injury to any class member.  Ludwin Dec. Ex. F at 38, 91, 94.  Plaintiff has proffered no class-wide evidence suggesting any overcharge on royalty rates stemming from collective licensing.  And while Mangum *speculates* (Mangum Rep. ¶ 21) that collective licensing raised the costs of NFL apparel licenses, he identifies no common evidence that could so *prove* on a class-wide basis, much less show that any such cost increases were uniformly passed on, first to retailers (and/or distributors) and then to consumers.  Ludwin Dec. Ex. F at 38, 91, 94, 136.  To the contrary, Mangum concedes that his proposed regression analyses (discussed pp. 36-39, below) would do nothing to measure the effects of the horizontal agreement.  *Id.* at 91, 94, 136.

Mangum also concedes that in the absence of the collective licensing arrangements, (a) royalty rates for some teams might have been *higher* than those charged by NFL Properties during the class period and (b) some teams might have engaged in either increased or decreased licensing activities.  *Id.* at 43-44, 81-82.  In light of these team-by-team variations, there can be no class-wide method for determining which class members might have suffered antitrust injury from collective licensing – and which were actually *better off* because of that arrangement.  Stiroh Rep. ¶ 85; *see Allied*

*Orthopedic Appliances,* 247 F.R.D. at 169 (predominance requirement not met where "in the but-for world, some purchasers would have had available more favorable pricing, and others would not").

The significance of the differing – and in some cases potentially higher – royalty rates that teams would charge in the absence of collective licensing is confirmed by the dismissed 1995 complaint filed by the Dallas Cowboys against NFL Properties. Mot. at 14. Plaintiff characterizes the complaint's allegations as evidence that the clubs would compete with one another absent the collective licensing arrangements leading to competitive pricing. Mot. at 14. But the Cowboys' allegations, even if assumed to be true, refute the notion of common impact susceptible to class-wide proof. Instead, the Cowboys' allegations suggest that in the absence of the collective licensing, royalty rates would vary and the rates of certain teams – particularly of popular teams like the Packers, the Steelers, or the Cowboys – might have been higher, just as Mangum's testimony suggests. *See* Stiroh Rep. ¶¶ 90-92.[14]

> ### 2. Plaintiff Fails to Demonstrate that the Impact of the Vertical Agreement on Indirect Purchasers Is Subject to Common Proof.

Plaintiff also fails to provide a common means of establishing the impact of the vertical (Reebok) agreement on all (or nearly all) of the proposed class members. That showing requires a "common, formulaic method of proving *impact* across the varying circumstances of the individual members of the proposed class," and "market data and economic theory do not, on their own," constitute such a method. *Graphics Processors*, 253 F.R.D. at 503-04 (denying certification). Plaintiff offers no such "common, formulaic method" in his discussion of antitrust injury (Mot. at II.C). Indeed, Mangum concedes that the models that he envisions to estimate *damages* would not be designed to (and would not) prove common impact, and that some products may not have been subject to *any* overcharge resulting from the challenged agreements. Ludwig Dec. Ex. F at 124, 126-27. Nor could he suggest otherwise; his contemplated models would estimate only average overcharges that "cannot serve to

---

[14] Of course, nothing in the Cowboys' complaint against NFL Properties bears on whether the impact of the other agreement plaintiff challenges – the Reebok agreement – can be evaluated on a common basis. That complaint was filed half a decade *before* the Reebok agreement and twelve years before the damages period. It did not purport to challenge the vertical licensing arrangement. Rather, the challenge was strictly limited to the horizontal joint licensing arrangement, and focused on alleged adverse impacts on the Cowboys as a *licensor*.

1    establish that all (or nearly all) members of the class suffered damage." *In re Optical Disk Drive Litig.*,

2    2014 WL 4965655, at *8.

3            Plaintiff instead relies on (i) anecdotal evidence from which he incorrectly infers price

4    increases for two (and only two) products, (ii) unsupported argument that the Reebok agreement

5    "necessarily visited harm" on all purchasers of Reebok-manufactured NFL apparel, and (iii) speculation

6    that Reebok's prices might have created an "umbrella" effect that raised prices for NFL-licensed apparel

7    manufactured by dozens of *other* producers.  None of these arguments is sufficient to prove common

8    impact, and each is affirmatively contradicted by the record evidence.

9            ***Anecdotal Evidence of Claimed Price Increases***.  Plaintiff offers anecdotal evidence that

10   he claims shows that "increased consumer prices . . . were actually realized."  Mot. at 16-17.

11   Specifically, he cites evidence that, in his view, shows that the price of a "replica jersey" rose from $40

12   to $75, and that the price of "basic fitted caps" rose from $19.99 to $30.  This "evidence" does not

13   reflect (a) *a single* record of an actual transaction at these allegedly higher prices, (b) *any* information

14   about prices Reebok or retailers charged for other types of apparel (*e.g.*, t-shirts and fleeces), or (c) *any*

15   information about prices charged by any other manufacturer.  Plaintiff merely *assumes* that the price

16   increases that he infers from this anecdotal evidence *must* have been imposed on every purchaser of

17   every kind of NFL apparel.

18           Such an assumption does not satisfy plaintiff's burden.  To begin, these anecdotes rely on

19   a false premise – that the $40 jersey was in fact the same product as the $75 jersey.  Plaintiff cites

20   (inaccurately) the testimony of former NFL executive Mark Holtzman for the proposition that prices

21   rose, but omits the testimony's central passage:  consumers were "paying for more quality and . . .

22   consumer[s] [were] getting more value than what they did before; and if there was an increase in price

23   for the garment, it was more than offset by the increase in quality."  Ludwin Decl. Ex. N at 91; *see also*

24   Stiroh Rep. ¶¶ 134-35.  As defendants explained in detail in their opposition to plaintiff's motion for

25   partial summary judgment, a price increase, standing alone, is not proof of anticompetitive effects.  *See*

26   Dkt. 102 at 12.  In any event, even accurate anecdotes about two products could not establish that prices

27   for *all* NFL apparel products increased.  Stiroh Rep. ¶ 134.

28

1    In contrast to Mangum's assumptions and speculation, Stiroh conducted a rigorous

2    empirical and economic analysis of wholesale prices actually charged by Reebok.  Her analysis

3    demonstrates that after the Reebok agreement, prices for some products *decreased*.  Stiroh Rep. ¶¶ 117-

4    25 & Exs. 11-12.  In the single largest category of apparel – t-shirts – average prices for Reebok's high-

5    and medium-quality products were lower in every year of the damages class period than the average

6    price for such products prior to the Reebok agreement.  *See* Stiroh Rep. Exs. 11(A)-(B).  Similarly, in

7    the medium quality tier, Reebok's average prices for bottoms, fleeces, knits, outerwear, and t-shirts were

8    lower in every year from 2002 to 2011 than average prices for apparel in those categories in 1999 (when

9    Reebok was not a licensee).  *Id.*  In light of such differences, the thousands of different items of NFL

10   apparel encompassed in the proposed class are not amenable to one overarching model or theory of price

11   effects.  Stiroh Rep. ¶¶ 122, 125.

12       Even within a particular category of apparel, it is not possible to evaluate the effect of the

13   Reebok agreement on a common basis.  Stiroh Rep. ¶ 121.  For example, while Reebok's prices for

14   high-quality fleeces were higher during the damages class period than prices in 1999, prices for

15   medium-quality fleeces were lower during that period than in 1999.  *Id.*  Similarly, prices for some

16   Reebok hats were higher during the damages class period than in 1999, but prices for other hats were

17   lower.  *Id.*  As a result, Stiroh determined:

18
19           This variation in Reebok's prices relative to prices in 1999 across product
             type, quality, and year suggests that 1) demand and supply conditions for
20           each type and quality of product varied over time; 2) any impact caused by
             the vertical agreement must have varied across members of the proposed
21           class; or 3) both.

22   Stiroh Rep. ¶ 122.  Even for *identical* products, "wholesale prices for the same NFL-branded apparel

23   sold by Reebok varied across retailers, which likely reflects retailers' varying levels of bargaining power

     with Reebok."  Stiroh Rep. ¶ 130.

24       Courts routinely deny class certification where there is variation in the *direction* of price

25   changes.  *See, e.g.*, *In re Fla. Cement & Concrete Antitrust Litig.*, 2012 WL 27668, at *9 (S.D. Fla.

26   2012) (denying class certification where "empirical analysis demonstrates that some class members'

27   prices increased, while many [c]lass members' prices stayed the same or decreased); *Kottaras*, 281

28

1  F.R.D. at 23-25 (similar); *Flash Memory*, 2010 WL 2332081, at *10 (no predominance where plaintiff's

2  expert failed to take into account price variations in regression analysis).  More broadly, in light of this

3  variation, any analysis of alleged wholesale price overcharges – or any downstream pass-through of any

4  overcharges to consumers – would require the type of "reseller-by-reseller analysis" that makes class

5  certification "problematic."  *Graphics Processing*, 253 F.R.D. at 505.

6          ***Assertion that the Reebok Agreement "Necessarily Visited Harm" on All Purchasers.***

7  Plaintiff argues that restricting an NFL license "to only Reebok for an *overwhelming majority* of the

8  market *necessarily visited harm* on end-user consumers who bought apparel containing the very team

9  trademarks that were the subject of Defendants' restraints."  Mot. at 17 (emphasis added).  This

10  assumption rests on Mangum's hypothesis that because the Reebok agreement "foreclosed competitors

11  from the downstream market," the "price paid by the consumers and the choice available to them

12  decreased in comparison to what would have been the case absent the agreement." *Id.* (citing Mangum

13  Rep. ¶ 67).  As courts have consistently recognized, such untethered "economic theory" cannot be used

14  to prove common impact.

15          Mangum offers no probative evidence for his sweeping hypothesis.  Instead of

16  investigating actual prices paid by consumers during the damages class period, he relies on a July 2001

17  chart, prepared by Reebok *before it had obtained the challenged license* (and *seven years* prior to the

18  start of the purported class period), considering proposed increases in "suggested" retail prices.  *See*

19  Mot. at 17-18 (citing Mangum Rep. ¶ 67.d ).  Such suggested prices often varied dramatically from the

20  prices retailers actually charged – as Dang's personal experience shows.  *See* p. 5, above; *see also*

21  Warren Dec. ¶ 12.  Reebok's guesses about future prices that might be charged by third parties are not

22  evidence of prices actually paid by proposed class members.

23          Notably, this is not the first time Mangum has tried to rely on this type of evidence; his

24  prior effort was squarely rejected.  *See Florida Cement*, 2012 WL 27668, at *9 (rejecting Mangum's

25  reliance on proposed price increases to demonstrate common impact).  This court should do the same.[15]

---

[15] For the same reasons, plaintiff's three-page discussion (Mot. at 14-16) of how the NFL and Reebok *intended* and expected prices to rise as a result of the Reebok agreement is off the mark; evidence of an

(continued…)

Plaintiff's "necessary harm" argument also depends on the erroneous belief that Reebok held what Mangum calls a "dominant" share – 81 percent – of NFL apparel sales during the damages class period; that "overwhelming" share, as plaintiff describes it, permitted Reebok to control pricing for, and cause a common impact on, sales of all NFL apparel.  Mangum Rep. ¶¶ 17, 71; Mot. at 17.  But Mangum did not *calculate* Reebok's share of NFL apparel sales during that period; he made only a rough estimate based on erroneous assumptions.  Mangum Rep. ¶ 17; Stiroh Rep. ¶ 114.

In fact, Reebok's actual share of NFL-licensed apparel sales during the damages class period was 62 percent – far from "an overwhelming majority" and far lower than the 81 percent figure that Mangum assumed.  Stiroh Rep. ¶ 114.  (That number was easily calculated using data provided to plaintiff long before Mangum prepared his report.  Ludwin Dec. ¶ 20.)  And the share of product sales in the categories for which Reebok had exclusive rights was far lower; only 35 percent of sales were in these categories.  Stiroh Rep. ¶ 106.  The difference is due in part to a fundamental error in Mangum's assumptions:  Reebok did *not* have exclusive rights for the single largest (*i.e.*, "key") category of NFL apparel sold during the damages class period (t-shirts) as well as other high-selling categories (*e.g.*, fleeces).  Warren Dec. ¶ 4; Gertzog Dec. ¶ 14.

Moreover, Reebok's share of sales – the source of its alleged market power – varied substantially for different product categories.  For example, during the damages class period, Reebok accounted for over 98 percent of sales of hats and jerseys, but only 13 percent of all sleepwear sales and only 29 percent of outerwear sales.  Stiroh Rep. ¶ 108.  These variations reflect an additional reason why the impact, if any, of the Reebok agreement would vary across product category.  *Id.*  In short, there is no plausible economic theory supporting the conclusion that Reebok had such a dominant market position that all (or nearly all) purchasers of NFL apparel, including purchasers of products made by dozens of other manufacturers, would have been injured by an increase in Reebok's wholesale prices.  Stiroh Rep. ¶¶ 105-06.

---

intention to raise prices is not evidence of either actual price increases or a common impact on all class members.  *See Florida Cement*, 2012 WL 27668, at *9 ("Plaintiffs have not shown how the price increase announcements – even if they were intended to affect all customers across-the-board – constitute common evidence through which impact on the individual class members can be proven").

1        *The Umbrella Pricing Theory*.  Mangum posits an "umbrella pricing" theory in which he

2   assumes that other manufacturers inevitably would have followed Reebok's lead if it had increased

3   wholesale prices, thereby injuring all purchasers of NFL apparel.  He offered this hypothesis without

4   analyzing *actual* wholesale prices charged by the 68 other manufacturers of NFL apparel, much less

5   *actual* retail prices paid by purchasers of those products.  His theory fails to demonstrate common

6   impact for three reasons.

7        *First*, plaintiff has provided no common basis for determining how Reebok's pricing of a

8   large number of different NFL apparel products would have affected the pricing decisions of 68 other

9   licensees with respect to a differing set of products.  As the Ninth Circuit held in rejecting the umbrella

10  theory as a matter of law for Sherman Act claims:

> [T]he result of any attempt to ascertain with reasonable probability whether the non-
> conspirators' prices resulted from the defendants' purported price-fixing conspiracy or
> from numerous other pricing considerations would be speculative to some degree.  When
> the fact of a multi-tiered distribution system is imposed upon the above complex set of
> variables, the obstacles to intelligent inquiry become nearly insurmountable.

14  *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1341 (9th

15  Cir. 1982) (footnotes omitted).  Recognizing these inherent difficulties, Judge Illston held that the bar

16  against umbrella damages extends to Cartwright Act claims.  *In re TFT-LCD (Flat Panel) Antitrust*

17  *Litig.*, 2012 WL 6708866, at *7 (N.D. Cal. 2012).  Judge Illston's reasoning on this point is persuasive,

18  but whether or not an umbrella pricing theory is legally cognizable under the Cartwright Act,[16] the

19  obstacles to calculating the effects, if any, of the pricing umbrella are "nearly insurmountable" and

20  "unacceptably speculative and complex."  *Petroleum Prods.*, 691 F.2d at 1341.  This means that *proving*

---

22  [16] Plaintiff's reliance on *City of San Mateo v. CSL Ltd.*, 2014 WL 4100602 (N.D. Cal. 2014), for the
23  contrary argument is misplaced.  That case did not involve class certification or indirect purchasers;
    instead it involved a single direct purchaser in an undisputed single product market in which defendants
24  were able to restrict product supply.  *Id.* at *3, *6.  In those narrow circumstances,  Magistrate Judge
    Corley held that plaintiff was not barred "as a matter of law" from pursuing an umbrella theory.  *Id.* *5-
25  6.  Nothing in *San Mateo* suggests that merely positing umbrella pricing effects, without more, can
    satisfy plaintiff's burden here, especially in the absence of evidence of constraints on the supply of the
26  68 other licensees of NFL apparel.  *Compare id.* at *6 (discussing how a restraint on supply can elevate
27  prices throughout the market), *with* Stiroh Rep. ¶¶ 109-11 (licensees constituting 38 percent of NFL
    apparel sales during the class period had neither incentive nor pressure to reduce supply).

1  umbrella damages here – even if legally permissible – would require individualized inquiry into the

2  "numerous other pricing considerations" influencing the pricing of the 68 non-defendant licensees.  *Id.*

3  *Second*, there is no basis in economic theory or literature for the proposition that the

4  competitive behaviors of dozens of manufacturers comprising 38 percent of relevant sales can be

5  assumed away for purposes of evaluating injury on a class-wide basis.  Stiroh Rep. ¶¶ 109-11.  In non-

6  exclusive categories like t-shirts, licensees other than Reebok had a *majority* of market share and,

7  importantly, faced no capacity restraints.  Stiroh Rep. ¶¶ 111, 115.  If prices increased above competitive

8  levels, these other licensees could easily increase supply, which in turn would bring market prices back

9  down to competitive levels.  There is accordingly no basis for assuming that Reebok had any ability to

10  raise prices in these categories above competitive levels.  *Id.*

11  *Third*, the limited nature of Reebok's exclusivity rights creates an insurmountable

12  contradiction for Mangum.  If all NFL apparel items are in the same market (as Mangum argues, *see*

13  Mangum Rep. ¶ 61), non-exclusive NFL apparel products (*e.g.*, t-shirts and fleeces) must be substitutes

14  for products for which Reebok has exclusivity (*e.g.*, jerseys); in that situation, price competition

15  presented by the non-exclusive products would constrain the prices of the exclusive products. *See* Stiroh

16  Rep. ¶ 110.  On the other hand, if all NFL apparel products are *not* in the same relevant market (*e.g.*, if

17  Reebok's NFL t-shirts do *not* compete with NFL t-shirts produced by other licensees, Ludwin Dec.

18  Ex. F at 207-08), there can be no class-wide method for evaluating impact using common proof; instead,

19  that impact would vary, at the very least, on a product-by-product basis.  Stiroh Rep. ¶¶ 115-16.

20  Because plaintiff has failed to establish a reliable method for proving common impact on

21  indirect purchasers as a class, the motion for class certification should be denied.  *Somers v. Apple*, 258

22  F.R.D. 354, 361 (N.D. Cal. 2009); *accord Graphics Processing*, 253 F.R.D. at 50 ("Without a reliable

23  method for proving common impact on all purchasers of defendants' products throughout the chain of

24  distribution, indirect-purchaser plaintiffs cannot proceed as a class."); *Flash Memory*, 2010 WL

25  2332081, at *13; *Infineon*, 2008 WL 4155665, at *11-12.

26  **C.    Plaintiff Cannot Prove Damages on a Common Basis.**

27  On the issue of quantification of damages, plaintiff's task was to demonstrate that he

28  could reliably calculate, using common evidence and on a class-wide basis, both (i) the alleged

"overcharges" at the wholesale level (*i.e.*, from Reebok or another manufacturer) to distributors and retailers and (ii) the extent to which any such overcharges were "passed-on" to all purchasers of NFL apparel in the proposed class.  *See, e.g.*, *Somers*, 258 F.R.D. at 358 (describing two-step requirement for calculating damages).  As the Supreme Court recently confirmed in *Comcast*, plaintiff must demonstrate that he *actually possesses* (not just envisions) a model for proving damages that is reliable and consistent with his theory of harm.  *See Comcast*, 133 S. Ct. at 1432.  Plaintiff has failed to do so.

### 1. Plaintiff Fails to Demonstrate that He Can Calculate on a Class-Wide Basis Overcharges on Distributors or Retailers.

Mangum suggests that he could use a regression analysis to "estimate the overcharge in the wholesale price after the vertical agreement with Reebok for all class members."  Mangum Rep. ¶¶ 81, 83.  A regression analysis is "is a statistical tool for understanding the relationship between two or more variables."  Daniel L. Rubinfeld, "Reference Guide on Multiple Regression" at 1, in *Reference Manual on Scientific Evidence*, Federal Judicial Center (3d. ed. 2011).  If properly used, a regression can demonstrate whether, and to what extent, a change in one variable is correlated with changes in another variable (such as, for example, price).  Although regressions are often used to calculate overcharges in antitrust cases, their reliability depends critically on the quality of the variables used to construct the model, the availability of sufficient data to perform a robust analysis, and the ability of the model to account for other variations in the marketplace.  *See* Stiroh Rep. ¶ 145.  Mangum's proposed regression is unreliable in all three respects.

*First*, Mangum has not only failed to run his model (even in an "illustrative" fashion); he has not even *constructed* it.  His report purports to list variables that he "would include" in the model, *see* Mangum Rep. ¶¶ 88, 89, but he testified that his list would be better described as "variable types" because he had not determined the variables that he might actually use, Ludwin Dec. Ex. F at 109.  Thus here, as in *Kottaras*, "not only had [plaintiff's expert] not yet performed a single regression, but also he could not even tell the Court the precise analyses he intended to undertake."  281 F.R.D. at 26.  Accordingly, Mangum's "proposed methodology is not sufficiently developed to meet Plaintiff's burden of showing that common questions predominate over individual ones, as required by Rule 23(b)(3)."

1    *Id.*; *see also Comcast*, 133 S. Ct. at 1433 (plaintiff must demonstrate possession of a proper model at the

2    class certification stage).

3            *Second*, Mangum did not look at any actual data in proposing a regression model, and his

4    proposed model does not reflect consideration of the data produced in this case. *See* Ludwin Dec. Ex. F

5    at 103 ("With the data I have, I have not explained the model that I can run.") This approach is not

6    consistent with accepted economic practices; the economist must undertake sufficient work to confirm

7    that the regression would be valid in light of the data available. Stiroh Rep. ¶ 144. Here, the situation is

8    even worse: Mangum did not even investigate whether the data needed for his envisioned wholesale

9    overcharge regression are in fact available. For example, he says that he "plan[s] to use the invoice data

10   of Reebok and other NFL licensees spanning periods before, and during the NFLP-Reebok agreement,"

11   Mangum Rep. ¶ 83, including data from years before 2001, Ludwin Dec. Ex. F at 96, but he failed to

12   determine whether any NFL licensee retained "invoice data" from 13 years ago or longer, *id.* at 97-98.

13           Mangum's approach to evaluating common impact stands in sharp contrast to the expert

14   work in cases highlighted by plaintiff's brief. In *In re CRT*, plaintiff's expert, in her opening report, did

15   far more than Mangum to demonstrate the reliability of her proposed damages methodologies with

16   "evidentiary proof," *see Comcast*, 133 S. Ct. at 1432; she offered specific regression models and, as

17   Judge Conti pointed out, she provided studies using those models "[that] include[d] over forty data sets

18   from twenty-nine different entities, for more than 131 million CRTs, in a data range spanning seven

19   years and more than 100 million price and cost observations." *In re CRT*, 2013 WL 5391159, at *8.

20           Similarly, in *In re TFT-LCD Antitrust Litigation*, Judge Illston noted that plaintiff's

21   expert had analyzed and incorporated into her proposed regression models "transactional data from

22   some defendants, as well as (separately) price data from DisplaySearch, a third-party market research

23   firm," and had conducted 53 studies using her proposed regression models and these data. *See* 267

24   F.R.D. 583, 607-08 (N.D. Cal. Mar. 28, 2010). Judge Illston distinguished this analysis from the expert

25   "analysis" offered in *Somers*, where plaintiffs' expert "ha[d] not yet developed a model or worked with

26   any data in the context of this case." *Id.* at 604 (quoting 258 F.R.D. at 360).

27           Like the expert in *Somers*, Mangum did not develop an actual model or work with any

28   data in the context of this case; on this basis alone, class certification should be denied. *Somers*, 258

F.R.D. at 361 (denying class certification where plaintiff's expert "proffered no specific economic model and has examined no set of data"); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification."); *compare Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (*Comcast* requirements satisfied because defendant had itself presented a reliable model for calculating damages that utilized data in its possession).  Mangum's description of his contemplated model is no different in substance from the "vague five-paragraph long collection of proposals" that the *Somers* court rejected.  258 F.R.D. at 361.  Discovery has been open for well over a year, and plaintiff "should be able to provide more than promises at this late stage of the litigation." *Graphics Processing*, 253 F.R.D. at 506.

At least equally problematic is the fact that, as Stiroh explains, much of the data Mangum assumes will be available does not exist, and even where certain data are available, they suffer from problems that undermine his proposed approach.  Stiroh Rep. ¶ 145.  There is no evidence – or even reason to believe – that the retailer-specific invoice and cost data central to Mangum's contemplated model would be available.  Reebok's data are limited to its own sales (and include no pre-2001 data of the kind that Mangum would need, as Reebok was not selling NFL apparel in the years immediately preceding the 2001 license agreement), and the NFL does not possess data on retailer-specific prices.  Gertzog Dec. ¶ 24; Warren Dec. ¶ 11; Ludwin Dec. ¶ 21; Bucklin Rep. ¶ 84; Stiroh Rep. ¶ 11-12, 143.  Plaintiff did not obtain data from any licensee other than Reebok, and he provides no reason to believe that other licensees kept either invoice or cost data from more than thirteen years ago.  Mangum also has no workable proposal to calculate the "but-for" royalty rates that would have existed absent the Reebok agreement.  He would be trying to compare royalty rates that varied by licensee and product prior to 2001 with rates paid by Reebok on products that in many cases did not even exist prior to 2001, and there is no reason to believe that he could be even partially successful in this effort.  Stiroh Rep. ¶ 145.

Even apart from the absence of necessary data, the model that Mangum envisions fails to account for the procompetitive effects of the challenged agreements and thus on its face cannot estimate reliably the *net competitive* effect of those agreements.  *See Kottaras*, 281 F.R.D. at 23-24 (proposed regressions cannot support class certification where "they fail to take into account any *benefits* customers may have received").  His proposed model would not account for factors such as improved

1   product quality, new product offerings, and improved promotional activities generated by the challenged

2   agreements.  Stiroh Rep. ¶¶ 50, 141; Bucklin Rep. ¶¶ 80-85.  This would render the model incapable of

3   addressing the central damages question of this case:  the *net* impact of the challenged agreements on

4   proposed class members.  *See id.*; *see also Kottaras*, 281 F.R.D. at 23-25.[17]

5           Moreover, Mangum proposes simply to *assume* that the impacts of the challenged

6   agreements were common to all product categories.  The damages model envisioned in his report would

7   estimate a *single* overcharge percentage applicable to every product sold to every class member during

8   the proposed damages period.  Ludwin Dec. Ex. F at 123.  But where, as here, prices for some products

9   are increasing and others are *decreasing* – even within the same product category (*see* pp. 31-32, above)

10  – a model must be able to account for differing effects on a product-by-product basis.  Stiroh Rep.

11  ¶¶ 122, 125.  Mangum's potential model would not do that.[18]

12          **2.      Plaintiff Fails to Demonstrate That He Can Calculate Pass-Through on a
                     Class-Wide Basis.**

13          Tracing an alleged overcharge through multiple levels of purchasers – the second prong

14  of the damages calculation – is a particular challenge for indirect purchaser plaintiffs at the class

15  certification stage.  *See Somers*, 258 F.R.D. at 358 ("[T]he problem of proof in an indirect purchaser

16  case is intrinsically more complex, because the damage model must account for the actions of innocent

17  intermediaries who allegedly passed on the overcharge." (quoting *Graphics Processing*, 253 F.R.D.

18  at 507)).  Plaintiff has not come close to satisfying his burden on this point.

19

20  _____

21  [17] As Bucklin explains, Mangum's argument that any improvements in quality or other relevant factors
    could be captured by Reebok's increased costs ignores the potential that the efficiencies of the Reebok

22  agreement actually reduced costs below pre-2001 levels, Bucklin Rep. ¶ 83, and assumes that all quality
    improvements are reflected by cost increases, an implausible claim for products such as apparel where

23  demand is highly dependent on design, Bucklin Dec. ¶ 82; Stiroh Rep. ¶ 141.

24  [18] Mangum also proposes to use monthly average prices by category.  Ludwin Dec. Ex. F at 104.  Where
    – as here – individual prices vary even within such categories, that approach "obscures individual

25  variations over time among the prices that different customers pay for the same or different products that
    appear in the data."  *Flash Memory*, 2010 WL 2332081, at *10; *see also Florida Cement*, 2012 WL

26  27668, at *10 (analysis by Mangum that "aggregates all customers" "limits the ability to reach a
    meaningful conclusion regarding whether common proof can be used to establish impact to individual

27  members of the purported class").

28

Mangum's preferred method of calculating pass-through is a second regression analysis. Ludwin Dec. Ex. F at 147-48. But again, because he did not actually create a model to calculate pass-through, *id.* at 160, he has failed to meet the requirements of Rule 23. *See Wiesfeld v. Sun Chem. Corp.*, 84 F. App'x 257, 264 (3d Cir. 2004) (finding insufficient an expert declaration that "contains only bare conclusions and a statement that the expert 'proposes' to use a multiple regression model (which may not take into account all relevant variables)"). And again, although his report stated that the regression could be run "subject to availability of retail price data," he did not confirm that such data are available. Mangum Rep. ¶ 97; Ludwin Dec. Ex. at 165-66. Stiroh investigated this issue and determined that data necessary for Mangum's pass-through regression are not available. Stiroh Rep. ¶¶ 153-59.

Mangum's contemplated pass-through regression analysis suffers from additional flaws. Stiroh Rep. ¶¶ 163-68. He appears to propose a single pass-through model that would aggregate sales by all retailers, despite compelling evidence that any pass-through would have varied across retailers. Even identical NFL apparel products are sold by different retailers at different prices. Stiroh Rep. ¶ 47. Any pass-through model therefore would need at a minimum to account for differing pass-through by different retailers, again invoking the need to conduct "reseller-by-reseller analysis" that makes class certification "problematic." *Graphics Processing*, 253 F.R.D. at 505; *see also Optical Disc Drive Litig.*, 2014 WL 4965655, at *9 (N.D. Cal. 2014) ("badly flawed" proposed damages methodology "serves to highlight the challenges presented by [plaintiffs'] desire to bring what remains a very broad conspiracy claim, involving disparate products and class members who may not all be identically-situated").

Even for a specific retailer, any pass-through would vary across time and across products. Stiroh Rep. ¶ 165. For example, Dang paid only $37.49 for a jersey with an MSRP of $260, a discount of nearly 86 percent. Ludwin Dec. Ex. J at 5, Ex. B at 3. Nothing in Mangum's contemplated model purports to account for such discounted sales. Stiroh Rep. ¶ 166; *see also In re Google AdWords Litig.*, 2012 WL 28068, at *14 (N.D. Cal. 2012) ("where, as here, proof of restitution due each class member cannot be proved with relative ease, the court finds good reason to deny class certification").

In any event, there is no evidence that Mangum will be able to obtain the data he needs for a reliable pass-through regression; there is no evidence that he can identify even the universe of *retailers* that sold NFL apparel. At his deposition, apparently unaware that discovery has been open for

1    more than a year, Mangum testified that his "experience is that companies often produce much more

2    data once discovery starts."  Ludwin Dec. Ex. F at 100.  That simply begs the question.  It is plaintiff's

3    burden to demonstrate *now* that he has the ability prove his case on a class-wide basis.  *Comcast*, 133 S.

4    Ct. at 1432.[19]

5              Finally, Mangum's "N/N+1" formula approach is even more infirm.  This formula has

6    exactly one variable:  the number of retailers selling NFL apparel in an undefined area.  Mangum Rep.

7    ¶ 96.  Mangum opines, based on that formula (N/N+1) and a list of retailers in a Reebok document dated

8    over seven years before the start of the class period, that retailers would pass through over 97 percent of

9    any overcharges to consumers.  *Id.*  Mangum's formula has never been validated for a market such as

10   this; nor has it received professional acceptance among economists as a reliable, independent method of

11   calculating pass-through.  Stiroh Rep. ¶ 169; Ludwin Dec. Ex. F at 152-53; *see Daubert v. Merrell Dow*

12   *Pharm.*, 509 U.S. 579, 594 (1993) (reliability of expert opinion may depend on whether proposed

13   "technique or theory has been generally accepted in the scientific community"); *see also, e.g.*, *Am.*

14   *Honda Motor Co. v. Allen*, 600 F.3d 813, 818 (7th Cir. 2010) (excluding expert testimony; no indication

15   that the methodology had been accepted by anyone other than the expert).

16             Indeed, the N/N+1 formula is inconsistent with Mangum's own explanations of the

17   factors that govern pass-through.  He testified that the pass-through rate for a given product will vary

18   depending on whether consumers are willing to substitute other products (the "elasticity of demand" for

19   that product).  Ludwin Dec. Ex. F at 140-41.  He conceded, however, that his N/N+1 formula cannot

20   capture that factor.  *Id.*  As a result, his formula would yield the same pass-through rate for products

21   with very different "elasticities of demand" (and thus very different actual pass-through rates) sold

22

23   ───────────────
     [19] Pursuant to discovery requests, both the NFL and Reebok have produced data in their possession, but

24   it is of little value for pass-through calculations.  The NFL's data consist of aggregated royalty reports,
     which include neither information on retailer customers nor retail prices.  Gertzog Dec. ¶¶ 8, 24; Stiroh

25   Rep. ¶ 11.  Reebok's data reflect sales to specific retailers, but they do not include any retail prices, and
     of course Reebok's data are limited to sales of products manufactured by Reebok, and do not include

26   information about sales to retailers by the other apparel licensees.  Warren Dec. ¶ 11; Stiroh Rep. ¶ 12.
     In neither case do the data permit comparison of *wholesale* prices to *retail* prices – the crucial question

27   of a pass-through analysis.

28

1   through the same retailers.  *Id.*  That flaw alone renders the formula inappropriate and unreliable in

2   calculating pass-through on a class-wide basis.  Stiroh Rep. ¶ 171.

3          Plaintiff attempts to bolster his pass-through assumptions by reference to Mangum's

4   "Table 2," which he characterizes as reflecting "the actual pricing data produced in this case."  Mot.

5   at 21.  But Table 2 reflects wholesale *list* prices and *suggested* retail prices contained in a Reebok

6   *catalog*.  *Id.*  The *actual* evidence, available to Mangum at the time of his report, shows a wide variance

7   in the wholesale prices charged by Reebok, and the only evidence of retail prices in the record is

8   inconsistent with Mangum's table.  For example, the price that Dang paid for his Cowboys jersey shows

9   a difference of approximately $220 between the MSRP listed on the tag and the retail price that he

10  actually paid.  *See* Stiroh Rep. ¶ 166.  Again, Mangum has made this mistake before.  *See Florida*

11  *Cement*, 2012 WL 27668, at *9 (rejecting Mangum's reliance on "price lists" where he failed to

12  "conduct any significant analysis at the individual customer level to determine whether any price

13  changes were consistent across the putative Class"); *see also In re Plastics Additives*, 2010 WL

14  3431837, at *4-5 (E.D. Pa. 2010) (plaintiffs "cannot demonstrate antitrust impact on a basis common to

15  the class through reference to list prices and price increase announcements" where they "have done no

16  empirical analysis of the actual effect of the price increases upon which they rely").

17  **IV.   Plaintiff's Proposed Nationwide Injunctive Relief Class Does Not Satisfy Rule 23.**

18         Plaintiff also seeks certification under Rule 23(b)(2) of a nationwide "injunctive relief"

19  class of indirect purchasers.  This request should be denied.  Plaintiff has offered no evidence to support

20  the required findings under Rule 23(a) for any such class, which differs from the proposed damages

21  class in fundamental respects.  Nor has plaintiff demonstrated that common relief to address assertedly

22  common impacts on this class would be "appropriate" under Rule 23(b)(2).

      **A.   Plaintiff Has Made No Meaningful Showing Under Rule 23(a) for a Nationwide**
23               **Class Seeking to Enjoin a New Set of Licensing Arrangements.**

24         Plaintiff's failure to satisfy the requirements of Rule 23(a) with respect to the proposed

25  damages class extends in *at least* equal measure to the proposed Rule 23(b)(2) injunctive relief class.  In

26  many respects those problems are vastly greater with respect to the latter because the Reebok licensing

27  agreement, the primary subject of plaintiff's complaint, expired two years ago.

28

1    Plaintiff has made no effort to address the class certification factors as they would apply

2    to NFL Properties' current licensing arrangements.  Even if plaintiff had fully satisfied Rule 23(a) with

3    respect to a California-only class seeking damages arising from the Reebok agreement, major questions

4    would remain unanswered under Rule 23(a) with respect to the alleged *future* effects on customers

5    *nationwide* of the *different* set of licensing arrangements that exist today.

6    It is undisputed that the Reebok agreement expired on March 31, 2012.  Warren Dec.

7    ¶ 15; Gertzog Dec. ¶ 19.  Plaintiff obviously cannot seek to enjoin an expired agreement, nor would

8    class certification be appropriate for such a fruitless effort.  *See Smith v. Univ. of Wash., Law Sch.*, 233

9    F.3d 1188, 1193-95 (9th Cir. 2000) (affirming decertification in a Rule 23(b)(2) class action after claims

10   for injunctive relief became moot).  And because plaintiff has proffered no evidence of common harm

11   from the clubs' joint licensing arrangement *other than* its past role in making the Reebok agreement

12   possible, he has offered no basis for injunctive relief as to that arrangement either.

13   Plaintiff seeks to circumvent this problem by pointing to NFL Properties' current

14   licensing agreement with Nike, implicitly suggesting that the Court should assume that the Nike contract

15   is in all pertinent respects identical to the Reebok contract.  But plaintiff offers no *evidence* that the Nike

16   and Reebok contracts are the same, either in letter or effect; to the contrary, they are very different,

17   especially with regard to the scope of exclusivity they afford.  Gertzog Dec. ¶ 20.  For example, the

18   product category for hats is no longer exclusive; multiple licensees now have rights to manufacture hats

19   with NFL club marks.  *Id.*  In addition, Nike offers a revised array of products, as do other licensees;

20   there have also been significant changes in the distribution of licensees across apparel categories as well

21   as in the marketing methods for NFL licensed apparel.  *See* Gertzog Dec. ¶ 21; Bucklin Rep. ¶¶ 27-28.

22   Plaintiff's experts have offered no analysis whatsoever of alleged anticompetitive effects

23   of the Nike agreement or any other aspect of NFL Properties' current licensing arrangements.  Nor have

24   they opined that it is possible to assess on a common basis either the competitive effects of those

25   arrangements or their future impacts on class members (the pertinent question for injunctive relief).

26   Indeed, Magnum admitted that his analysis was limited exclusively to the effects of the expired Reebok

27   agreement.  Ludwin Dec. Ex. F at 218; *see also id.* at 54 (Mangum has not even "thought about

28   injunctive relief issues for right now").

Plaintiff also fails to offer evidence of common *nationwide* effects of the challenged agreements.  Both of plaintiff's experts acknowledged that their work was limited to impacts in *California* only.  *See id.*; Ludwin Dec. Ex. I at 10.  Neither suggests a basis to extrapolate his findings to customers nationwide.  *See* Bucklin Rep. ¶ 33.[20]

Without evidence addressing the market effects outside California of even the expired agreement, much less the current NFL licensing arrangements, plaintiff has failed to establish (a) that any members of this class are threatened with actual injury and hence have standing, (b) that there are any questions can be answered "in one stroke" for the entire nationwide class through common evidence, (c) that plaintiff Villa is typical of this broader class, or (d) that plaintiff can adequately represent this class.[21]

## B.   Certification Under Rule 23(b)(2) Would Be Improper.

If – and only if – plaintiffs could satisfy all elements of Rule 23(a), the Court would turn to the question whether "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2); *see also Wal-Mart v. Dukes*, 131 S. Ct. at 2541 (certification under Rule 23(b)(2) is appropriate "only when a single injunction . . . would provide relief to each member of the class").  No such finding can be made here.  The arrangements that plaintiff challenges do *not* "apply generally to the class . . . as a whole."  Even were the Court to accept the unsupported assumption that the Reebok and Nike contracts are the same for current purposes, it is beyond dispute that future buyers of many kinds of apparel, including those in such popular categories as t-shirts and hats, will buy products that are not subject to an exclusive license held by *anyone*.  And

---

[20] Mangum opines that the relevant geographic market for purposes of assessing the competitive effects of the challenged agreements is nationwide, Mangum Rep. ¶ 35, but neither he nor Isaacson performed any analysis to evaluate any effects outside California.  Ludwin Dec. Ex. F at 54; Stiroh Rep. ¶ 175.

[21] These defects could not be cured by limiting the injunctive relief class to California customers only.  Villa, who is no longer a California resident, cannot represent a California class that seeks only prospective relief.  *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014) (class representative must be a class member).  Moreover, plaintiff concedes that Rule 23(b)(2) certification is not available for a class that also seeks monetary relief.  Mot. at 25.

plaintiffs have identified no respect in which the clubs' joint licensing arrangement, standing alone, has had any general application that will adversely affect all members of the proposed class.

Nor has plaintiff shown that injunctive relief would be appropriate with respect to the class as a whole. *See id.* at 2557 ("The key to [a Rule 23(b)(2)] class . . . is the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." (internal quotation marks omitted)).  As shown above (pp. 22-23), members of plaintiff's proposed classes have diverse and even conflicting interests with respect to the challenged agreements. Many class members would be *harmed* by entry of an injunction that precluded the arrangements from continuing.  Certification under Rule 23(b)(2) is therefore improper.  *See Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 559 (C.D. Cal. 2012) (denying certification under Rule 23(b)(2) where "no single declaration or injunction sought would benefit the class as a whole" because some class members would not benefit from such relief).

## CONCLUSION

For the reasons stated above, the motion for class certification should be denied.

November 25, 2014

By:    /s/ Timothy Hardwicke
      TIMOTHY HARDWICKE

Timothy Hardwicke (pro hac vice)
GOODSMITH GREGG & UNRUH LLP
150 S. Wacker Drive, Suite 3150
Chicago, Illinois 60606
Telephone: (312) 322-1981
Facsimile:  (312) 322-0056
E-mail: thardwicke@ggulaw.com

Joshua N. Holian (Bar No. 211772)
LATHAM & WAKTINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 391-0600
Facsimile:  (415) 395-8095
Email: joshua.holian@lw.com

Respectfully submitted,
COVINGTON & BURLING LLP

By:    /s/ Derek Ludwin
      DEREK LUDWIN

Sonya D. Winner (SBN 200348)
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-6000
Facsimile:  (415) 591-6091
E-mail: SWinner@cov.com

Gregg H. Levy (*pro hac vice*)
Derek Ludwin (*pro hac vice*)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave. NW
Washington, D.C. 20004
Telephone: (202) 662-6000
Facsimile: (202) 778-5429
E-mail: GLevy@cov.com
E-mail: DLudwin@cov.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Michael J. Nelson (pro hac vice)
LATHAM & WAKTINS LLP
330 N. Wabash Ave., Ste. 2800
Chicago, IL 60610
Telephone: (312) 876-7700
Facsimile:  (312) 993-9767
Email: michael.nelson@lw.com

*Attorneys for Reebok International Ltd.*

*Attorneys for the NFL, NFL Properties, and
the Individual NFL Clubs*